MHW

RECEIVED
8-1-2008
AUG 1 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

John Phillips  Plaintiff,

v.

Nancy Brown, Timothy Speight, Tad Griffin,
Sgt. James Cooper (Robbins P.D.)
Susan Danielson, (Asst. Cook County
State's Attorney)
Kathleen Bankhead, (Asst. Cook County
State's Attorney)
Marcella Lipinski, (Asst. Public Defender)
Darrell L. Torr, (Asst. Public Defender)

**08CV4389**
**JUDGE COAR**
**MAG. JUDGE MASON**

## CIVIL RIGHTS COMPLAINT   "8-Part"
## UNDER 42 U.S.C. § 1983

NOW COMES Plaintiff, John Phillips, on his own, and prays that this Honorable Court will hear his complaint, in that there has been a "Denial Of Liberty Interests" without, "Due Process" of law, Committed against him in direct violation of his, 4th amendment right's against, "Illegal Search and Seizure's", his 5th amendment right's to, "Due Process" of law, his 6th amendment right's to, a "Fair Trial", as well as, "Effective Assistance of Council", his 8th amendment right's against, "Cruel and Unusual Punishment", and his, 14th amendment right's to, "Due Process", as well as, "Equal Protection" of the law. All of which, though "guaranteed" him by, U.S. Constitutional Law", as well as the, "Illinois Constitution of 1970", were "violated" with reckless abandonment, by the named "Defendent's within this Complaint, by the Commission of numerous "Unlawful Act's" against the plaintiff, that also violated "Criminal Law" as well. Through, "Perjury Testimony", (A Class 3 Felony) "Manufacturing Evidence", through (Police Brutality) "Witness Manipulation", by the (State's Attorney's Office) "Voicing Opinion's" that were not supported by the "evidence", (Both Asst. State's Attorney's) and "Reversible Error's", by the (Trial Judge) All of which, was

due to "Ineffective Assistance of Council". First, by the "Circuit Court's" defense Council, (At Trial) then by an "Appellate Attorney", who plaintiff reported to the "Attorney Registration Disciplinary Committee". Before trial, "Defense Council" visited the plaintiff "once" Which was the "only" time that plaintiff was visited by the Public Defender's office in his entire "19 month's" stay at the Cook County Jail. Defense Council, never "Conducted Investigation's", "Interview Witnesses", ~~Depose~~ State's Witnesses" "File Motion's" to (Quash and Supress, or Dismiss Charge's), based on the "Recantation Testimony", of the state's "key" witness against plaintiff, the "Perjury Testimony" that was given by individual's within this Complaint who's account's of the incident in question were, "Completely Discredited", by the cases very own "Chief Investigating Officer", to the "Grand Jury", under oath, (So therefore, they all should have been "dismissed as witnesses" rather than being allowed to testify at trial.) The total "Lack" of "Phisical, or Forensic Evidence" necessary to Connect plaintiff to the Commission of a Crime, (Crime Crimes) as well as never attempting to "Impeach" any of the State's witnesses for testimony "known" to be "Perjury". All of which, would have changed the outcome of the plaintiff's trial. See (Federal Rule 401)

On the "Appellate Court" level, rather than "investigating", and "uncovering" all of these "documented" fact's, (Trial Transcript's and Police Report's) the Court appointed "Appellate Attorney" displayed "Gross Negligence" in Claiming that plaintiff had no "appellable" issue's, though, in the "Trial Judge" alone, "allowing" a State's witness to Committ "Perjury" under oath, while "personally" knowing that it was being done, and after "instructing" the prosecutor to, (During side Bar) Clear up the matter, but not "dismissing" the witness nor "Consaquenting" him, nor the prosecutor, when the instruction was

was blatantly ignored; the "refusal" to give to the jury, Jury Instruction's, regarding the scope of, "Reasonable Doubt", stating; let the jury use their "Common Sense" in determining what reasonable doubt is; As well as him "Voicing Opinion's", regarding the plaintiff being able to possibly shoot someone with "both" hand's, stating; Back in the "Western Day's", they used "Two" hand's to shoot. All of which, was enough on "it's own" to, not only "prejudice" the jury against the plaintiff, but to also demand a new "trial" on the plaintiff's behalf, due to "reversible error". In addition to the "prosecution's" act's of, "Voicing Opinion's", in "undermining" the importance, and necessity of, "Police Report's", as well as who they themselves "alleged" to the jury, the plaintiff's "identity" was, which Contradicted "all" witness testimony, as well as the "Trial Judge's" personal "determination", therefore Constituting the Commission of a "Class 3 Felony".

Plaintiff exhausted all State "remedie's", with no success, due to his "lack" of "legal knowledge", though it did not prevent plaintiff from trying, with the, "minimal to no knowledge" at all on how to explain his situation to the "Court's". Ultimately, his "Harpus Corpus" petition was denied, due to having filed, "Two day's" too late, due to problem's with the, "prison mailroom", at Cuero Correctional Center. Rendering plaintiff "Helpless", to having subjected to; "Unlawful Arrest", "Malicious Prosecution", "Wrongful Conviction", and "False Imprisonment", which was all in direct violation of his "Constitutional Right's". Of which, plaintiff is Charging the defendant's within this Civil Right's Complaint with.

WHEREFORE, plaintiff now pray's that this Honorable Court see's fit to, hold all of the individual's responsible for this "Travesty", and also "Conspiracy of Injustice", accountable for their action's, and grant the plaintiff the "redress" that he is rightly entitled. Thank You.

Respectfully Submitted,

/s/ John Phillips

#B-39383

Centralia CC

P.O BOX 7711

Centralia Il 62801

STATE OF ILLINOIS
COUNTY OF CLINTON
SIGNED AND SWORN TO BEFORE ME ON
7/10/08 BY JOHN PHILLIPS

SIGNATURE OF NOTARY PUBLIC

OFFICIAL SEAL
LARRY B. TAYLOR
Notary Public  State of Illinois
My Commission Expires Feb 25, 2012

## Timothy Speight

The testimony of, Timothy Speight, at the trial of, John Phillips, was illegally solicited by the States Attorney on the Case. Who knew beforehand that Mr Speights accounts of the events that took place on the night in question regarding himself "seeing" Mr Phillips shoot Yancey Brown, were Completely "disreditted" as being Creditble and True testimony, by the "Chief Investigator" of the Crime's Case himself, Sgt. James Cooper. Who beforehand testified to the Grand Jury "under oath", upon the Completion of his entire investigation of the incident the "Fact" that, it was someone other then Mr. Phillips that shot Yancey Brown, and that that individual was still at large.

In Sgt. Cooper stating these "Facts" to the Grand Jury "under oath", the "State" therefore became "Legally Obligated" as officer's of the Court, to uphold the law by "dismissing" Mr. Speight from the Case as a Creditble witness to the incident in question, by his allegations being proven to be "untrue" by the Cases "Chief Investigating Officer", along with anyone else's that Claimed to have "witnessed" Mr. Phillips shoot Yancey Brown, because they were "all" disreditted by Sgt. Cooper before the Grand Jury "under oath", upon his and his teams Conclusion of their investigation of the accounts of that night, and "also", while in the presence of a "States Attorney".

Therefore, the dismissal of, Timothy Speight, Ted Griffin, and also Yancey Brown, (who Changed his testimony at trial) from the Case, was "Mandatory Legal Procedure", that was intentionally ignored by the State, even though they knew that the investigation by Sgt. Cooper, and his "Team" of investigators, had proven these "State witnesses" accounts of the incident in question to be "False".

28

The States Attorney knew that allowing these individual's to remain on as Credible and believable witnesses, was not only against the law, but it was also an outright "Conflict of Interest" between the Robbins P.D., who upon the Conclusion of their investigation, "Cleared" Mr. Phillips of allegedly shooting Yancy Brown, and the States Attorney's trying the Case. Who, in not having any "Physical Evidence" with which to Connect Mr. Phillips to the Commission of any Crime whatsoever, was forced to have to Choose between either "freeing" Mr. Phillips, and therefore forfeiting their Case, or "Manipulating" the Same alleged "eye witnesses" that were previously "discredited" by Sgt. Cooper at the Grand Jury, into Committing "perjury" under oath, at Mr. Phillips' trial, in order to Secure the Conviction based on "Perjury Testimony", that would be Considered by the Court to be "Circumstantial" under false pretences, and allowed to be weighed by the Jury as Such, that they would never have received otherwise.

Allowing these individual's to "Continue" testifying to "Seeing" Mr. Phillips shoot Yancy Brown, "after" the Chief Investigating Officer of the Case, Sgt. James Cooper Swore "under oath" to the Grand Jury that it was someone other than Mr. Phillips that shot Yancy Brown upon the Conclusion of his investigation, was to Knowingly allow them to Committ "Perjury", under oath, in a Court of law, as an "Officer of the Court." Of which was a "Criminal Act", that was Committed by the states Attorney's of the Case, rather than obeying the very law's that they'd taken Sworn oath's to uphold, and dismissing these individual's from the Case, (as their accounts were not found to be believable nor Credible) which they were legally "obligated" to do. Instead, the States Attorney's of the Case, elected to break the law, by "manipulating" these individual's into Committing "perjury" under oath, at Mr. Phillips' trial, where this "Conflict of Interest" played itself out, resulting in a Trial based on "Perjury" testimony, in Violation

Of Mr. Phillip's Constitutional Rights. Which lead in its wake, "Documented Evidence", to the fact that, "numerous" pages of "Perjury Testimony", was given "under oath" at the trile of Mr. Phillips by; Timothy Speight, Ted Griffin, and Yancy Brown, which further violated Mr. Phillips' 6th amendment rights to a "Fair" trile. The testimonie's of these individual's, not only "Contradicted" the accounts that they'd Submitted by "Police Report" to the Robbins P.D. as "Factual Eye Witness Account's", but their individual accounts of the "Same Incident", also Conflicted with one and other's as well. Therefore proving exactly "why", these account's by these individual's, were all "discredited" by the Coses, "Chief Investigating Officer", Sgt. Seames Cooper, at the Grand Jury, "under oath" before trile. Of whom's title of, "Chief Investigator" had given to him, "Sole Authority", over the entire Cose, "including" who should be looked upon as an "authentic" eye witness. By his testimony to the Grand Jury, after "all" of the "information" was gathered, and witness account's were "investigated", Clearing Mr. Phillips of being the person Guilty of Shooting Yancy Brown, with Sgt. Cooper "further testifying" to the fact that, the actual assailant was "still at large", this therefore "discredited" any Credibility that the statements of; Timothy Speight, Ted Griffin, and Yancy Brown, may have had in their entirety. In these alleged witness account's being discredited as being "true" by the Coses own "Chief Investigating Officer", they were all by law Supposed to be dismissed from the Cose as "Credible" eye witnesses to the incident in question by, the State's Attorney's, that were to by the Coses. Otherwise their testimonie's would not only "Contradict" the testimony of the Coses own Chief Investigating officer, but in them all being witnesses for the "State", this would prove that the State's Attorney knowingly used "Perjury Testimony" in order to Secure a Conviction. Of which, they did in manipulating these previously discredited witnesses into Committing Perjury "under oath", after Swearing to tell the truth, So that their Cose which lacked the "Physical Evidence" necessary to Convict Mr. Phillips, Could therefore be tried and won, based "Solely" on the "Circumstantial Evidence" that these "discredited" accounts presented, though they knew that this information (after Sgt. Cooper's testimony to the Grand Jury) were False, and also "Illegally" Solicited by the State.

The state's Attorney's of this Case are "guilty" of ; "Coaching these state witnesses, Voicing Opinion's that were not supported by the evidence, and Manipulating and Prejudicing the jury, with "Perjury Testimony", without any objection's being made by the Defense Counsel" for Mr. Philips, which resulted in a guilty verdict due to, "Ineffective Assistance of Counsel" at Mr. Phillips' trial. This was also, in violation of his Constitutional Right's.

The State's Attorney's at the trial of, John Phillips, therefore made a mockery of the "Justice System", as well as of the "Trial Court," though they were "officer's of the Court" in the Commission of these "Unlawful Act's"; for the Sake of Securing a Conviction based on "Perjury Testimony". Which are Criminal act's, punishable by imprisonment.

63 yr. old Timothy Speight, knew 25 yr. old Yoncy Brown (The Victim) since Mr. Brown was a child. Under these Circumstances alone, a "Conflict of Interests" was introduced to the Case in question;

Under duress from being overwhelmed with grief and emotion for his Close friend, Mr. Speights Close bond with the victim "may" very well have prompted him to cast, point the finger seeking "pay back" for someone so close to him becoming the victim of such a violent Crime. Of which, is "not" known for Certain because, neither the Robbins P.D., the States Attorney at the Police Station, nor Counsel for the Defendant John Phillips (which was non-existant) ordered a "screening" of Mr. Speight, by a Psychologist, in order to gauge the "traumatic impact" that the incident may have had on Mr. Speight, before he was questioned by Police, and asked to identify an assailant. Therefore, it was not known whether or not Mr. Speight was even "mentally" sound enough to even be Considered a Credible and Reliable witness. Of which, is a factor that absolutely "must" be taken into Consideration, whenever an incident so "Life Threatening" occur's to a person so close to another. Simply because, the facts of life have always's proven that: "Emotion's", have always's been known to Cloud judgement, and ▇▇▇▇ Fraze honesty in times of Crisis. In which Case; The slip of any tounch will suffice". Though it is unknown whether or not this was actually the Cause, it is however known through Mr. Speight's own Police Report, as well as his testimony at Mr. Phillips' trial "Under Oath", and "after" he had already been "discredited" as a "Credible" eye witness by the Case's own "Chief Investigator", that though Mr. Speight Claimed to have seen Mr. Phillips behind the "victim" Yoncy Brown, no one else that Claimed to have either "witnessed" the incident, or who had "personal involvement" in the Crime itself, could "Corroborate" this statement when they were interviewed, "first", on the Scene, and neither at the Police Station by Sgt. Cooper a

Mr. Speight also Claims that Mr. Yoncy Brown was seen at the Mannings Night Club around 12:00 to 12:30 pm "flashing a big roll of money". Several witness account's stated ▇▇ that, Mr. Phillips didn't even leave his home until after 1:00 a.m. In addition to this fact, as was also testified to, it took Mr. Phillips an additional

45min, to make it to the, "Robbins, Il." night Club, from his home in Chicago, Il. Therefore, the earliest that Mr. Phillips would have been able to arrive at the night Club would have "still" been an "Hour and Fifteen minutes" after, Mr. Speight rushed to Secure his friend "Bonnie playful", and Flashing a huge wad of money, while paying his Cover Charges.

This huge Difference in the "timeframe" arena, makes it "impossible" for Mr. Phillips to have even Seen whether or not, Torrey Brown even had money to be taken, or even which "Car" to Choose out of a "2 parking Lot's full Selection, in order to Successfully accomplish the task of getting Mr. Torrey Brown, to have to Come to the parking Lot, where he would then be robbed to begin with. According to the testimonies of both, Mr. Speight, and also, Mr. Tod Griffin, the Car in the parking Lot actually belonged to Mr. Griffin. In Mr. Griffin, as well as Mr. Brown, both testifying to the fact that they'd never Seen John Phillips before, it would therefore be "impossible" for Mr. Phillips to have even known that, Tod Griffin, and Torrey Brown, were together, and also that, they were Close enough to one and other that it would require Mr. Brown to Come and move a Car that was not his, rather than Mr. Griffin of whom, the Car actually belonged to, ████ Proving that, Someone that "knew" them "both", Committed the Crimes

When asked; "What happened when Mr. Brown left the Club", Mr. Speight stated; About a minute, a minute and a half later, "I guess" 2 guy's went out behind him. Which was therefore "proof" of Mr. Speight's "Uncertainty" of the accounts of that night. But when he was asked; "Do you See those two guy's in Court," Mr. Speight was "Certain" that Mr. Phillips was one of the two.

By Mr. Speight being "uncertain" whether or not 2 men left out behind Mr. Brown, it was therefore "impossible" for him to be Certain that Mr. Phillips was one of them. Unless of Course, he was made to be Certain by the Coaching from the State that occurred before trial. There is ~~there are~~ otherwise, no other way that this Clear

Contradiction of the statement; "I guess", 2 guy's walked out behind him, and a "Statement", in Court I.D. of the Alleged Offender be explained.

When asked; "What did you do when the defendant went out behind Yancy", Mr. Speight stated in his own words; "Well I kept doing Security".

Therefore, admitting the fact that he'd, "Turned his back", to Mr. Brown and the guy's on outside of the Club. When asked; "What happened Afterwards", Mr. Speight stated; A man came in and stated that they're sticking up Yancy outside in the lot, and he then "ran to the door".

These "fact's" prove that, Mr. Speight was so far away from the "front door", where he'd previously "alleged" to be working "Security", that, when that announcement was made, he had to "run", as quickly as a 63yr. old man could move, in order to reach the door in time to witness anything.

All of these Circumstances, automatically depletes any Credibility that, a "positive I.D." by Mr. Speight may have had if been true. Even in the worst "Case Scenario", if the person that Mr. Speight "guess" walked out behind Mr. Brown was Mr. Phillips, after Mr. Speight then, "turned his back to the door" to Continue doing Security as he'd stated, it is therefore quite "possible" that, whomever it was that was seen behind Mr. Brown, Could have actually went on there way, and Since Mr. Speight's eye's were pre-occupied doing Security on the "inside" of the Club, and not on the outside, he did not see that happen. Therefore, Mr. Speight Could not say with any level of "Certainty", whether or not Someone else who was at the Club and Saw Mr. Brown Flashing this huge wad of money, didn't Catch up to him in the parking lot and rob and Shoot him. Therefore, his I.D. of Mr. Phillips being the person that Committed this Crime was "False". ~~Especially~~

Especially after Mr. Speight testified to the fact that, Mr. Brown, along with the

88.

2 assailants, were "across the street", from the night Club where Mr. Speight was, and in another parking lot of a night Club Called the "Big 10".

With the partial Cue's of "2" night Club's impairing "Vision", and also, a direct line of sight, "Traffic" moving "East and West" on the street that Separated these 2 night Clubs, along with the fact's that, it was after "midnight", and Also that the assailant ran "North" which was even "further" away from Mr. Speight's sight, it was "impossible" under these Circumstances for "anyone", especially a 63 yr. old man, who had previously taken his focus off of Mr. Brown, and the person that he "Claimed" to have seen walk out behind him, in order to do Security inside of the Club, to have been able to make a "positive identification" of Mr. Phillips as the person that he'd seen, in the parking lot of another Night Club as he'd alleged.

According to the "Evidence", as well as the "Circumstances" surrounding Mr. Speight's I.D. of an alleged assailant, the person witnessed by Mr. Speight Could have Came out of the "Big 10" night Club itself.

In addition to that fact, Mr. Speight testified that the assailants ran "North" through the "Big 10" night Club's parking lot. With Mr. Speight's night Club being "South" of the "Big 10", his "testimony", indicated that the assailant ran further away from Mr. Speight's sight.

Proving the fact that, the only way that Mr. Speight's I.D. of "any" alleged assailant Could be at all "positive", is if he were ~~Coached~~ Coached, and Showed whom to blame.

Such were the actions of the state, in the assailant's in question never running back "South" towards Manning, where a positive I.D. Could be made by Mr. Speight.

Mr. Speight also testified to the fact that, there was approximately "200 people" at the Club where he worked Security that night.

For Mr. Speight testifying to never seeing Mr. Phillips before, it was therefore impossible for Mr. Speight to remember Mr. Phillips' face, out of approximately "200" other's, So Clearly that he Could make a positive I.D. of Mr. Phillips being the alleged shooter. Especially when, neither Mr. Phillips, nor his face, caused any "Flag's of Caution", that required his face to be remembered by Mr. Speight. Which therefore, is a "Clear indication" that, Mr. Speight's identification of Mr. Phillips being the assailant, was "Coached".

Another Clear indication that Mr. Speight's testimony at trial was "Coached", was given when he was asked, if he'd ever seen Mr. Phillips again, and Mr. Speight stated; "Yes, I saw him in a Markham police car after they Caught him in "Blue Island".

By Mr. Speight's night Club being in, Robbins, Ill., it was impossible for him to have "Seen", police Catch an assailant "Clear" in another "City". (Blue Island) So Clear in fact that, according to his testimony under oath, he was able to see that it was a "Markham" police Car, and also that it was Mr. Phillips, that the police Caught.

The "only" way that Mr. Speight would have been So "Certain" that it was Mr. Phillips that was apprehended in Blue Island, Ill., that he would Swear to it "under oath" in a Court of law, was if he was "Coached" by the Police and the State.

"Markham Car", "Mr. Phillips", and "Blue Island, Ill.", was far too "Specific" for a person to State, that was not actually on the "Scene" of the apprehension. Mr. Speight would have therefore ~~been~~ had to be on the Scene himself, (who clearly testified that he was at the front door of Mannings bar) or "Coached" by Someone that was.

10 8

Mr. Speight also admitted to "knowing" an individual named "Black Doe", that lived in Robbins, IL. When asked where Black Doe was when Tonry Brown got shot, Mr. Speight Stated; "I don't know," "I guess" he was still in the Club". But later, when asked if Black Doe was outside with Mr. Brown, Mr. Speight answered a different "No". This was the "same question", which "now" had "2" different answer's.

These 2 statements "Contradict" one and other. Therefore proving that, the State "lead" this already "discredited" witness into further Committing perjury under oath.

When asked, "what Black Doe "looked like", Mr. Speight stated that he was a "Young Man", looking about 25 yrs. old maba. Proving that, he'd "known" Black Doe well enough to determine that he looked about 25, and that Mr. Phillips was obviously "not" Black Doe. As the state's Attorney prejudiced the jury into believing through his very own "Perjury Testimony", during Closing Arguments, where "various Opinion's" passed the jury's mind's into believing that, Mr. Phillips, an "innocent man", and "Black Doe" the "True" assailant according to the "evidence", were actually one person, John Phillips, which was "not supported by "any" of the State's witnesses, who "knew" this Black Doe individual "personally", and neither by the "evidence" at Mr. Phillips' trial. This was a "Criminal Act" by the prosecutor that said to a now "Confused" jury; "Believe" everything that the "state's witnesses" say about seeing Mr. Phillips shoot Tonry Brown, but "Do Not" believe the "State's witnesses" at all when they say that Mr. Phillips "is not" Black Doe. Instead, believe "me" because, Mr. Phillips "is" in fact Black Doe.

In "Various Opinion's", the state had in fact, "impeached" their own witnesses. According to the state's Closing Argument's, all of the "state's witnesses" Committed "Perjury" under oath. Damaging done, was the fact that the jury was not able to separate "Black Doe", who the "Guilty" verdict was "actually meant for," from John Phillips "an innocent man", because the "Prosecutor" on the Case, said that the "2" were actually "one," So the "Guilty" verdict meant for "Black Doe", was given to Mr. Phillips.

Also, when Mr. Speight was asked; "When you saw him (John Phillips) did you say anything to anyone about him", Mr. Speight stated; "I told the police officer that was driving the car, that's him". When he was asked; "In terms of what", Mr. Speight answered; "The one that shot Tunay".

But, when Mr. Speight was later asked; "Now did you "see" a Gun on John Phillips", Mr. Speight answered; "No".

This prove's that this, "already discredited" witness, had "again", Committed "Perjury" under oath with this statement, giving the way a "false" identification of the shooter. Additionally, there exists "No" legal documentation whatsoever, that would verify that an "on site" identification of Mr. Phillips was ever made by "any" of these previously "discredited" state witnesses. In fact, the only person according to Mr. Speights very own "Police Report," that an "on site" identification was made of, was, Shawn McCrea. Who admits on "numerous" occasion's his personal involvement in the Crime's that were Committed, and who was "also", Chased by police while attempting to escape in a "stolen Car", Shot at by police while attempting to elude them on foot, and who was also "selected" by witnesses through a police line-up, but was "still" never Charged for a single offense. Instead, he was offered his freedom, in exchange for his promise to implicate Mr. Phillips in the Crime's.

Mr. Speight "was not" a Credible witness to this Cause. Giving "Perjury Testimony" under oath as a means to assist the state in their objective of Convicting Mr. Phillips "Falsely" has therefore, been proven to be a "Fact".

Sgt. James Cooper, after "interviewing" Mr. Speight during his initial "investigation" of the Crime's in question, had determined that, Mr. Timothy Speight's "information" regarding the account's of the incident's, "Was Not Credible, nor Believable". Which is "why" he elected "not", to submit Mr. Speights "name" to the Grand Jury as a "Credible" witness a

12mg

And also "why", he discredited Mr. Speights testimony, as well as his "I.D." of Mr. Phillips, as the person that shot Yancy Brown, "under oath", to the Grand Jury.

In stating that, it was someone "other than" Mr. Phillips that shot Yancy Brown, and that, that person was "Still At Large", which was in "Complete opposite's" of Mr. Speight's testimony during Sgt. Cooper's "investigation" of the Crime, as well as, Mr. Speight's trial testimony "under oath", which was solicited by the State's Attorney "illegally", after the State's Attorney was "present" at the Grand Jury hearing when Sgt. Cooper "discredited" Mr. Speight's "statement", and his "identification" of Mr. Phillips as the shooter.

The prosecutor therefore, "knew" beforehand, that any testimony given by Mr. Speight, in regards to himself seeing "Mr. Phillips" shoot Yancy Brown would therefore be "Perjury". Still, the State's Attorney's on the Case elected to "Manipulate" Mr. Speight into making these "False statements" at Mr. Phillips trial.

In the State's Attorney's being "Officer's of the Court", they "knew" that what they were doing in order to Secure a Conviction against Mr. Phillips was a "Crime". Still, they Chose to Commit these Crime's in order to Secure a Conviction against an "innocent man" because, without these "already discredited" witnesses, Mr. Phillips would have had to be set "free", as there existed No "Physical Evidence" whatsoever, to Connect Mr. Phillips to the Commission of any Crime, and therefore, the entire "process" would be knocked back to square one. For the State, trying Mr. Phillips, whom the State "knew" was an "innocent man", but was the "only" person in Custody, as the "True Assailant", that was mentioned by Sgt. Cooper to the Grand Jury was, as Sgt. Cooper put it, "Still At Large", was much easier, than it would be for the State to "bad" this individual, who by this time, had a "19 month" headstart on the State, and the Robbins P.D. .

13 of

"Proof" that Sgt. Cooper, the Cases "Chief Investigating Officer", had in fact interviewed Mr. Speight, was given when Mr. Speight was asked: "So you want to tell Sgt. Cooper everything that you remember right"? And Mr. Speight stated, "I Did".

Afterwhich, "all" statements given by Mr. Speight to Sgt. Cooper regarding Mr. Speight "witnessing" Mr. Phillips shot Yancy Brown, were "Completely Discredited" before the "Grand Jury", under oath by Sgt. Cooper, the "Chief Investigator" on the Case, because after Sgt. Cooper's "investigation" into Mr. Speight's alleged account's, Sgt. Cooper found these allegations to, "Lack Credibility".

This is "why", Sgt. Cooper testified to the Grand Jury, that it was someone "other than" Mr. Phillips that shot Yancy Brown, and that, that individual was "Still At Large".

Which is "why", Mr. Speight was to be "Dismissed" from the Case by the State as an eye witness. Instead, Mr. Speight was "Manipulated" by the state, and used to secure a Conviction against Mr. Phillips through "Perjury Testimony", with the State "knowing" that the testimony that would be given by Mr. Speight to the jury at Mr. Phillips' trial, would in fact be Perjury. Of which was a Crime, in addition to these "fact's being "proof" that Mr. Phillips' Constitutional Right's "were" in fact violated.

14 of

Mr. Speight stated the "fact" that, he'd known Lonny Brown since he was a child which introduces a "Conflict of Interest" to the "identification" process, due to a possible "Mental" traumatic impact, by Mr. Speight and Lonny Brown being so close. (See "C-9" 4-7) Mr. Speight stated that he was working "Security" at the "front door" of Mamma's Blue Room, though he never mentioned seeing the, "17 yr. old" Sean McCrea, who "admittedly", entered this establishment, and stayed about "5 to 10 minute's", before leaving back out of the Club, but remembered so vividly that he'd seen Mr. Phillips standing behind Lonny Brown, even though the timeframe that Lonny Brown was there "flashing" a huge roll of money, "does not" match the timeframe that several witnesses state that Mr. Phillips left home, in addition to 45 min. more, of travel time, in order for Mr. Phillips to reach this night Club. (See "C-9", 24, thru "C-10", 1-2) and ("C-90", 13-16, "C-95" 17-22 "C-109" 1-2) and "C-11", 3-5). Mr. Speight Claims to have seen Mr. Brown walk past him, and toward's the "back" of the Club upon entering, though Lonny Brown state's that he'd gone "downstair's" to play "pool" upon entering the Club, as so did Ted Griffin Confirm that in order to play pool, a person had to go "downstair's", and into the basement: (See "C-11", 8-10 ) thru (B-31", 11-14, "B-32", 1-4, "B-33", 10-12 ) and ("B-14", 5-7). Mr. Speight also Claimed that as he saw Mr. Brown leave the Club, a minute to a minute and a half later, "he guess", 2 guy's went out behind Mr. Brown, though that amount of time between people leaving and going "freely" in a Crowded night Club was "Average". Therefore, "no evidence" existed to support Mr. Speight's Claim. Additionally, Mr. Brown had no almost, 2 min. thereabout on "anyone" leaving the night Club after he did. Proving that, Mr. Speight's "Caution" of his friend being robbed, "Did Not", stem from seeing Someone Leave out shortly after him, but from the "fact" that his friend had been "flashing" a huge roll of money for everyone to see, therefore making himself a target. And because of this "Fact", to Mr. Speight, "anyone" that left the Club after his friend was in his mind, a potential "Robber". (See "C-11", 21-22 thru "C-12", 1-2)

Mr. Speaght stated that, "after" he'd witnessed these alleged individual's leave, he "Continued doing Security". Therefore, "admitting" to taking his sights off of what was going on the outside of the night Club, Making the "2-guy's" that "he guess" walked out behind Yancy Brown, "Going on their way", a very "Real" possibility, that due to Mr. Speaght "not" paying any attention to the "outside" of the Club, he did not witness. (See C-12, 14-18) Mr. Speaght stated that a man came to the door and announced that, Yancy Brown was being robbed, which would have been impossible for Mr. Speaght to hear over "Blaring Music", that accommodated the Club's Capacity Crowd of an upwards to "200 people". (See "C-12", 21-22 and "C-19" 5-11) Mr. Speaght stated that, he then "ran" to the door, and saw 2 men "across the street" with Yancy Brown (See "C-12", 23-24 thru "C-13", 1) "Admitting" the fact that, he was so far away from the Club's front door, where he was "supposed" to be doing Security "allegedly", that he had to "run" in order to get back to it as quickly as a 63 yr. old man Could, in order to allegedly "witness" Yancy Brown being robbed in the parking lot of "another" night Club, with the "parked Car's", at approximately "200 patron's" in his Club's parking lot "alone" blocking a "Clear line of Sight", in addition to the "2 way traffic", that traveled East and West on the street that "Separated" the parking lot's of these 2 night Club's, blocking a "Clear line of Sight", the parked Car's of the "other Club's" parking lot blocking a "Clear line of Sight", the "distance" between these 2 Club's becoming a Factor in "Compromising" the Sight of Mr. Speaght, as well as the "fact" that, it was also after "midnight", and therefore, "extremely" dark outside, there is no way possible that Mr. Speaght, nor "anyone else", under these extreme Circumstances, Could have positively identified anyone. Especially, after Mr. Speaght stated that the assailant ran "North", after he Committed the Crime, which was even "further" away from Mr. Speaght, who's Club was "South". In addition to that fact, Mr. Phillips "was not" wearing a single stitch of "Clothing", that was described by neither Mr. Speaght, nor Yancy Brown "himself," to have been worn by the actual assailants. (See "C-13", 2-24 thru "C-14", 1-2) (See Yancy Brown's "Police Report")

16

Therefore, Mr. Speight's "identification" of "Mr. Phillips", as the offender that he'd seen, was "Perjury Testimony". (See "C-14", 10-15). There was also, no way that Mr. Speight could have "heard", Yancy Brown "say" anything from "standing in the doorway" of such a "Noisy" night Club, filled with an upwards of "200 people", with music "Blaring" to accomodate the Club's "Capacity Crowd", from "clone across "2-parking lot's", and "2-way traffic". Proving that His statement "under oath", was Perjury Testimony as well. (See "C-15", 1-2). Mr. Sean McCraw stated that he was ordered into the Car in question, "before" the victim was shot, which was unknowingly Cooberated by the victim Yancy Brown himself, during his "own" testimony. Therefore, Mr. Speight again Committed "Perjury" under oath. (See "C-15", 5-8)(See "C-48", 21-24 thru "C-49", 1-3)(See "B-44", 1-17 and B-45, 9-14). Mr. Ted Griffin, the "owner" of the Car in question, stated that he'd "seen" his Car leaving the scene, and he and a Mr. Otis Nutall immediately gave Chase in another Car. As this occurred, he "never" witnessed anyone else being picked up in his Car by the driver in question. Therefore, Mr. Speight's "identification" of Mr. Phillips being picked up by one of the offender's while escaping from the scene, was "Perjury Testimony". (See "C-16", 1-5)(See "B-129", 15-21, "B-130", 1-21, and "B-131", 1-15) Also See Ted Griffin's, and Otis Nutall's ("Police Report")

When Mr. Speight was asked, "From which "direction" did the "shot" Come from"? Mr. Speight stated, From the "Right". This was an attempt to make his testimony "mirror" the fact that Yancy Brown was, "shot on his right side". But Mr. Speight "also" testified that the gunshot rang out "In front of him". Also "mirroring" the fact that, the parking lot of the Big "10" night Club where the shot "occurred", was directly "North", of where he was standing, which was in the parking lot of Manning's night Club, directly "South" of the Big "10". This alone, makes it "Scientifically Impossible" for "anyone", under these Circumstances, to be able to determine from which "side", a shot

that was heard, "Exactly 3 or 4 of them", Came from Therefore, Mr. Spraight's testimony regarding this matter was "perjury" as well. (See "C-16", 8-13)

In Mr. Spraight stating that he'd seen Mr. Phillips again after the police, "Caught him in Blue Island". Which was "impossible" to see from the doorway of a Night Club, Clares in another City, (Blue Island) but far too "Specific" in "detail" as to "who" was Caught, and "where", to not have either been on the scene itself "witnessing" the events unfold, or to not have been "Coached" by Someone who was a Therefore proving that Mr. Spraight was "Coached" by police, or the state, (See "C-16", 23-24 thru "C-17", 1)

In stating "under oath" that he'd told the police officer that was driving the Car; "That's him" and "The one who shot Yancy", but his "police statements" Completely Contradicting this testimony, Mr. Spraight again Committed "perjury" (See "C-17", 5-10, and Mr. Spraight's police report's)

In Mr. Spraight admitting "under oath" the fact that he "knew" Black Dee, and also the "fact" that Black Dee was at the Club on the night in question, but "Could not" Confirm exactly "where" Black Dee was when Yancy Brown was shot when asked, stating; "I don't know, I guess he still was in the Club", but then stating a adamant "No", when asked again if Black Dee was outside with Yancy, Mr. Spraight was lead by the state into "again" Committing "Perjury" under oath. (See "C-17", 11-17, "C-17", 21-24 and "C-18", 14-15)

Mr. Spraight stated that there was maybe a "hundred to two hundred" people in Mannings night Club on the night in question, where he was working the front door. Proving that, in "never" Seeing Mr. Phillips before, and in no place of "Caution" arising in Seeing Mr. Phillips for the first time "ever" that would require his face to have to be remembered by Mr. Spraight, there was no way that Mr. Spraight would have been able to remember Mr. Phillips face out of "200 others" seen that night. Therefore, Mr. Spraight I.D. of Mr. Phillips was "Coached", by either the police, or the state. (See "C-18", 5-13)(Police Reports)

18 y

Mr. Speight stated that he'd "seen" Yancy Brown get shot. He also stated that, "Mr. Phillips", was the person that shot Mr. Brown. Mr. Speight also "admitted" to "never" seeing Mr. Phillips with a gun. And also, only "hearing" the gunshot. Proving the "fact" that, in Mr. Speight pointing the "finger of blame" at Mr. Phillips as the person that shot his Close Friend, though he didn't actually "see" anyone get shot, he therefore Committed "Perjury" under oath. (See "C-19", 17-18, "C-20", 9-11, "C-29", 5-7 "C-33", 18-23, "C-34", 8-9)

Mr. Speight, when asked; "What was Mr. Phillips doing to Yancy Brown, going through his pocket's, or holding the gun"? Stated that Mr. Phillips was; "Holding the gun"- But in "previous" testimony, "under oath", Mr. Speight also "admitted" the fact that, he did not "see" a gun on Mr. Phillips. Which "Confirms" the statement of the victim himself, Mr. Yancy Brown, that stated the person that had the gun on him, had on a "Tan Shirt", and wore a "Ponytail" type hairstyle, as being "true". Who Mr. Brown also stated made him open the vehicle. This person, from the "very beginning" which "include's", before his "Recantation Testimony" at trial, had been stated by ——— Mr. Sean McCrae, who at the time, was "Cooperating" with the State, to have in fact been the subject who went by the name, "Black Dog". Of whom, Mr. McCrae "admitted" to have driven to the scene with from, 71st and Muskegon, and "also" who, Mr. McCrae, Mr. Speight, Yancy Brown, and even the Cases "Chief Investigating Officer", Sgt. James Cooper, who "all" knew "Black Dog" personally, and even the "Judge" at Mr. Phillips trial, all "admitted", as well as acknowledged the "fact" that this subject "Is Not", John Phillips. They are in fact "two different" peoples. Therefore, in making this "False" identification of, Mr. Phillips, at trial, and before the jury, Mr. Speight had "again", Committed "Perjury" under oath. (See "C-24", 5-11, "C-18", 17-18, "B-43", 18-24, "B-44", 1-5, "B-83", 18-19, "B-84", 1-2, "C-17", 11-24, "C-18", 14-15, "C-48", 8-9 and "C-49", 1-5) In addition to this "fact", the victim, Yancy Brown, in his "police report", as well as his "in Court" description of Mr. Phillips, as well as Mr. Phillips "photo" from the line up that Mr. Brown was asked to look at, the Yancy Brown "always's" described Mr. Phillips as having "Braids", Not a "Ponytail." (See Yancy Brown's Police Report, "B-61", 7-19, and "B-62", 4-9)

In Mr Phillips being depicted as number "2" in the photo line up, he was "never" selected by the victim Yancy Brown at all, as a person that did anything to, nor against him because, though Mr Phillips had braids, he was still, the "wrong man". This was "proven", when Mr Brown was shown a photo line up, that Consisted of "5" individual's, and he selected; number "1", who according to Mr McCrea's account's of who "forced" him to get in the vehicle, as well as Yancy Brown's own account's of this "Same" individual "shooting" him immediately after forcing Mr McCrea to get into the vehicle, and Black Dog and number "3", who was in fact Sam McCrea "himself," as his "True assailant's". Not, Mr Phillips, who was number "2", in Mr Brown's police report, number "4", in Mr Griffin's police report, and number "2" again, in Otis Nutall's police report. "Never", was Mr Phillips ever number "1", nor number "3", in the photo line up. Proving the fact that, though Mr Phillips "photo" was in the "5" individual line up as well, he was still never selected as an offender, Simply because, "braided" hairstyles amongst young Black male's were Common, And Mr Phillips having braids, like Mr Brown's "true" assailant, "did not" Change the "Identity" of Mr Phillips "face". Which was therefore "proven", by Mr Brown "himself," through the "photo line up", that it "Did Not" match the face of his "True Assailant's". Which therefore "proved" Mr Phillips to be an "innocent man's. At the same time, this line up showed that Yancy Brown "selected" Mr McCrea, and Black Dog, though neither one of them were "ever" Charged with a Single Crime. (See Police Report's) Mr Specht removes the gun from Mr Phillips hands "again", this time, "proving" that the other person in the parking lot with Mr McCrea were in fact, the Subject "Black Dog", when he was asked; "Was the other person involved Black Dog"? and he stated; "There was only "3" people out there, Yancy, the man that was going through his pocket's, and the man with the gun"; then when asked if the man that he saw "going through Mr Brown's pocket's" was Black Dog, Mr Specht stated; "No". Which therefore placed the "gun" into Black Dog's hands, in Mr McCrea, and Yancy Brown "both", Confirming the fact that, Mr McCrea, was the other person in the parking lot, as Mr McCrea Confirmed that it was "Black Dog" who shot Mr Brown (See "C-24" 12-18, and "C-48" 8-18, "C-49" 1-5

**CHICAGO POLICE**

| | | | | |
|---|---|---|---|---|
| CLASSIFICATION LAST CRIME REPORT | 0410 | 7911 Broadway | Kidding | 305 |

AGGRAVATED BATTERY

1. VICTIM/SUBJECT'S NAME AS SHOWN ON LAST PREVIOUS REPORT

BROWN, YANCEY

VICTIM/SUBJECT'S ADDRESS
2840 W 139 Blue Island   Parking Lot

11. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.)

Phillips, John    7025 S San Gammon   m   25/00   125   DRK/BLK/BK

**NARRATIVE**

ON 04:30 HRS REPORTING OFFICER SPOKE WITH SPRIGHT, TIMOTHY
WHO IN SUMMARY RELATED TO R/O THAT HE WAS INSIDE
MANNYS LOUNGE. WHEN A SUBJECT CAME IN AND STATED
THAT 2 M/BLKS WERE TRYING TO TAKE TED's GREETEN
VEHICLE FROM THE VICTIM, AS HE EXITED THE LOUNGE
HE OBSERVED, 2 M/BLKS PUSHING VICTIM AGAINST THE VEHICLE
GOING THRU HIS POCKETS. AT THIS TIME SPRIGHT SAW OFFENDER
BEHIND VICTIM SHOOT VICTIM IN THE BACK, THEN FLED N/B
THRU THE PARKINGLOT. OFFENDER #2 JUMPED INTO
TED'S VEHICLE AND DROVE SOUTH ON CLAIRE TO RICHMOND
WHERE HE PICKED UP OFFENDER #1, THEN TURN LEFT
ON RICHMOND TRAVELING S/B UNTIL THEY GOT 135ST THEN
E/BOUND TO FRANSE, THEN NORTH TO BROADWAY
THEN EAST BOUND ON BROADWAY.

90. EXTRA COPIES REQUIRED (NO. & RECIPIENTS)
NORMAL

91. DATE THIS REPORT SUBMITTED — MO. DAY YR.
13 AUG 95    16:00

93. REPORTING OFFICER (PRINT NAME)   STAR NO.
Sgt James Cooper #00

95. DATE APPROVED (DAY-MO.-YR.)
15 AUG 95

1      A    No, they are not.

2      THE COURT:  Anything further?

3      MR. DANIELIAN:  No.

4      THE COURT:  You may step down.

5              (Witness excused).

6      THE COURT:  You may call your next witness.

7      MS. BANKHEAD:  Your Honor, People would call Timothy

8  Speight.

9      THE COURT:  Mr. Speight, step up here.  Raise your

10  right and to be sworn by the clerk.

11              (Witness sworn)

12                  TIMOTHY SPEIGHT,

13  a witness herein, called on behalf of the People of the

14  State of Illinois, after being first duly sworn was

15  examined and testified as follows:

16                  DIRECT EXAMINATION

17                      BY

18                  MS. BANKHEAD:

19      Q    Mr. Speight, would you please state your name

20  and spell your last name for the Court Reporter?

21      A    My name is Timothy Speight, S-p-e-i-g-h-t.

22      Q    And how old are you, Mr. Speight?

23      A    Sixty-three years old.

24      Q    And where do you live?

C-8

1      A    Robbins, Illinois.

2      Q    How long have you lived in Robbins?

3      A    Since 1983.

4      Q    Do you know Yancy Brown?

5      A    Yes.

6      Q    How long have you known Yancy?

7      A    I've known Yancy since he was a little boy.

8      Q    From --

9      A    From California Garden, the youth center in

10    Blue Island, that's where I know him from.

11      Q    Are you also familiar with his parents?

12      A    I have seen his parents.  I don't know them

13    personally, no.

14      MR. TARR:  Objection.

15      THE COURT:  The objection is overruled.

16      MS. BANKHEAD  Q  Did you see Yancy on August 11,

17    1995?

18      A    Yes, I did.

19      Q    And where did you see him?

20      A    Mannings Blue Room.

21      Q    Where is that?

22      A    2911 Claire Boulevard, Robbins.

23      Q    And were you affiliated with Mannings Blue Room

24    on that day?

C-9

1          A    Yes, I was working security.

2          Q    And by security, where were you located in

3    Mannings?

4          A    Front door.

5          Q    Did you see Yancy when you came in the front

6    door?

7          A    Yes, I did.

8          Q    And what did you notice as Yancy came through

9    the front door?

10         A    He was playful as usual, and he had a big roll

11   of money, and I was teasing him about it.

12         Q    Did he pay to get in?

13         A    Yes.

14         Q    Did he pay out of that big money?

15         A    Yes.

16         Q    Did you see anyone else that night at that time

17   that you see in court today?

18         A    Yes.

19         Q    Could you please point to that individual and

20   describe an article of clothing that that person is

21   wearing?

22         A    Sitting at the table right there in a white

23   shirt, dark tie and dark suit, and he has a ponytail

24   (Indicating).

C-10

1    THE COURT:   Record reflect in-court identification

2    of the defendant.

3       MS. BANKHEAD   Q   When you saw the defendant, where

4    was he?

5       A    He was right behind Yancy.

6       Q    And did Yancy come into Mannings?

7       A    Yes.

8       Q    When he came in, where did he go?

9       A    He walked passed me and must have went in the

10   back.

11      Q    Did you see Yancy again?

12      A    Yes.

13      Q    And where was that?

14      A    When he came back out of the club.

15      Q    I'm sorry, about what time was it when Yancy

16   got there if you recall?

17      A    Oh, sometime between 12:00, around 12:00,

18   12:30, something like that.

19      Q    And that's at night?

20      A    Yes.

21      Q    You saw Yancy when he left the club?

22      A    Yes, I did.

23      Q    When he left the club, what if anything else

24   did you notice?

C-11

Leading>

1          A      Well, about a minute, a minute and a half, I

2    guess, two guys went out behind him.

3          Q      Do you see either of those two guys in court

4    today?

5          A      I see one of them, yes.

6          Q      Would you please point to him and describe what

7    he's wearing?

8          A      Sitting over there at the table with the dark

9    suit (Indicating).

10          Q      The same individual who you previously

11    identified?

12          A      Yes, the same individual who I pointed out at

13    first.

14          Q      What did you do when the defendant went out

15    behind Yancy?

16          A      Well, I kept doing security.

17          Q      Did anything else -- did something happen after

18    that?

19          A      Yes.

20          Q      What happened?

21          A      A man came in and hollered they're sticking up

22    Yancy outside in the lot.

23          Q      What did you do when he said that?

24          A      I ran to the door and outside I saw two men

C-12

1    across the street with Yancy.

2         Q    Now, can you describe for the ladies and

3    gentlemen of the jury the layout of Mannings and the

4    parking lot and the streets and where Yancy was?

5         A    Mannings is directly across the street from

6    another lounge called the Big 10.  We got some big lights

7    in front of Mannings and also on the other club.

8         Q    You mean like --

9         A    Like daylight night.  They come on dusk, dawn

10   lights.

11        Q    Is there a parking lot in front of Mannings?

12        A    Yes.

13        Q    How wide is that parking lot would you

14   estimate?

15        A    It's larger than this room.

16        Q    Okay, and then is there a street in front of

17   the parking lot?

18        A    Claire Boulevard.

19        Q    How wide is Claire Boulevard?

20        A    I would say about two car lengths wide.

21        Q    Is there a parking lot on the other side?

22        A    Yes.

23        Q    Is that the parking lot of Big 10?

24        A    That's the parking lot for the Big 10.

C-13

1     Q    And is that where Yancy was?

2     A    Yes.

3     Q    Where was he in that parking lot?

4     A    He was right at the front of the parking lot

5 beside a white car, two men standing with him.

6     Q    Which direction was Yancy facing?

7     A    Yancy was facing the car.  The car was parked

8 here (Indicating) facing the streets.  Yancy was on the

9 driver's side of the car.

10    Q    And the individual that you earlier identified

11 as having followed Yancy out of the club, did you see him

12 out there?

13    A    Yes.

14    Q    Where was he?

15    A    He was standing on Yancy's right.  The other

16 guy was standing almost in front of Yancy.  It looked

17 like his hands were in his pockets, in Yancy's pockets.

18    Q    The defendant was standing to the right of

19 Yancy, was he in front of him or behind him?

20    A    He was to the side of him.  You could see him

21 like here (Indicating) -- Yancy is here (Indicating), and

22 he's standing right at his side.

23    Q    Okay, on the right side?

24    A    Yes.

1    Q    Okay, and what did you see happen next?

2    A    Well, what happened next was Yancy kicked the

3  car, he cursed or said something, and that's when the

4  shot rang out.

5    Q    And when the shot rang out, what happened?

6    A    The guy that was standing directly in front of

7  him opened the car, got in.  The other guy ran through

8  the other parking lot.  The guy that got in the car

9  pulled out on Claire Boulevard like he couldn't hardly

10 drive.

11   Q    How was the car going, fast or slow?

12   A    It was going real slow.

13   Q    Okay, the person who ran -- Who was the person

14 who ran?

15   A    (Indicating).

16   MS. BANKHEAD:  Judge, may the record reflect the

17 witness is pointing to the defendant?

18   THE COURT:  It may so reflect.

19   MS. BANKHEAD  Q  Which direction did he run?

20   A    He ran north through the parking lot, the

21 parking lot of the Big 10.

22   Q    And then what did you see?

23   A    He came up Richmond, which is the street that

24 crosses Claire.

C-15

1     Q    Okay, then what happened?

2     A    The car picked him up at that point.

3     Q    Is that the same car, the white car that pulled

4 out of the parking lot after the shot?

5     A    Right.

6     Q    What happened to Yancy after the shot rang out?

7     A    He fell to the ground.

8     Q    From what direction did the shot come?

9     A    From the right.

10    Q    From the right of Yancy?

11    A    Yes.

12    Q    And in front of you?

13    A    Yes.

14    Q    After that -- after you saw the defendant jump

15 in the white car that had pulled off and was driving

16 slowly, did you see him again that night?

17    A    Not the one that was driving, no.

18    Q    Okay, did you see the one who jumped in the

19 car?

20    A    Yes.

21    Q    And that's the defendant?

22    A    Yes.

23    Q    And where did you see him?

24    A    I saw him in a marked police car after they

C=16

1    caught him in Blue Island.

2         Q     About how much time had passed before you saw

3    him again?

4         A     Maybe 20, maybe 20 minutes.

5         Q     And when you saw him, did you say anything to

6    anybody about him?

7         A     I told the police officer that was driving the

8    car that's him.

9         Q     And that's him in terms of what?

10        A     The one that shot Yancy.

11        Q     Let me ask you a couple of questions,

12   Mr. Speight, do you know a guy who lives in Robbins by

13   the name of Black Dog?

14        A     I've seen him, yes.

15        Q     How do you know him?

16        A     Well, just one of the guys around in the

17   streets.

18        MR. TARR:  Objection.

19        THE COURT:  The objection is overruled.  The answer

20   may stand.

21        MS. BANKHEAD  Q  Did you see him that night?

22        A     Yes, he was in the club.

23        Q     Where was he when Yancy was shot?

24        A     I don't know, I guess he still was in the club.

1    Q    Was he out there with Yancy?

2    A    No.

3    Q    Was he one of the guys in the bar?

4    A    No.

5    MS. BANKHEAD:  May I have a moment, Judge?

6    THE COURT:  Sure.

7               (Whereupon there was a short

8               pause in the proceedings).

9    MS. BANKHEAD:  Nothing further, Judge.

10   THE COURT:  Cross.

11                    CROSS-EXAMINATION

12                         BY

13                    MR. TARR:

14   Q    Mr. Speight, what does Black Dog look like?

15   A    He's a young man, I'd say about 25 maybe.

16   Q    Younger than me?

17   A    Yes.

18   Q    Younger than, say --

19   A    Maybe a little bit older than this man

20   (Indicating).

21   Q    I mean you never asked him for identification,

22   right?

23   A    Right.

24   Q    And all of this is approximation?

C-18

```
 1        A     Yes.

 2        Q     Now, how long have you worked security at

 3   Mannings Blue Room?

 4        A     At that time about 10 years.

 5        Q     How crowded was it on August -- the early

 6   morning hours of August 11, 1995?

 7        A     It was a lot of people in there.

 8        Q     Approximately how many?

 9        A     I don't know, maybe a hundred, two hundred.

10        Q     So it must have been packed pretty tight?

11        A     Yes.

12        Q     And you're working the front door, correct?

13        A     Yes.

14        Q     Because being a security guard, you don't want

15   to have any problems there?

16        A     Right.

17        Q     Now, did you see a gun on John Phillips?

18        A     No.

19        Q     Did you see a gun on Black Dog?

20        A     No.

21        Q     Do you know a -- you didn't see a gun on Yancy,

22   correct?

23        A     No.

24        Q     Did you see a Sean McCree there?
```

C-19

1     A    Who is Sean McCree?

2     Q    So you don't know a Sean McCree offhand?

3     A    I don't know him by name.

4     Q    Okay.

5     MR. TARR:  If I may have a second, Judge.

6     THE COURT:  Sure.

7              (Whereupon there was a short

8              pause in the proceedings)

9     Q    Now, you saw when Yancy got -- you saw Yancy

10 get shot?

11    A    Yes.

12    Q    Now, when Yancy was shot, was he facing you,

13 facing you or his back to you?

14    A    He was facing a white car.

15    Q    But you, I mean?

16    A    His side was to me.

17    Q    Was this his left side or right side?

18    A    His left side.

19    Q    So his left side was facing you?

20    A    Yes.

21    Q    So he's pointing this direction to you, right?

22    A    Yes.

23    Q    And you saw two people up there, two other

24 people struggling with him, right?

C-20

1          A     Not struggling, no.

2          Q     Okay, well one was holding a gun on him?

3          A     Yes.

4          Q     And the one who was holding the gun on him was

5     faced which way?

6          A     He was facing south towards Yancy.

7          Q     So the one who had the gun on him was behind

8     Yancy?

9          A     He was to the side of him.

10         Q     Okay, I'm sorry, I don't quite know north,

11    south, east, or west right offhand?

12         A     The car was facing south, okay --

13         Q     Now, he was --

14         MR. DANIELIAN:  I'm going to ask the witness be

15    allowed to answer the question.

16         THE COURT:  There is really no question right now.

17         MR. TARR  Q  Yancy was pointing in this direction

18    (Indicating) when you saw him get shot, right?

19         A     Yes.

20         Q     The guy who shot him, which way was he facing,

21    I mean if you could direct me?

22         A     He was facing -- no, turning around the other

23    way.  He was facing this way (Indicating) almost to the

24    side of Yancy.  He's like this (Indicating) to Yancy.

C-21

1  Q So he was more like pointed this way?

2  A Yes.

3  Q Yancy's facing this way, and this other guy is

4 facing -- okay, record should so reflect that my left

5 side is pointing towards Mr. Speight reflecting the

6 position of Yancy, is that correct, sir?

7  A Yes.

8  Q And the person behind Yancy was faced

9 diagonally toward Mr. Speight -- I'm facing the jury box,

10 the person behind Yancy was diagonally pointed between,

11 say, between the jury box and the witness, you, correct,

12 is that about right?

13  A The man that was in front of Yancy was going

14 through his pockets standing in front of him.  Yancy was

15 facing the car, the man who was going through his pockets

16 back was to the car --

17  THE COURT:  What he's talking about is the person

18 with the gun?

19  THE WITNESS:  No, I'm talking about the one without

20 the gun.

21  THE COURT:  The one without that gun, how was that

22 person faced?

23  THE WITNESS:  He was on Yancy's right.  May I

24 demonstrate?



C-22
C-14

1    THE COURT:  You mind him going down?

2    MR. TARR:  Please.

3    THE WITNESS:  Wait a minute, I'll show you.  He's

4    standing like this (Indicating).  The guy that's going

5    through Yancy's pocket is standing here like this

6    (Indicating).

7    MR. TARR:  Miss Lipinski, could you represent the

8    person going through Yancy's pockets for purposes of

9    demonstration here?

10    THE WITNESS:  Not exactly in front right here going

11    through his pockets.  The other guy is standing here like

12    this (Indicating).

13    MR. TARR   Q   Behind him?

14    A     Not quite behind him, but to his side like this

15    (Indicating)

16    Q     And your hand represents the gun?

17    A     Yes.

18    Q     And you're holding it in his hand?

19    A     Yes.

20    MR. TARR:  Just for the purpose of record again,

21    Miss Lipinski representing the person going through

22    Yancy's pockets, she's pointing diagonally towards me.

23    Her back is diagonally pointed between the jury box and

24    the witness stand.

C-23

1          Q   Is that about right, sir?

2      A    Diagonal between the car and --

3      THE COURT:   Listen, Mr. Tarr, I think that's good

4  enough.  I think the jury can see.

5      MR. TARR   Q   Thank you, sir.  Now, of those people,

6  which one did you identify as John Phillips, my client?

7      A    I did not know his name, but that is the man

8  right there (Indicating).

9      Q    And what was he doing?   Was he holding the

10  gun, or was he going through the pockets?

11      A    He was holding the gun.

12      Q    Was the other person involved, Black Dog?

13      A    There was only three people out there:  Yancy,

14  the man that was going through his pockets, and the man

15  with the gun.  Those were the only people I saw.

16      Q    The man going through the pockets, was that

17  Black Dog?

18      A    No.

19      Q    Now, the person who was holding the gun, was he

20  wearing gloves at the time?

21      A    Sir, he was wearing -- as far as I could see,

22  he was not wearing gloves.

23      Q    And you did see him inside --

24      A    He had been in the club, yes.

C-24

Q    Now, you also talked to the -- you talked to

the State's Attorneys before you testified today, right?

A    Yes.

Q    And you went over your testimony with him,

correct?

A    Yes.

Q    And they didn't tell you -- of course, he

didn't tell you -- they didn't tell you -- they told you

to tell the truth, right?

A    Yes.

Q    Now, do you also remember talking to a Sergeant

Cooper that night of the Robbins Police Department?

A    Yes.

Q    And you talked to Sergeant Cooper after Yancy

had gotten shot?

A    Yes.

Q    And your the most term I could say right now is

you're ticked off as all heck, right, when you talked to

Cooper?

A    No.

Q    Well, you had just seen Yancy get shot?

A    Yes.

Q    And you were pretty upset?

A    No.



1        Q     Calm?

2        A     Yes.

3        Q     After seeing a guy that you've known since a

4    little boy get shot?

5        A     Yes.

6        Q     But you wanted the person who shot Yancy to get

7    caught, correct?

8        A     Wouldn't you?

9        Q     Yeah, but did you?

10       A     Yes.

11       Q     So you want to tell Sergeant Cooper everything

12   that you remember, right?

13       A     I did.

14       Q     And do you remember telling Cooper that Yancy

15   was holding a great big roll of money?

16       MS. BANKHEAD:  Objection, Judge.

17       MR. DANIELIAN:  Objection, Judge.

18       THE COURT:  The objection will be sustained.

19       MR. TARR  Q  Do you remember telling Cooper that you

20   saw Yancy with a lot of money?

21       MR. DANIELIAN:  Objection.

22       MR. TARR:  Judge, sidebar on this?

23       THE COURT:  The objection is overruled.

24                 Do you understand the question?

C-26

1        THE WITNESS:  I don't understand who he's trying to

2   say.

3        THE COURT:  Listen to the question and try to answer

4   the question the best of your ability.

5        THE WITNESS:  I will answer his question if he

6   explained it.

7        THE COURT:  He doesn't have to explain it.  Just

8   answer to the question and answer it to the best of your

9   ability.

10       MR. TARR  Q  Sir, if you don't understand the

11  question, could you let me know somehow, please?

12       A     Yes.

13       Q     When you were telling Sergeant Cooper what

14  happened, did you tell Sergeant Cooper that Yancy was

15  holding a lot of money?

16       A     He had some money, yes.

17       Q     You did tell Sergeant Cooper that?

18       A     Yes.

19       Q     And do you remember telling Sergeant Cooper

20  that when Yancy left, this guy was right behind him?

21       A     No.

22       MR. DANIELIAN:  Objection, Judge, to the form.

23       THE COURT:  The objection is overruled.

24       MR. TARR  Q  Now, this other guy who -- this other

1  guy who was going through Yancy's pockets, had you seen

2  him in Mannings Blue Room?

3       A    Yes.

4       Q    Did you tell Sergeant Cooper that?

5       A    Yes.

6       Q    Did you tell Sergeant Cooper that you saw both

7  of these guys follow Yancy out towards the parking lot?

8       A    They left out immediately after Yancy left out.

9       Q    And then somebody -- and about how much later

10 did somebody come in and say that they're sticking up

11 Yancy?

12      A    I don't know, maybe two, three minutes, four

13 minutes, I don't know, I don't remember that time, no.

14      Q    It wasn't very long?

15      A    No.

16      Q    It was a lot shorter than you've been up on the

17 witness stand?

18      A    Yes, a lot shorter.

19      Q    And were you still working the door at this

20 time?

21      A    Yes.

22      Q    So you come on out, correct?

23      A    What you mean I came on out?  I came out after

24 a man ran in and said somebody was sticking up Yancy, I

C-28

1    ran to the door, looked out, saw the man had Yancy

2    outside, stood there because I didn't have a weapon or

3    nothing.

4         Q    Okay.

5         A    So the man -- I stood there while they was

6    searching him, and Yancy said something and kicked the

7    car, and I heard the shot.

8         Q    And after the shot, you saw Yancy fall?

9         A    Yes.

10        Q    And when you saw Yancy fall, what did you do?

11        A    The guy who was working on the door with me was

12   calling the police.

13        Q    And what were you doing?

14        A    I was standing there looking.

15        Q    And did anybody come up -- okay, I guess it was

16   a guy that went through Yancy's pockets and got into the

17   car?

18        A    Yes.

19        Q    And the guy who had been holding the gun was --

20   he was running southbound?

21        A    No.

22        Q    Okay, which direction?

23        A    He ran north through the Big 10's lot.

24        Q    Showing you what Mr. Danielian is coming up

C-29

1   with what's been marked as State's Exhibit No. 1?

2        THE COURT:  Again, is this chart going to be used to

3   aid the witness in describing his testimony?

4        MR. TARR:  Please.

5        THE COURT:  Again, ladies and gentlemen, this is a

6   demonstrative aid to help you understand his testimony.

7   This diagram is not evidence in and of itself.

8        MR. TARR  Q  Can you see this chart?

9        A    Yes, I can.

10       MR. DANIELIAN:  Judge, we have no objection to the

11  witness stepping down.

12       THE COURT:  Do you mind going down there?

13       MR. TARR  Q  Sir, step up, please, now, this map

14  reflects Mannings, correct?

15       A    Yes.

16       Q    The parking lot right outside Mannings?

17       A    Yes.

18       Q    And this other parking lot?

19       A    This is the parking lot here (Indicating).

20       Q    And that's across the street, correct?

21       A    Yes, the Big 10.

22       Q    Now, where were you standing -- where were you

23  standing when you saw these two guys around Yancy?

24       A    Right here (Indicating).

C-30

1     Q     Where the X is?

2     A     Yes.

3     Q     Now, have you ever seen this map before?

4     A     Yes, I helped them draw it up.

5     Q     You mean by them draw it, you're talking about

6     the State?

7     A     Yes.

8     Q     Now, Yancy was where?

9     A     Yancy was here (Indicating).

10    Q     Could you draw a little stick figure of a man

11    where you saw Yancy?

12    A     Yancy was here (Indicating), the car was parked

13    here (Indicating), there was another car here

14    (Indicating), there's a telephone on the telephone pole

15    right here (Indicating), the other car was sitting here

16    (Indicating).

17    Q     Okay, now, a little stick for --

18    A     This is Yancy (Indicating), and the people was

19    right here (Indicating).

20    Q     So if you could draw a little stick figure.

21    Now this represents Yancy, correct?

22    A     Yes.

23    Q     Which way was this car facing?

24    A     They were facing south, both cars.

C-31

1        Q    Now, the guy -- By the way, which way is

2    Yancy -- okay, Yancy was pointing?

3        A    Yancy was facing the car right here

4    (Indicating).

5        Q    Now, the guy who shot Yancy took off in which

6    direction?

7        A    North through the Big 10's parking lot this way

8    (Indicating).

9        Q    So one guy -- I'll draw a little dotted line

10   indicating north.  Which way did the other guy go?

11       A    The other guy got in the car and went this way

12   (Indicating).

13       Q    So the car went around Claire Boulevard?

14       A    To Richmond.

15       Q    Where would Richmond be on this map?

16       A    Richmond would be here (Indicating), about a

17   half of block.

18       Q    So Richmond runs perpendicular to --

19       A    North and south.  Claire runs on an angle.

20   There's Broadway -- Blue Island is Broadway and Robbins

21   is Claire Boulevard.

22       Q    Now, when this car, it came out slowly,

23   correct?

24       A    Yes.

C-32

1    Q    Did you see anybody else run out towards this
2    car?

3    A    No.

4    Q    Did you see anybody come out yelling at the
5    car?

6    A    There were people yelling all over.

7    Q    Did you see anybody throw a brick at the car?

8    A    I didn't see that.

9    Q    Or a beer bottle?

10   A    I was seeing Yancy on the ground.

11   Q    But you're standing at the door?

12   A    I moved from here (Indicating) up to here
13   (Indicating).

14   Q    So you --

15   A    To the middle of Claire Boulevard.

16   Q    And you saw their car come around and go to
17   Richmond?

18   A    Yes, make a left turn.  The guy that went north
19   had circled around through the parking lot and jumped in
20   the car right at Richmond going south.

21   Q    By the way, when he jumped in the car, did he
22   still have the gun with him?

23   A    I didn't see no gun.

24   Q    Okay, thank you.  Being a security guard, I

C-33

1   presume you used to be -- Were you a police officer at

2   any point?

3       A    No.

4       Q    Service?

5       A    No.

6       Q    Security guard training?

7       A    No.

8       Q    But you heard the gunshot?

9       A    Yes.

10      Q    And were you able to tell what kind of a weapon

11  it was --

12      A    No, it was a loud noise, a loud gunshot.

13      Q    So it was larger than say a 22?

14  MR. DANIELIAN:  Objection, Judge.

15  THE COURT:  Well, if he knows.

16  MR. TARR  Q  it was louder than a 22?

17      A    Yes.

18  MR. TARR:  If I may have another moment, Judge?

19  THE COURT:  Sure.

20  MR. TARR:  Thank you.

21              (Whereupon there was a short

22              pause in the proceedings)

23      MR. TARR  Q  By the way, you say Claire turns into

24  Broadway?

C-34

1    A    Yes.

2    Q    And Claire and Broadway are basically the same

3  street?

4    A    They are the same street.

5    Q    By the way, I noticed that you're not wearing

6  glasses, do you?

7    A    Only to read.

8    Q    So you could see me pretty well, then?

9    A    Yes.

10    Q    And you could, of course, see the incident?

11    A    Yes.

12    MR. TARR:  Thank you, no other questions.

13    THE COURT:  Any redirect?

14    MS. BANKHEAD:  No, Judge.

15    THE COURT:  You may step down.

16            (Witness excused).

17    THE COURT:  We are going to take a short recess at

18  this time.

19

20

21

22

23

24

C-35

*Part Two*

(Recantation)

Sean McCree, before "Recanting" the testimony that he was "forced" to give to the, "Grand Jury", as the result of the "Police Brutality" that was inflicted upon him by, Sgt Seamus Cooper, of the Robbins Police Department, which was accompanied by the threats of a lengthy "prison sentence", given by the Assistant States Attorney, who was also at this police station engaging in this illegal "Mental", and "Physical" treatment of "Brutality", that directly violated Mr. McCree's, "Miranda" rights, his "Constitutional" rights, and also his "Juvenile" rights, in Mr. McCree only being a "16 yr. old minor", who's "parent's", nor "legal Counsel" were afforded the legal right to be present, neither "before", nor "during" the Commission of these "Unlawful Acts".

These "facts" by law, should have therefore deemed "any" information obtained under these Circumstances, "Inadmissible", in being obtained "Unlawfully", and in violation of the 4th, 5th, 8th, and 14th amendments, which protect against, "Illegal Search and Seizures", "Self Incrimination", and violation's of "Due Process" right's, through "Equal Protection" of the law. Of which, Mr. McCree was "never" afforded, though he was only a minor. In addition to this information being obtained by the use of illegal means, (Brutality) in direct violation of the "Cruelty Clause" of the 8th amendment.

Before his testimony at the trial of, John Phillips, "19 month's later", the "now" 18yr. old Sean McCree, was "first" made aware of the fact that he would be placing himself in jeopardy of, "Perjury Charge's", being brought against him, upon the Conclusion of his "recantation testimony". He was later "interviewed" (per the Court) by a private Attorney, in order to make sure that he

26

understood the Consequences of being found, "Guilty of Perjury", in an Court of law, and to make sure that he was not "again" being forced against his will to make a statement.

Still, despite the outcome, Mr. McCree insisted upon "recanting" his "illegally obtained", and the "manufactured" testimony, which was given to the Grand Jury, in "exchange" for his freedom. Which was "Coercion" according to the manner in which this "same" information was previously obtained.

Though Mr. McCree had implicated "himself," in every aspect of the Crime's that were Committed, and was also, picked out of an Police line up (however illegal) he was "never" Charged with a Single Crime.

This was Mr. McCree's reward for the "Coerced" testimony that he'd given to the Grand Jury, as an "alleged" accomplice to the Crime, though a Co-defendant Can't be Convicted Soley on the testimony of an accomplice.

In "exchange" for his own freedom, Mr. McCree was told to implicate Mr. Phillips as an accomplice, though there existed no other evidence that proved Mr. Phillips to actually be an accomplice "at all."

All of Mr. McCree's right's were violated in the presence of an Assistant State's Attorney, who is an "officer of the court", knew that Mr. McCree was a "minor", And because of that "fact," he was not to be interviewed by police at all, without the presence of his parents, or legal Counsel, being afforded beforehand.

3

Mr. M°Craw, from the very beginning of his "Recantation" testimony, during "direct examination", when asked; "How did you get to Monnines bar from, 71st and Muskegon", (which is where he was before being picked up) stated that he and 3 other individual's were transported there by the individual known as "Black Doc".

Mr. M°Craw also stated that he went "inside" of Monnines bar, where Mr. Speight alleged to have been doing "Security" at the front door.

Which brings into question, "how" was it that, a man that has allegedly done "Security" at Monnines bar for "10yrs.", who was also "so focused" on doing his job that, his "eyesight" Canvassed not only the parking lot of Monnines bar, which was where he worked, but also, the parking lot of another Club that was located across the street so "Closely" that, he was able to allegedly witness "every detail" of an incident that took place, but he Could not "see", the "16yr. old", Sean M°Craw entering the bar?

Asking for "identification" proving that a person is of age to be in a Club where "alcohol" is sold, is a "first priority", of a Club's Security, before a weapon's Check is administered.

Therefore, in Mr. M°Craw gaining access into this Club, the "10yr." Security "Veteran", Timothy Speight, was not at the front door as he'd alleged to witness anything at all.

When Mr. McCrea was asked; "Now, while in that bar, were you in there with Black Dog"?, he answered, "No".

When asked where Black Dog was?, Mr. McCrea stated; "Parking the Car".

When Mr. McCrea was asked; "When you left the bar, "what" if anything unusual happened"?, he stated that, "when he left the bar, "Black Dog" approached him, put his arm around him, and led him to a Cadillac".

When asked who was by this Cadillac? Mr. McCrea stated; "Some guy, the victim that got shot".

Therefore placing himself "Directly" at the Scene of the Crime, though he was never Charged with a single offense.

Mr. McCrea also stated that, "Black Doe" instructed the victim, Yancy Brown to give the Car key's to Mr. McCrea, and that Mr. Brown Complied. Mr. McCrea, then got "into" the Car, and Started it up, as another guy joined him, before "Black Doe" Shot the victim.

When asked; "Did you "See" Black Doe shoot this guy"? Mr. McCrea stated, "Yes".

Therefore, giving a positive "eye witness" testimony to the fact that, Mr. Phillips "did not" shoot Yancy Brown as he was accused.

And "also", according to, Sean McCrea, Ted Griffin, Sgt. James Cooper, who was the "Chief Investigator" of the Case, Timothy Specht, and also the "victim" himself, Yancy Brown; John Phillips "is not" Black Doe.

58

Additionally, when Mr. McCrea was asked, if "Black Dee" was with him when he drove off, Mr. McCrea stated, "No." "Verifying" the fact that, it was "Black Dee" that was left in the parking lot, standing over the victim, Yancy Brown, though Mr. Speight, Committed "parjury" in stating that, it was Mr. Phillips that he had seen standing over the victim, "under oath", at Mr. Phillips' trial, but "not" in the "police report."

Which "prove's" the fact that, the places of, "John Phillips", who was in handcuff's, and "Black Dee", a known "gang member", and "violent Criminal", who was "Still At Large", were switched by Mr. Speight, out of fear for his own "well being".

When Mr. McCrea was asked if anyone went through the victim Yancy Brown's pockets? Mr. McCrea, who was directly involved "in the Crime's, and who was also, "Closer" to the incident than any alleged witness testified to have been, Stated "No".

Therefore "proving" Mr. Speight's allegations of Yancy Brown's pocket's being rambled through to be, "False".

When Mr. McCrea was asked if he knew John Phillips, Mr. McCrea stated, "No".

"Again", verifying the fact that, Black Dee, and Mr. Phillips, "are" and were, "2 different people"

66

Due to these "fact's" alone, "John Phillips", should not have been Charged with a "Gun Charge", in the individual, "Black Doe", being "proven" to have been the person that shot the victim, Yancy Brown. And neither should he have been Charged with a "Robbery", in Mr. M°Crea, who directly involve's himself in these Crime's, stating that, going through the victims pocket's, was never done by anyone at all.

Separating John Phillips, from "Black Doe", occur's "again" when, Mr. M°Crea was asked if Mr. Phillips was there with himself, and "Black Doe" and Mr. M°Crea stated, "No Ma'am".

When asked; "Did Mr. Phillips go through Yancy Brown's pocket's"? Mr. M°Crea stated, "No".

When asked if Mr. Phillips shot anyone, Mr. M°Crea stated, "No Ma'am".

Therefore proving the "fact" that, John Phillips, was in "no way" involved in the incident in question. Which was the "same" incident that, Sean M°Crea "himself", admitted to being "directly involved" in, with "absolutely nothing" to gain by "excluding" Mr. Phillips from the incident as he'd done "under oath", during his "Rennitution" testimony at, Mr. Phillips trial for doing so.

Mr. M°Crea stated that, the only reason that he'd even implicated John Phillips in the incident to begin with, was because he was, "Coerced" into doing so, "after", being placed in a "Cell", considered "Adult's" as a "16 yr. old minor", "Picked" out of an "Illegal" line up, "forced" to Sign a "Statement", that he "did not" write, after he was "threatened", and also "Beaten", by Sgt. James Cooper, and after the "promise" of his Charge's being made to "disappear", were made by an "Assistant State's Attorney", in exchange for Mr. Phillips, who by all "evidence", was an

78

"innocent man". Verification of that "promise" being kept by the "State", was given when Mr. McCrea "admitted" to being, directly involved in every aspect of the incident in question, from driving from 71st and Muskegon, in Chicago Illinois, to the Mansions Blue Room night Club, with the actual assailant, "Black Doe", to taking the victim's Car Key's, and driving away after "Black Doe" shot Mr. Brown, in attempt's to, "Elude and Evade" police, in a "Stolen Car", after being an "accomplice" to an alleged "Armed Robbery", which resulted in an "Attempted Murder", before he was later Chased and apprehended on foot, attempting to "escape Custody". And still, Sean McCrea was "never" Charged with a Single offense, regarding the incident in question, though the "Stolen Vehicle" alone had connected him to the Commission of a Crime, long before he himself had.

Mr. McCrea also admitted the fact that, before Mr. Phillips ran up to the police asking for help ~~beca~~ because he heard "Gun shot's", of which was proven to be true by, Mr. McCrea himself stating that it was "he" that the police were Shooting at, along with the other assailant "Sean" jumping out of the victim's Vehicle. Therefore making it impossible for Mr. Phillips to have been that person.

In order for the "police" to have "Shot" at Mr. McCrea, and the other passenger of the vehicle, they would have "first", had to have a "Clear line of Sight", and also a "Better than average" Chance of hitting their target's, as apposed to making the City liable to pay for damage's suffered from the officer's bullet's hitting "innocent victim's". Because, the bullet's from these officer's gun's, would have had to be stopped somehow.

Because of these facts, if, Mr. Phillips was actually the other person "Seen" by police, jumping out of the vehicle with Mr. McCree before being "shot at" by the police, or "Police Line Up", would not have been at all necessary.

Additionally, Mr. Phillips would have "doubled back" to give himself up, after he'd "escaped" Claim, because the police that did the "shooting", would have already "known" that it was him, by their personal "eye witness" accounts "alone".

And also, Mr. Phillips, having "multiple" trumped up Charges against him already, would have also had added to his list of Charges, "Eluding and Evading", and also "Carjacking".

These "were not" added because, the police "knew" that, Mr. Phillips "was not" one of the people that they'd shot at. Proving the "fact" that, he was not the other person that allegedly jumped "into" not "out of", the vehicle in question.

Mr. Phillips was only an "innocent man", who was unfamiliar with the area in not being from "Robbins Illinois", who heard "gun shots", (Police "shooting" at Mr. McCree) and out of fear for his "Safety", he ran to the police for help. But rather than helping Mr. Phillips, the police made him the person that got away.

Seam M^cCrea, under "Cross Examination" Swore his "recantation testimony" at Mr. Phillips' trial, recording the first time that he'd ever seen Mr. Phillips, "never" Changed his testimony. Even when question's were "re-arranged", or asked differently so that a different answer would be given though the question was the "Same", Mr. M^cCrea, "never" Changed his testimony. Mr. M^cCrea, nor Mr. Phillips ever had an opportunity to rehearse their Stories, So that they would Sound Similar. "First", in being transported to the station in "2 separate" vehicles, after only being in the Same vehicle for "5" to "10" minutes, where Mr. M^cCrea stated that, Mr. Phillips would ask him "what was going on", only to be ignored by Mr. M^cCrea.

Proving that the "facts", of Mr. M^cCrea's "recantation testimony", were "true".

"None", of the testimonie's of the State's witnesses are "Compatible", though they all Claimed to have witnessed the "Same incident", and Despite the "fact" that, their testimonie's were given to Set. Cooper, on the night of the incident itself.

"19 month's", and a Complete severance of "ties", and "Communication", and also being of different "Mindstate's", due to their "Situation's", in Mr. M^cCrea already being "free and Clear" of all Charge's, and at "home", while Mr. Phillips was an "innocent man", who was in the "County Sail" awaiting trial, "Separated" these two individual's, and yet, their account's of the incident in question Still "Matched" Completely. Of which, Could not be accomplished by the "State's witnesses", though they were all "together", and were also "Coached" by the State at trile, though Set. Cooper, had already "discredited" their account's before the "Grand Sury",

10 of

1) Sean McCree admitted to come to the Manured Blue Room night Club where the incident in question took place, "with" the actual assailant, "Black Doe". Who picked Mr. McCree up on 71st and Muskegon which was in "Chicago Illinois", in order to take him to the "Robbins Illinois" night Club. (See "C-45", 22-24, thru "C-46", 1-23 and "C-47", 2-9)

2) Mr. McCree stated that he'd "entered" into the "Adult" night Club. (though he was a "16 yr. old minor") Proving that, the "alleged" Security General, Timothy Speight, who made "no mention" of ever seeing Mr. McCree, Committed "Perjury" in stating that he was at the "front door" doing security when he allegedly witnessed the incident in question. (See "C-47", 13-16)

3) Mr. McCree implicated the person known as "Black Doe", as the "actual assailant" that Committed the Crime of shooting Yancy Brown. Which was "unknowingly Coobarated" by the victim himself. Of whom, Mr. McCree stated, was by the Car that Mr. McCree was "led" to by the neck, by "Black Doe", as well as Mr. Brown here who got shot by "Black Doe". Stating that, "Black Doe" requested for Mr. Brown to give the Car key's to Mr. McCree, before "Black Doe" ultimately "shot" Mr. Brown. Of which, was exactly how Mr. Brown "himself" explained the incidents taking place (see "C-48", 8-11, 15-18, 21-24, thru "C-49", 1-5 and 8-13) Also See (Yancy Brown, "B-40", 6-14, and "B-43", 3-13)

4) Mr. McCree admitted to drove away in the victim's Car, leaving the assailant, "Black Doe" in the parking lot, standing over the victim. Just as Tal Griffin Committed "perjury" stating that the person standing was Mr. Phillips according to his "eye witness" account's. (See "B-99", 13-15)

118

5) Mr. McCrea not only states that John Phillips was not around when the incident in question took place, but also the "fact" that he did not even know Mr. Phillips. (See "C-49", 17-23, "C-50", 13-21, "C-51", 10-24, "C-52", 1-2, "C-53", 18-24)

6) Mr. McCrea "elected" to "elude the police", in the victim's Car, then jumping out and running from the police, who were also "shooting" at him before he was eventually Caught, handcuffed, and placed into Custody, where he later witnessed Mr. Phillips running up to the police, and asking for help, before he "himself" was also handcuffed, and placed into a police Car alongside Mr. McCrea, where he asked Mr. McCrea "what was going on", only to be ignored. (See "C-51", 1-8 and "C-52", 3-11)

7) Mr. McCrea states that, he was placed into "Adult" lock-up, (though he was only a 16yr. old minor) with Mr. Phillips being placed in a Cell next to him though Mr. Phillips had only run to the police Car asking for help. (See "C-52", 18-20, "C-52", 22-24, thru "C-53", 1)

8) Mr. McCrea states that, he was interviewed by Sgt. Cooper, and also a State's Attorney, though they knew that without a Parent, Guardian, or legal Counsel being present, (in Sean McCrea being a 16 yr. old minor) it was "Unlawful" to do so., in addition to any information gathered, statements Signed, or witness identification of Mr. McCrea, being all "Inadmissible" under the Circumstances, according to law. (See "C-53", 10-24)

9) Mr. McCrea states that the statement that he was "forced" to sign, and that also "was not" written by him, nor the accusation's therein were at all true ("C-54", 3-20)

128

10) Mr. McCrea states that, not even in the "statement" that he was forced to sign by, Sgt. Summers Cooper, and a State's Attorney, did he "ever" say that Mr. Phillips shot the victim, Toney Brown. (See C-54, 22-23)

11) Mr. McCrea stated that, he'd only said the thing's at the "Grand Jury", that Sgt. Cooper, and the State's Attorney, put into the "illegally manufactured" statement that he was forced to sign. Which was that Mr. Phillips was involved, and that he'd gone through the victim's pockets. But "also" that, it was "Black Dog", that shot the victim, Toney Brown. (See "C-55", 10-24, thru "C-56", 1-7)

12) Mr. McCrea explained to the Court, "why" he was **Recanting** the testimony that he'd given to the Grand Jury, and also "admitted" that, though he was "directly involved" in the incident in question, he was "never" Charged with a single offense, because he was told by Sgt. Cooper, and the State's Attorney, that if he implicated John Phillips as one of the "offender's", they would "Let him Go". Which prove's the fact that, Savin McCrea's "implication's" of Mr. Phillips in the incident in question "were not" at all true. They were only "Coerced Testimony". Of which, was "illegal". (See "C-54", 2-24, "C-58", 15-22, thru, "C-59", 1-10)

13) Mr. McCrea, while under "Cross Examination", again stated the fact that, John Phillips "ran-up" to the police Car himself asking for help, while also "again" admitting the fact that, he "himself" was arrested After he'd "fled" from police though he was never Charged with a single offense. (See "C-60", 10-17, "C-60", 22-24) Also see ("C-51", 1-8, and "C52", 3-11)

14) Mr. McCrea stated that he'd heard Mr. Phillips telling the police that he needed help because he was unfamiliar with the area, and Someone

13¢

was shooting, Which according to Mr. McCrea, was the police, at himself. See "C-61" 14-18, and

15) Mr. McCrea stated that, both he, and Mr. Phillips, were transported to the station in "2" separate vehicle's, (to prevent calling story straight) explaining that they were first placed in the Same vehicle for only "5-to 10" minute's. Which were not spent attempting to make-up "Cooborating" Storie's, otherwise, Mr. McCrea would have attempted to tell that story, before agreeing with the state to implicate an "innocent man", (John Phillips) in "exchange" for his own "freedom". (See "C-62", 6-15, "C-62", 18-24, thru "C-63", (1-2)

16) Mr. McCrea even stated that, he was placed into an "Adult" lock-up alongside of other adult's, particularly Mr. Phillips, whom Mr. McCrea "did not know as of yet, (which was a "Scare" tactic by police, to sway the cooperation of a 16 yr. old "minor") but is who asked Mr. McCrea "what was going on", only to even be ignored. Which was the Same thing that Mr. Phillips asked Mr. McCrea in the police Car, receiving the same result. (See "C-63", 15-24, "C-64", 6-10) Also See (C-52, 18-20, 22-24)

17) Mr. McCrea stated that, he'd learned Mr. Phillips' name when, Sgt. Cooper called him out of the Cell. (See "C-64", 13-24)

18) Mr. McCrea, though only a "minor", who's Miranda, and Constitutional rights were therefore "violated" is no Parent, Guardian, nor Legal Counsel haave present beforehand, as the law "required" in Mr. McCrea only bane "16 yrs. old", was "interviewed" against his will by, Sgt. Cooper and made to admit his involvement in the incident in question. (See "C-65", 6-13) Also See (C-53, 10-24)

14 %

19) Mr. McCrea, while under "Cross-Examination", could not be "tricked" into changing his testimony regarding "how" he'd come to know "who" Mr. Phillips was, and exactly "how" he'd come to implicate him in the incident in question, alone with himself. Though what Mr. McCrea stated Mr. Phillips "did" still "excluded" Mr. Phillips from any possibilities of ever being the "shooter", as Mr. Spradt and Mr. Brown had alleged at trial, but did not state in their "police report's", where Mr. Spradt "Generalizes", as the victim himself, Yoney Brown, "outright" describes his "shooter", who by all accounts, including photo's used in a "5 photo line up", was not John Phillips. (See "C-65", 17-23, "C-66", 7-16, and the police report's of Yoney Brown, and Timothy Spradt)

20) Mr. McCrea stated that, he'd only implicated Mr. Phillips as an offender, "after" he was "Beaten", "Slapped around", and "Threatened" into doing so, by Sgt. James Cooper (see "C-66", 24, thru "C-67", 1-11) Proving that, he'd done as a "minor", what police have been proven to make "adults" do even against their will. Which was, to say "anything" that the police wanted, simply so that the torture or brutality would stop. Just as "anyone" would have.

21) Mr. McCrea proves that he was at the police station "alone", being interrogated by police in station that, he told his parent's what the police did to him, when they arrived (His parent's) (See "C-69", 19-24, thru "C-70", 1-11)

22) Mr. McCrea stated that, he was present while Sgt. Cooper, "Coached" the witnesses ~~as to~~ as to whom to select from the line-up, though he admit's that he himself should have been identified (See "C-71", 4-16, 19-20)

15 8/

23) Mr. McCrea states that, what he'd told to the, Grand Jury, "was not" the "truth" (see "C-73", 2-4).

24) Mr. McCrea stated that, he only knew Mr. Phillips a total of about three, from the time that Mr. Phillips ran up to the police car, until Mr. McCrea left the police station, going home. Which "again" prove's the fact that, though he was implicated in the incident in question by alleged witnesses, and had "also" implicated himself in every aspect of the crime's that took place, Mr. McCrea was "still", never charged with a single offense. (See "C-73", 24, thru "C-74", 1-4). Which was done in exchange for Mr. McCrea implicating Mr. Phillips, who was an "innocent man", though Mr. McCrea still never told the police that Mr. Phillips "shot" anyone. Proving that, the police "knew" that the "actual shooter", was "still at large". Of which, was exactly what was reflected in the "testimony" of the Cases, "Chief Investigative Officer", Sgt. Somas Cooper, that was given to the Grand Jury "under oath", after his investigation into the account's of the incident in question was completed. (See

25) Mr. McCrea as a "16 yr. old mind", was made to say that he'd known Mr. Phillips for "3 to 4 yrs". Which would have therefore made Sean McCrea a, "12 yr. old" Inmate, of the I.D.O.C., as that is "exactly" where "record's" clearly prove that, it is where Mr. Phillips was during that time, serving a "3 yr. sentence", from 1990 - to - 1993, which therefore proves this statement to be "false", concerning Mr. McCrea "knowing" Mr. Phillips for "3 or 4 yrs". (see "C-74", 5-9)

26) Mr. McCrea "admitted" to "lying" to investigator's regarding the crime. (See "C-77", 8-23)

16 g

27) Mr. McCrea stated that, he'd attempted to come to court on the behalf of Mr. Phillips, "before" the trial. (See "C-80", 2-18)

28) Sean McCrea stated that, he was "Recanting" everything that had previously stated regarding Mr. Phillips being involved in the incident in question, though still "admitting" the fact that, he "himself" was involved in every aspect of the Crime's that took place. (See "C-81", 8-24)

29) Mr. McCrea "avows" proves that a State's Attorney, "assisted" in the violation of his "Miranda", and "Constitutional right's", with Sgt. Cooper, though Sean McCrea was only a "16 yr. old minor". (See "C-82", 7-12)

AGGRAVATED BATTERY   0410   2911 Breadw   Robbins   305   BEAT ASSIGNED 3

VICTIM'S/SUBJECT'S NAME: Brown, Yancy

VICTIM/SUBJECT'S ADDRESS: 2840 W 139th Bluesland

TYPE OF LOCATION: Parking Lot

OFFICER'S NAME: Phillips, John   HOME ADDRESS: 7025 S Sangmon   M | 25 | 600 | 175 | Bro | Blk | me

NARRATIVE:

ON 11 AUG 1995 18:30 HRS REPORTING OFFICER SPOKE WITH McCREE, SHAUN WHO IN SUMMARY RELATED THAT HE CAME OUT TO ROBBINS WITH A SUBJECT KNOWN TO HIM AS BLACK DOG. AND THEY WENT TO MANNYS AND HE WENT INSIDE, WHILE THE OTHERS STAYED IN THE CAR, WHILE INSIDE McCREE STATED HE HAD A FEW DRINKS AND NOTICE HE HAD TO MANY SO HE STARTED BACK OUTSIDE, ONCE HE GOT OUTSIDE BLACK DOG GRABBED McCREE BY THE NECK, AND HIT McCREE ONCE ABOUT THE HEAD WITH A WEAPON, AT THIS TIME PHILLIPS, JOHN CAME UP AND STOOD ON THE OTHER SIDE OF McCREE AND MADE HIM WALK TOWARD VICTIM AS EXITED THE VEHICLE.

EXTRA COPIES REQUIRED: NORMAL

DATE THIS REPORT SUBMITTED: 11 AUG 95   TIME 20:00

REPORTING OFFICER: Sgt James Cooper

DATE APPROVED: 15 AUG 95   TIME 19:40

SHAUN McCree

1                    (Whereupon a recess was taken

2                    after which the following

3                    proceedings were had out of the

4                    presence and hearing of the

5                    jury:)

6          THE COURT:  Is the State resting?

7          MR. DANIELIAN:  Yes.

8          THE COURT:  Are there any exhibits that you're going

9    to admit?

10         MR. DANIELIAN:  Judge, we would seek leave to admit

11   People's two, which is the photograph of the lineup that

12   was utilized during the testimony of Fred Griffin.

13         THE COURT:  Any objection?

14         MS. LIPINSKI:  No, Judge.

15         THE COURT:  It will be admitted.

16         MR. DANIELIAN:  Should I tender it to the Court

17   now?

18         THE COURT:  Yes.  Anything else?

19         MR. TARR:  For whatever it's worth, we will seek

20   leave to --

21         THE COURT:  What I'll do on the diagram, it's not

22   being admitted as evidence in this case.  It does not

23   appear to be a scale drawing.

24         MR. DANIELIAN:  That's correct.


                              C-36

1      THE COURT:  I'll allow the parties to use it since
2  it's mainly used as a aid in the testimony.  You can use
3  it in closing arguments, but I'm not going to send it
4  back unless both parties want me to send it back.
5      MR. DANIELIAN:  No, Judge, I'm just making it
6  available.
7      THE COURT:  And you're resting then?
8      MR. DANIELIAN:  Yes.
9      THE COURT:  State rest.
10     MS. LIPINSKI:  Judge, at this time we will make a
11  motion for directed verdict.
12     THE COURT:  Any argument?
13     MS. LIPINSKI:  No.
14     THE COURT:  Any argument on behalf of the State.
15     MR. DANIELIAN:  No.
16     THE COURT:  Motion for directed verdict is denied.
17         Is your witness here?
18     MS. LIPINSKI:  Yes.
19     THE COURT:  What's his name?
20     MS. LIPINSKI:  Sean McCree.
21     THE COURT:  State your name for the record.
22     MR. MC CREE:  Sean McCree, M-c-C-r-e-e.
23     THE COURT:  Mr. McCree, defense has caused a Writ of
24  Habeas to bring you here today to testify in this case.

C-37

1    Do you understand that?

2         THE DEFENDANT:  Yes.

3         THE COURT:  My understanding you spoke with the

4    defense attorney already, is that correct?

5         THE DEFENDANT:  Yes.

6         THE COURT:  Did you talk to the State as well?

7         MR. DANIELIAN:  Yes, briefly.

8         THE COURT:  Did you talk to the State at all?

9         THE DEFENDANT:  Yes.

10        THE COURT:  Do you wish to testify in this case?

11        THE DEFENDANT:  Yes.

12        THE COURT:  Now, Miss Lipinski raised some kind of

13   issue that there might be a necessity for an attorney for

14   you, what is the reason for that?

15        MS. LIPINSKI:  Your Honor, I believe by his

16   testimony, Judge, it would involve recanting what he

17   previously stated at a hearing, a Grand Jury hearing,

18   Judge, where he was put under oath.  I believe if he does

19   get up and testify today, he should be made aware that

20   possibly he will put himself in jeopardy of perjury

21   charges being brought against him.  Also, your Honor, he

22   is going to testify about this case and the happenings in

23   defense of this case.  I do believe Mr. McCree possibly

24   would put himself in jeopardy of being charged with the

C-38

1    offense -- some offense that is involved in this case,

2    and I do believe, your Honor, because of that, that

3    Mr. McCree should have his own attorney.

4         THE COURT:  It's up to Mr. McCree.

5              Number one, Mr. McCree, I'm not

6    required -- my understanding of the case law, I am not

7    required to give you what they call fifth amendment

8    right, it's something, although to a certain extent it

9    would whether or not you want to voluntarily testify in

10   this matter.  You may have a fifth amendment by this to

11   possibly, any involvement you might get charged as a

12   result of your testimony here today.  As far as perjury,

13   I don't know whether or not you would have a fifth

14   amendment right as to that or not because you're expected

15   to tell the truth, and I don't know whether or not you

16   could tell the truth.  It's up to you, do you want to

17   talk to a lawyer?

18        MR. MC CREE:  Yes, sir.

19        THE COURT:  All right.  What I'll do is, I see

20   Mr. Turner here, I would like to appoint you if you

21   possibly could if you have a few minutes to speak to

22   Mr. McCree, he is a potential witness in this case.  He's

23   here on a Writ of Habeas Corpus on behalf of the defense,

24   and the defense attorney has just told -- Miss Lipinski

C-39

1    has just told me there may be two problem with Mr.

2    McCree.   One is that he testified in front of a Grand

3    Jury as to this proceeding earlier, and she expects his

4    testimony to be different if he's called to testify

5    today.   As I said, I don't know whether or not he has a

6    fifth amendment right as to that regard, but there is a

7    second aspect of this, whether or not he would have a

8    fifth amendment -- he's putting himself involved at this

9    particular time that he might be charged.   So I will

10   appoint you, Mr. Turner, if you would be willing to do

11   this for the Court.

12        PRIVATE ATTORNEY:   Sure.

13        THE COURT:   And we'll pass it, maybe you could talk

14   to him for a few minutes.

15        PRIVATE ATTORNEY:   Fine, I will be happy to.

16              (Whereupon a recess was taken

17              after which the following

18              proceedings were had out of the

19              presence and hearing of the

20              jury:)

21        THE COURT:   All right.   Bring out Mr. Phillips.

22              Okay, Mr. McCree, you've had a chance to

23   talk to an attorney by the name of Harold Turner, is that

24   right?

C-40

1      MR. MC CREE:  Yes.

2      THE COURT:  Do you have any questions at all about

3  anything you spoke to Mr. Turner about?

4      MR. MC CREE:  Yes, sir.

5      THE COURT:  I don't want to you repeat your

6  conversation with Mr. Turner, but I want to know if you

7  have any questions of me?

8      MR. MC CREE:  No, sir.

9      THE COURT:  Basically, he went over your rights with

10 you, is that correct?

11     MR. MC CREE:  Yes.

12     THE COURT:  And if there's the possibility that you

13 could be possibly charged with an offense, is that

14 correct?

15     THE DEFENDANT:  Yes.

16     THE COURT:  It is your decision whether or not you

17 want to testify, is that correct?

18     THE DEFENDANT:  Yes.

19     THE COURT:  You don't want to testify in this

20 matter?

21     MR. MC CREE:  Yes, sir.

22     THE COURT:  We will pass this case.  You will be

23 called shortly.

24

C-41

1          (Whereupon a recess was taken

2          after which the following

3          proceedings were had out of the

4          presence and hearing of the

5          jury:)

6     THE COURT:  The State is formerly resting, and we

7  will go right into the defense.

8     MR. DANIELIAN:  Your Honor, based upon questions

9  that were asked of Detective Cooper yesterday on cross,

10  I'm going to ask for an offer of proof regarding what I

11  anticipate are going to be two defense witnesses who are

12  apparently the mother and sister of the --

13     MS. LIPINSKI:  Mother and girlfriend.

14     MR. DANIELIAN:  And ask since there was no statement

15  taken of the defendant, I'm going to ask for an offer of

16  proof as to what their relevance is, I assume it will be

17  their presence at the police department.

18     THE COURT:  I don't know.  What are you seeking --

19  there was some indication yesterday that they had

20  something to do with some kind of statement made by

21  Mr. McCree to the mother or something like that.

22     MS. LIPINSKI:  Yes, your Honor, there was an

23  indication.  However, your Honor, we do not and I don't

24  believe we will be proceeding in that manner as to

C-42

1    anything that was stated between Sean McCree and the

2    mother, Judge, and to their relevance being called, your

3    Honor.  I do believe by their testimony will indicate to

4    the jury and to the Court where exactly was John that

5    night when all of this started.

6        THE COURT:  All right.

7            Are you going to call Mr. McCree as your

8    first witness?

9        MS. LIPINSKI:  Yes.

10        THE COURT:  Okay, let's bring the jury out.

11            (Whereupon the following

12            proceedings were had in the

13            presence and hearing of the

14            jury:)

15        THE COURT:  Okay, you may be seated.

16            State have any further witnesses?

17        MS. BANKHEAD:  No, Judge, People would rest in our

18    case in chief.

19        THE COURT:  Defense wish to proceed?

20        MS. LIPINSKI:  Yes, your Honor, I would call

21    Mr. Sean McCree.

22        THE COURT:  All right.  Sean McCree.

23            Sir, if you would raise your right hand to

24    be sworn.

1                    (Witness sworn)

2        THE COURT:   Sir, if you would take a seat there,

3    move that chair up.

4                        SEAN MC CREE,

5    a witness herein, called on behalf of the defendant,

6    after being first duly sworn, was examined and testified

7    as follows:

8                    DIRECT EXAMINATION

9                          BY

10                   MS. LIPINSKI:

11        Q    Sean, would you state your full name, and I

12    want you to talk loud enough so everyone in the room can

13    hear you and spell your last name, please?

14        A    Sean McCree, M-c-C-r-e-e.

15        Q    Sean, how old are you?

16        A    Eighteen.

17        Q    Sean, what kind of education do you have?

18        A    It's average.

19        Q    Sean, did you finish high school?

20        A    No, ma'am.

21        Q    How far did you get in high school?

22        A    Sophomore.

23        Q    So that would be the 10th grade, correct?

24        A    Yes, ma'am.

1    Q    Sean, originally are you from the Chicagoland
2    area?

3    A    Yes, ma'am.

4    Q    How long have you lived in the Chicagoland
5    area?

6    A    All my life.

7    Q    Do you have family in this area?

8    A    Yes, ma'am.

9    Q    And have you lived in Chicago with your family?

10    A    Yes, ma'am.

11    Q    How many brothers and sisters do you have?

12    A    I have four brothers, three sisters.

13    Q    Sean, I want to talk about late night of August
14    10, early morning hours of August 11, 1995, okay, were
15    you then late that night at a Mannings bar or lounge in
16    Robbins, Illinois?

17    A    Yes, ma'am.

18    Q    Now, what time did you get to that Mannings
19    bar?

20    A    I don't know the approximate time, but I know
21    it was late, after 10:00.

22    Q    Now, before you were at Mannings bar, where
23    were you?

24    A    On 71st and Muskegon.

C-45

1     Q    How did you get to that bar from 71st and

2  Muskegon?

3     A    Black Dog.

4     Q    Now, 71st and Muskegon, is that in Chicago?

5     A    Yes, ma'am.

6     Q    You say Black Dog?

7     A    Yes, ma'am.

8     Q    Do you know Black Dog?

9     A    Not well, but I know him, I've been with him.

10     Q    Do you know Black Dog by any other name other

11  than Black Dog?

12     A    No, ma'am.

13     Q    Now, what, did you meet Black Dog at 71st and

14  Muskegon?

15     A    Yes, ma'am.

16     Q    And he did -- how did you proceed -- did you

17  and Black Dog proceed to Robbins, Illinois?

18     A    Yes, ma'am.

19     Q    How?  In a car? on a bus?  How did you get

20  there?

21     A    In a car.

22     Q    Okay, whose car?

23     A    Black Dog.

24     Q    What kind of car was it?

C-46

1      A      A white colored Chevy.

2      Q      Was anybody else with you and Black Dog when

3  you went to Mannings?

4      A      Yes, it was four of us.

5      Q      Do you know the other guys?

6      A      No, ma'am.

7      Q      Were they guys that Black Dog brought with him

8  or that you brought with you?

9      A      Brought with him.

10     Q      Now, when you arrived at Robbins, Illinois on

11 that night, it was approximately after 10:00 o'clock?

12     A      Yes, ma'am.

13     Q      Did you go into Mannings bar?

14     A      Yes, ma'am.

15     Q      So you entered that bar?

16     A      Yes, ma'am.

17     Q      Now, while in that bar, were you in that bar

18 with Black Dog?

19     A      No, ma'am.

20     Q      Where was Black Dog at?

21     A      He was outside parking the car.

22     Q      How long were you in the bar?

23     A      About five, ten minutes.

24     Q      Now, did you ever leave the bar?

C-47

1      A      Yes, ma'am.

2      Q      When you first arrived there, when did you

3   leave the bar?

4      A      Five, ten minutes.

5      Q      Now, sir, at that night on August 11 at

6   Mannings bar or August 10, when you left that bar, what

7   if anything unusual happened?

8      A      When I left the bar, Black Dog approached me

9   put his arm around me and led me to a Cadillac.

10      Q      What do you mean he put his arm around?

11      A      Put his left arm around me.

12      Q      How did he put his arm around you?

13      A      Like this (Indicating) as if he was talking to

14   me.

15      Q      And where did he take you?

16      A      To a white Cadillac.

17      Q      Who was by this white Cadillac?

18      A      Some guy, the victim that got shot.

19      Q      Do you know this person that got shot?

20      A      No, ma'am.

21      Q      Well, what happened when Black Dog took you

22   over there by this guy?

23      A      Took me over there, and he requested the guy to

24   give me his car keys, and the guy cooperated, gave him

C-48

1    his car keys, and he said get in the car and start it up,

2    and I get in the car and start it up, and another guy

3    jumped in with me, and Black Dog shot the guy.

4         Q    Did you see Black Dog shoot this guy?

5         A    Yes.

6         Q    What hand -- did he have a gun?

7         A    Yes.

8         Q    What hand did he have this gun?

9         A    Right.

10        Q    And you saw him shoot him?

11        A    Yes, ma'am.

12        Q    Okay, what happened after Black Dog shot this

13   guy, what did you do?

14        A    I start the car up, and I just drove off.

15        Q    Was Black Dog with you when you drove off?

16        A    No, ma'am.

17        Q    Did anybody -- before Black Dog shot this man,

18   this victim, did anybody go through his pockets?

19        A    No, ma'am.

20        Q    Was John Phillips there?

21        A    No, ma'am.

22        Q    Do you know who John Phillips is?

23        A    No, ma'am.

24        Q    Do you see John Phillips in this courtroom?

C-49

1    A    Yes, ma'am.

2    Q    Where do you see him?

3    A    (Indicating).

4    THE COURT:  I'm sorry, did he point to somebody?

5    THE WITNESS:  Yes, sir.

6    THE COURT:  Point to him again.

7    THE WITNESS:  (Indicating).

8    THE COURT:  What's he wearing?

9    THE WITNESS:  Blue tie, black suit, ponytail

10    (Indicating).

11    THE COURT:  Record reflect in-court identification

12    of the defendant.

13    MS. LIPINSKI  Q   Now, was John there with Black Dog

14    and you?

15    A    No, ma'am.

16    Q    Did John ever go through his pockets?

17    A    No.

18    Q    Did John shoot anybody?

19    A    No, ma'am.

20    Q    Did you see John that night?

21    A    No, ma'am.

22    Q    That night, not with Black Dog, after you drove

23    off in a car -- Well, excuse me, you drove off in a car,

24    what did you do?

1      A    I made a few turns heading to a viaduct.  As I

2    reached the viaduct, I was pulled over by a lot of

3    polices.  I got out of the car, me and the other guy, and

4    I ran.  I was under a truck, and when I came out of the

5    truck, I saw the police, and they were shooting, and the

6    police slide me to the ground, and they handcuffed me.

7    During the period of time I was handcuffed and put me in

8    the back seat --

9      Q    Put you in the back seat of what?

10      A    The police car.  That's when I saw John, he's

11    running up to the police asking for help.  He says I'm

12    not familiar with Robbins, Illinois, and he locked him

13    up, they put him in the car with me.

14      Q    You say that's when you saw John.  Now, at that

15    time, you didn't know that person was name John, though,

16    did you?

17      A    No, ma'am.

18      Q    Okay, now, when John ran up to the police and

19    said help me, help me, I'm lost, what happened next, what

20    could you see happening?

21      A    He put him in handcuffs and threw him in the

22    car.

23      Q    Put him in handcuffs and threw him in the car?

24      A    Yes, ma'am.

C-51

1     Q    Was that the same car you were seated?

2     A    Yes, ma'am.

3     Q    After you and John -- both of you are

4 handcuffed, you're both in the back seat, what happened

5 then?

6     A    He asked me what was going on.

7     Q    Who asked you?

8     A    John.

9     Q    Okay.

10    A    I couldn't explain it to him, you know, we were

11 just going through a thang, you know.

12    Q    Did you go anywhere after you were put in a

13 squad car -- were you then taken to a police station?

14    A    Yes.

15    Q    Was John taken to that police station?

16    A    Yes, ma'am.

17    Q    Was that the Robbins police station?

18    A    Yes, ma'am.

19    Q    At the Robbins police station, were you put in

20 a cell?

21    A    Yes, ma'am.

22    Q    Did you see what happened to John?

23    A    Yes.

24    Q    What happened to him?

C-52

1    A    He was in the cell next door to me.

2    Q    Could you talk to John?

3    A    Yes, ma'am.

4    Q    Did you talk to John?

5    A    Yes, ma'am.

6    Q    Did John talk to you?

7    A    Yes, ma'am.

8    Q    Is that when you learned his name?

9    A    Yes, ma'am.

10    Q    Now, while at the Robbins police station, did

11 you talk to Sergeant Cooper?

12    A    Yes, ma'am.

13    Q    And at the Robbins police station while there,

14 did you ever make a statement?

15    A    Yes, ma'am.

16    Q    And was it -- did you ever sign a statement?

17    A    Yes, ma'am.

18    Q    Who was present when you signed this statement?

19    A    A Mr. Cooper and State's Attorneys.

20    Q    Now, the State's Attorney that was present, did

21 you talk to the State's Attorney?

22    A    Yes, ma'am.

23    Q    Was there a male or female?

24    A    A male -- female.

C-58

1      Q      Do you remember her name?

2      A      No, ma'am.

3      Q      Now, you made a statement and you signed the

4   statement -- this statement that you signed, this wasn't

5   in your writing, was it?

6      A      No, ma'am.

7      Q      And in that statement, did you say that John

8   was involved?

9      A      Yes, ma'am.

10     Q      With the incident with the victim?

11     A      Yes, ma'am.

12     Q      Did you say in that statement that John went

13  through the victim's statement?

14     A      Yes, ma'am.

15     Q      Did you say in that statement that John had a

16  gun?

17     A      Yes, ma'am.

18     Q      Now, when you made this statement, was that

19  true?

20     A      No, ma'am.

21     Q      Did you ever say in this statement that John

22  shot the victim?

23     A      No, ma'am.

24     MR. DANIELIAN:  Objection, Judge, leading.

1    THE COURT:  That is a leading question.  The

2    objection is overruled.  That answer may stand.

3                Please don't lead the witness.

4    MS. LIPINSKI:  I'm sorry, Judge.

5        Q   Sean, did you testify before a Grand

6    Jury?

7        A    Yes.

8        Q    Do you remember the date that you testified?

9        A    No.

10       Q    Did you testify at a Grand Jury regarding this

11   incident that we're talking about today?

12       A    Yes, ma'am.

13       Q    Before you testified at that Grand Jury, did

14   you swear to tell the truth?

15       A    Yes, ma'am.

16       Q    And at that Grand Jury, did you say things more

17   or less the same that you stated in that statement that

18   you made?

19       A    Yes, ma'am.

20       Q    And that was?

21       A    That John was involved.

22       Q    And what else did you say about John?

23       A    That he went through the guy's pockets.

24       Q    And did you make a statement about anybody else

C-55

1   at the Grand Jury?

2        A    Yes, ma'am.

3        Q    Who was that?

4        A    Black Dog.

5        Q    And what was stated, what did you state about

6   Black Dog?

7        A    Black Dog shot the guy.

8        Q    Now, that wasn't true, was it, when you were

9   talking to the Grand Jury, was it?

10       A    No, ma'am.

11       Q    Now, before -- you've talked to me before you

12  came out today, didn't you?

13       A    Yes, ma'am.

14       Q    And that was what?

15       A    Monday.

16       Q    Was that the first time you ever talked to me?

17       A    Yes, ma'am.

18       Q    And you talked to the State's Attorney, too, is

19  that correct?

20       A    Yes.

21       Q    And that was when?

22       A    Monday.

23       Q    That was the first time you ever talked to

24  these attorneys?

C-56

1    A    Yes, ma'am.

2    Q    Before you testified today, you spoke to a

3  lawyer, didn't you?

4    A    Yes, ma'am.

5    Q    And that lawyer was named Mr. Turner?

6    A    Mr. Turner.

7    Q    And Mr. Turner explained to you today about

8  testifying, didn't he?

9    A    Yes, ma'am.

10    Q    And he told you that you have -- that there

11  were possibly Fifth Amendment rights?

12    MR. DANIELIAN:  Objection, Judge.

13    THE COURT:  Objection sustained.

14    MS. LIPINSKI  Q  What did Mr. Turner tell you.

15    MR. DANIELIAN:  Objection.

16    THE COURT:  Objection sustained.

17    MS. LIPINSKI  Q  Sean, why today are you telling

18  what you are and to this Court about John?

19    A    Because I didn't feel comfortable -- I felt bad

20  about what I did, having an innocent man being sent to

21  prison for something he never did, being deprived from

22  his freedom, especially his loved ones, I just couldn't

23  go on with it.  I wanted to bring forth to the jury that

24  he never was involved with it.

C-57

1          Q     Sean,, you've been convicted of a felony,

2    haven't you?

3          A     Yes.

4          Q     In fact, you're currently serving time for a

5    felony?

6          A     Yes, ma'am.

7          Q     And, Sean, you do know the ramifications of

8    testifying?

9          MR. DANIELIAN:  Objection, Judge.

10         THE COURT:  Objection sustained.

11         MS. LIPINSKI:  If I may have a moment, Judge?

12         THE COURT:  Sure.

13                (Whereupon there was a short

14                pause in the proceedings).

15         MS. LIPINSKI  Q  Sean, could you tell us why at the

16    Robbins police station you made that statement about John

17    Phillips?

18         A      Terrified, I was intimidated, you know,

19    threaten a little bit.

20         Q     Sean, at that police station, did you ever have

21    a lawyer present?

22         A     No --

23         MR. DANIELIAN:  Objection, Judge.

24         THE COURT:  Objection sustained.

C-58

1    MS. LIPINSKI  Q  Sean, were you ever charged --

2    MR. DANIELIAN:  Objection.

3    MS. LIPINSKI:  Can I finish my question?

4    THE COURT:  She hasn't finished her question.

5    MR. DANIELIAN:  I'm sorry, I draw it.

6    MS. LIPINKSI  Q  Were you ever charged with

7 anything involving this incident?

8    A    No, ma'am.

9    Q    The incident we're talking about today?

10    A    No, ma'am.

11    Q    Sean, why did you make this statement at the

12 Grand Jury about John being involved?

13    A    Like I stated, they asked me if I tell on John,

14 they will let me go.  So I thought I did what was best

15 for me.  He got the time and I told.  He was an innocent

16 man, though.

17    MS. LIPINSKI:  Thank you.  I have nothing further.

18    THE COURT:  Cross-examination.

19             CROSS-EXAMINATION

20                  BY

21             MR. DANIELIAN:

22    Q    Mr. McCree, whereabouts were you arrested in

23 Robbins the night you were arrested?

24    A    I'm not familiar with Robbins, sir.

1      Q      About how far were you from Mannings lounge

2    when you were arrested?

3      A      About a block, two blocks.

4      Q      And after you were arrested, you were placed

5    into a squad car, is that correct?

6      A      Yes, sir.

7      Q      And that's the first time you saw -- you claim

8    you saw the defendant, John Phillips, is that right?

9      A      Yes.

10     Q      And where was he arrested?

11     A      I'm not -- like I say, I'm not familiar --

12     Q      How far from the spot you were you arrested he

13   was arrested?

14     A      Same spot.

15     Q      About a few blocks away?

16     A      Hold on now, he ran up to the car, that's when

17   they arrested him.  I was arrested first.

18     Q      And you were arrested a few blocks away from

19   Mannings, and that's where he ran up to the car where he

20   was arrested, is that right?

21     A      Yes, sir.

22     Q      And you were arrested after you fled from the

23   scene from a shooting that took place, is that correct?

24     A      Yes, sir.

C-60

1      Q      And you were arrested in the location -- in an

2   area where you were trying to get -- Strike that.   You

3   were trying to get away from Mannings, is that right?

4      A      Yes, sir.

5      Q      And you got to the furthest possible place you

6   were able to when you were arrested, is that right?

7      A      Yes, sir.

8      Q      And that was in the same location where the

9   defendant was placed under arrest, is that correct?

10     A      No, sir.

11     Q      Was that the same location where the defendant

12  ran up to the car?

13     A      No, sir.

14     Q      What did the defendant say when he came up to

15  the car?

16     A      Officer, I need help, somebody shooting.   I'm

17  not familiar with Mannings, -- I mean Markham, I'm not

18  familiar with it, and that's it, and they arrested him.

19     Q      Did he say he was lost?

20     A      Yes, sir.

21     Q      He said help me I'm lost?

22     A      Yes, sir.

23     Q      I'm not familiar with Mannings?

24     A      I'm not familiar with around here.

C-61

1  Q And somebody has been shot?

2  A Yes, sir.

3  Q And you didn't know his name at this time, did

4 you?

5  A No, sir.

6  Q You were brought back to the Robbins Police

7 Department, is that correct?

8  A Yes, sir.

9  Q And on the way over, you were in the squad --

10 you're claiming you were in the same squad car as the

11 defendant was, is that correct?

12  A Okay, on our way there, they exchanged police

13 cars.

14  Q Okay, and therefore?

15  A We was brought in separate.

16  Q So you were brought back to Mannings?

17  A No, sir, went straight to the police station.

18  Q You went straight from the place -- in the same

19 squad car as him?

20  A No, sir.

21  Q You have to explain to me then.  At what point

22 and then were you in the same squad car as Mr. Phillips?

23  A When he first ran up to the police car, put him

24 in the car with me, when they was pulling off -- before

C-62

1   they pulled off, they took him out the car and placed him

2   in another car.

3       Q    How long were you with him in this car

4   together?

5       A    Five, ten minutes.

6       Q    Five, ten minutes you spent in the squad car

7   with John Phillips?

8       A    Yes, sir.

9       Q    And then you -- he was put into another squad

10  car, correct?

11      A    Yes, sir.

12      Q    And you were brought to the Robbins Police

13  Department?

14      A    Yes, sir.

15      Q    And when did you meet back up with

16  Mr. Phillips?

17      A    When they brought me to a cell.

18      Q    Were you put in the same cell?

19      A    No, sir.

20      Q    Were you put in separate cells?

21      A    Yes, sir.

22      Q    And that's when he introduced himself to you,

23  hi, my name is John Phillips?

24      A    No, sir.

C-63

1    MS. LIPINSKI:  Objection.

2    THE COURT:  This is cross-examination.  The

3    objection is overruled.

4    MR. DANIELIAN  Q  Well, how did you come to know his

5    name as John Phillips?

6    A    He asked me what was going on.

7    Q    He asked you what was going on?

8    A    Yes, sir.

9    Q    And what did you tell him?

10   A    I didn't say nothing to him.

11   Q    What else did he tell you?

12   A    He said man, what's going on, that's all he

13   kept asking me, and I didn't say nothing.  Then

14   Mr. Cooper called his name.

15   Q    Called whose name?   How did -- the detective

16   called his name?

17   A    Yes, sir.

18   Q    Okay, how did he call his name?

19   A    Mr. John Phillips.

20   Q    Announcing his name like calling for him?

21   A    Yes.

22   Q    Okay, and then what did you hear Mr. Cooper

23   announce or say?

24   A    That was it, Mr. John Phillips step up.

1      Q    Well, did you hear anyone else -- you were in a

2   cell by yourself, correct?

3      A    Yes, sir.

4      Q    And did you hear anyone else in his cell?

5      A    No, sir.

6      Q    You met with Sergeant Cooper, is that correct?

7      A    Yes, sir.

8      Q    And did Sergeant Cooper ask you about what you

9   had been involved in?

10     A    Yes, sir.

11     Q    And it was at that time that you told him about

12  your involvement, correct?

13     A    Yes, sir.

14     Q    How you had been threaten or intimidated into

15  being a part of this armed robbery, is that correct?

16     A    Yes, sir.

17     Q    And it was at that time that you got the name

18  John Phillips?

19     A    No.

20     Q    How did you come to implicate John Phillips?

21     A    That's when they came with an offer saying they

22  were going to let me go if I tell on John Phillips, say

23  it was him --

24     Q    Hold on just a minute, now.  Before they said

C-65

1   they would give you an offer if you told them about John

2   Phillips, what did they tell you about John Phillips?

3      A   They never told me nothing about it.

4      Q   Well, did they ever ask you who else was

5   involved with you in this incident?

6      A   Yes, sir.

7      Q   What did you tell them?

8      A   I told them it was me, that guy they got in the

9   cell with us, and that was it, and two more guys.

10      Q   So you told them in the very beginning that

11   John Phillips was involved, correct?

12      A   After he said his name, yes, sir.

13      Q   And what did you tell them about his

14   involvement?

15      A   I told him he went through his pockets, took

16   some change, and he was in a car with me.

17      Q   Okay, so right from the very beginning you

18   implicated John Phillips, is that right?

19      A   Yes, sir.

20      Q   Once Sergeant Cooper mentioned John Phillips,

21   boom, he's involved now, you're hooking him into this

22   thing, right?

23      A   Yes, sir.

24      Q   So why did Sergeant Cooper intimidated you and



C-66

1    beat you and threaten you if you in the very beginning

2    implicated John Phillips, why would he do such a thing?

3        A    Because I wasn't -- I wasn't applying (sic) to

4    what Sergeant Cooper was saying.

5        Q    I'm sorry?

6        A    I wasn't applying (sic) to what he was saying.

7    He was urging me, like pushing me on to say more things

8    about John Phillips, you know what I'm saying.

9        Q    Well, you were saying more things?

10       A    After I was slapped around a couple times, yes,

11   I was.

12       Q    Why would you be slapped around if you were

13   telling the police that he was involved?

14       MS. LIPINSKI:  Objection, your Honor.

15       THE COURT:  As to the form of the question

16   sustained.

17       MR. DANIELIAN  Q  At what point did he start

18   slapping you around?

19       A    When I started to be silent.

20       Q    And what were you being silent about?

21       A    When he asked me who shot the guy.

22       Q    You wouldn't answer him?

23       A    No, sir.

24       Q    Let me ask you this, how did you respond to

1    Sergeant Cooper when he told you about John Phillips

2    being identified at the scene as the person who was the

3    shooter?

4         MS. LIPINSKI:  Objection.

5         THE COURT:  Objection sustained.

6         MR. DANIELIAN  Q  Well, what did you learn about --

7    did Sergeant Cooper ever tell you about him being

8    identified as the scene?

9         A    No, sir.

10        Q    He never told you that?

11        A    No, sir.

12        Q    He never confronted you with your silence about

13   him being the shooter about the fact that he had been

14   identified.

15        MS. LIPINSKI:  Objection, your Honor.

16        THE COURT:  To the form of the question sustained.

17        MR. DANIELIAN  Q  Well, you had a chance to talk to

18   an Assistant State's Attorney, is that right?

19        A    Yes, sir.

20        Q    How would you describe her, how she looked, do

21   you remember what she looked like?

22        A    Yes, sir, not much I know, she was about your

23   height, blond hair, she was white female.

24        Q    How did she treat you?

C-68

1    A    She spoke kindly.

2    Q    Did she mistreat you in any way?

3    A    No, sir.

4    Q    How did she respond when you told her how you

5  had been intimidated and slapped by Sergeant Cooper?

6    A    I never said that.

7    Q    I mean to say Sergeant Cooper slapped you and

8  intimidated you, and yet in the presence of -- she

9  identified herself as Assistant State's Attorney, is that

10  correct?

11    A    Yes.

12    Q    You never told her about what had happened to

13  you?

14    A    No, sir.

15    Q    Well, how did your family members respond when

16  you told them about it when you met with them at the --

17    MS. LIPINSKI:  Objection.

18    THE COURT:  Objection sustained.

19    MR. DANIELIAN  Q  Met with your family members at

20  the police station, didn't you?

21    A    Yes.

22    Q    Who brought them in?

23    A    My stepfather.

24    Q    I'm sorry, who brought them in to meet with you

C-69

1 | in the station?

2 |     A    I'm not sure, all I know I had a visit.

3 |     Q    And, of course, you told them about this

4 | mistreatment, is that right?

5 |     A    Yes, sir.

6 |     Q    You did?

7 |     A    Yes.

8 |     Q    What did you tell them?

9 |     A    I told them Mr. Cooper slapped me.

10 |     Q    And what else did you tell them?

11 |     A    That was it, Mr. Cooper slapped me.

12 |     Q    And did they ask you why he slapped you?

13 |     A    No, ma'am -- no, sir.

14 |     Q    Did you tell them that you were implicating an

15 | innocent person into a crime that he didn't commit?

16 |     MS. LIPINSKI:  Objection.

17 |     THE COURT:  Objection overruled.

18 |     THE WITNESS:  No, sir.

19 |     MR. DANIELIAN  Q  You never told your family about

20 | that?

21 |     A    No, sir.

22 |     Q    Now, were you told that John Phillips was

23 | identified in a lineup, right?

24 |     A    Yes, sir.

```
 1        Q    What did you respond -- who told you that,
 2   Sergeant Cooper?
 3        A    Yes.
 4        Q    So he -- and what was your response to that?
 5        A    Sergeant Cooper was coaching them guys.
 6        Q    He was coaching --
 7        A    I was there.  We was both in the lineup
 8   together.
 9        Q    And by coaching, tell me what you mean by that?
10        A    He will go back there and then say -- you could
11   hear him talking, was it number one or number two.
12        Q    Were you in that lineup?
13        A    Yes, sir.
14        Q    I take it he coached them about you, too, is
15   that right?
16        A    Yes.
17        Q    And you were identified, is that right?
18        A    I'm not sure.
19        Q    Well, should you have been identified?
20        A    Yes.
21   MS. LIPINSKI:  Objection.
22   THE COURT:  The answer will stand.
23             Sir, if there's an objection, wait until I
24   rule on the objection before you answer, okay?
```

C-71

1      MR. DANIELIAN  Q  You appeared in front of the Grand

2  Jury, is that correct?

3      A    Yes, sir.

4      Q    And that's the Grand Jury sits in a large

5  courtroom, is that right?

6      A    Yes, sir.

7      Q    And there are many people that are Grand Jurors

8  that sit there?

9      A    Yes, sir.

10     Q    And it's much like a courtroom, a little

11 different than this, is that correct?

12     A    Yes.

13     Q    And it's a secret proceedings, in other words

14 there are chairs; that people can come in and out,

15 correct?

16     A    Correct.

17     Q    You were in the Grand Jury?

18     A    Yes, sir.

19     Q    The Grand Jurors, correct?

20     A    Yes.

21     Q    And the Assistant State's Attorney?

22     A    Yes, sir.

23     Q    And you took an oath before you testified in

24 front of the Grand Jury, is that right?

C-72

1    A    Yes, sir.

2    Q    You swore to tell the truth, the whole truth

3 and nothing but the truth, and you didn't do that, did

4 you?

5    A    No.

6    Q    How would you characterize how --

7    MS. LIPINSKI:  Objection.

8    THE COURT:  Objection sustained.

9    MR. DANIELIAN  Q  Now, you told the Grand Jurors

10 about this mistreatment at the hands of Sergeant Cooper,

11 is that correct?

12    A    No, sir.

13    Q    You mentioned nothing to them about this

14 so-called mistreatment, is that correct?

15    A    No, sir.

16    Q    Let me ask you this about John Phillips, tell

17 the ladies and gentlemen of the jury how you described

18 under what circumstances and how you knew and how long

19 you knew John Phillips?

20    MS. LIPINSKI:  Objection, your Honor, to the

21 question, that's compound.

22    THE COURT:  Objection sustained to the form of the

23 question.

24    MR. DANIELIAN  Q  Tell the ladies and gentlemen how

C-73

1   long you said you knew John Phillips?

2       A    From the time he ran up to the police car and

3   from the time I left the police station, which is about

4   I'll say six hours.

5       Q    I don't think you understood my question.  My

6   question is this:  How long did you tell both Sergeant

7   Cooper and the State's Attorney and the Grand Jury for

8   that matter, how long you had known John Phillips?

9       A    Three or four years.

10      Q    And how did you describe the way or how you

11  knew John Phillips, what your connection or relation --

12      A    Through my brother.

13      Q    What brother is that?

14      A    Santana McCree.

15      Q    And what was the relationship between John

16  Phillips and your brother?

17      A    Cousins, cousins, friends, somebody.

18      Q    And you do have a brother -- that's your real

19  brother, right?

20      A    Yes, sir.

21      Q    Mr. McCree, as you testified, you're a

22  convicted felon, is that right?

23      A    Yes, sir.

24      Q    Now, that crime for which you were convicted

C-74

1   and sentenced to time in the penitentiary, that took

2   place after the time you met with Sergeant Cooper, is

3   that right?

4        A    Yes, sir.

5        Q    It took place after the time you talked with

6   the State's Attorney, is that right?

7        A    Yes, sir.

8        Q    And it happened after the day that you

9   testified in front of the Grand Jury, is that correct?

10       A    Yes, sir.

11       Q    But, of course, that happened prior to today's

12  date, is that correct?

13       A    Excuse me?

14       Q    It happened prior to today's date, is that

15  right?

16       A    I don't understand.

17       Q    Well, when were you convicted?

18       A    I was convicted in '95.

19       Q    Well, actually it was March 8 of 1996?

20       A    Yes, yes, sir, correct.

21       Q    So in addition to your claiming that the change

22  in your testimony between then, back in August of '95 and

23  today, the other difference between you and then and you

24  now is between that time you were convicted of a felony,

C-75

1  is that right?

2      A    Yes.

3      Q    For which you're serving 40 years, is that

4  correct?

5      A    Yes.

6      Q    And that being a result of a case in Cook

7  County, correct?

8      A    Yes.

9      Q    By which you were prosecuted by Assistant

10  State's Attorneys, correct?

11      A    Yes, sir.

12      Q    From Cook County?

13      A    Yes, sir.

14      Q    Now, you claim that up didn't feel comfortable

15  seeing an innocent man going to jail, is that right?

16      A    Yes, sir.

17      Q    And you -- I take it you claim this lack of

18  comfort in light of your now serving time in the

19  penitentiary and having your freedom deprived, is that

20  right?

21      A    Yes, sir.

22      Q    Well, do you feel comfortable about the fact

23  that really in your eyes, the real perpetrator of this

24  crime has gone free?

C-76

1      A    Do I feel what --

2      MR. TARR:  Objection.

3      THE COURT:  Objection sustained as to the form of

4  the question.

5      MR. DANIELIAN  Q  Well, if you're asking these

6  people to accept your testimony as true today, then --

7      MS. LIPINSKI:  Objection.

8      MR. DANIELIAN:  I'll withdraw it.  You lied to the

9  people who were investigating this crime, is that

10 correct?

11     A    Yes.

12     Q    You lied to the people that were making

13 decisions as Grand Jurors regarding this crime, correct?

14     A    Yes, sir.

15     Q    You lied to an Assistant State's Attorney who

16 was entrusted with looking at and taking --

17     MS. LIPINSKI:  Objection, your Honor.

18     THE COURT:  He hasn't finish his question.

19     MR. DANIELIAN  Q  Interviewing people regarding this

20 crime, correct?

21     MS. LIPINSKI:  Objection.

22     THE COURT:  Objection overruled.

23     THE WITNESS:  Yes, sir.

24     MR. DANIELIAN  Q  Now, what if anything have you

1   done to assist in the apprehension of this Mad Dog or

2   Black Dog person?

3        MS. LIPINSKI:  Objection.

4        THE COURT:  The objection is overruled.

5        THE WITNESS:  State that again.

6        MR. DANIELIAN  Q  What if anything have you done to

7   assist in the apprehension of Mr. Dog, Black Dog, or Mad

8   Dog, whatever his name is?

9        A    What have I done?

10       Q    Yes.

11       A    What you mean?

12       Q    Have you done anything to assist in his

13  apprehension?

14       A    No, sir.

15       Q    Matter of fact, up until what, a few days ago,

16  you haven't really done anything about or addressed

17  anything about your testimony today and what you claim to

18  be lies that you gave before, is that right?

19       A    Yes, sir.

20       Q    Matter of fact, you wouldn't be here today if

21  this case weren't at trial right now, is that correct?

22       MR. TARR:  Objection.

23       THE WITNESS:  Yes, sir.

24       THE COURT:  Again, when there's an objection, you

1    have to wait until I rule on the objection before you

2    answer the question.  The objection is sustained.  The

3    answer is stricken.

4         MR. DANIELIAN  Q  Well, you knew up until now that

5    this case was pending against John Phillips, right?

6         A    Yes, sir.

7         Q    Matter of fact, did you learn of his -- of what

8    happened to him because of the investigation in this

9    case?

10        A    No, sir.

11        Q    You didn't learn anything about whether he had

12   been charged or anything?

13        A    No, sir.

14        Q    Well, did you have any idea what your

15   so-called -- what your statement and your testimony at

16   the Grand Jury would result in?

17        A    Yes, sir.

18        Q    What's that?

19        A    That he would be convicted.

20        Q    And you know how the trial process goes, is

21   that correct, or the court process, right?

22        A    Well, not actually.

23        Q    Well, sir --

24        MS. LIPINSKI:  Objection, your Honor.

C-79

1        THE COURT:  Objection sustained.

2        MR. DANIELIAN  Q  Well, did you ever make efforts to

3   come to court on behalf of John Phillips prior to this

4   day.

5        MR. TARR:  Objection.

6        THE COURT:  The objection is overruled.

7        THE WITNESS:  Yes, sir.

8        MR. DANIELIAN  Q  When was that?

9        A    When I received the letter.

10       Q    Prior to -- when did you receive this letter?

11       A    March or April.

12       Q    March of April when?

13       A    March or April, I can't remember the date.

14       Q    And what did you do -- how did you act upon

15   receiving that letter, what steps did you take in

16   furtherance of receiving that letter?

17       A    Well, when I read it, when it mentioned John

18   Phillips' name, I felt bad, and I tore the letter up.

19       Q    During the course of the statement that you

20   gave to the Assistant State's Attorney, you told her that

21   you had been treated well while you were at the Robbins

22   Police Department, didn't you?

23       A    Yes.

24       Q    You told them they allowed your family to bring

C-80

1    you something to eat, is that correct.

2         A    Yes.

3         Q    And they did bring you something to eat, right?

4         A    Yes.

5         Q    And you told those same things to the Grand

6    Jury, is that right?

7         A    Yes, sir.

8         Q    So suffice it to say that the only thing that

9    you're changing with your testimony today is when you

10   first implicated John Phillips, now you're no longer

11   implicating him, is that correct?

12        A    Yes.

13        Q    You're not denying that the crime took place, a

14   crime took place?

15        A    A crime took place.

16        Q    You're not denying your involvement in that

17   crime?

18        A    No, sir.

19        Q    You're not denying the fact that you were

20   actually forced into being part of that crime?

21        A    No, sir.

22        Q    The only thing that you're changing today is

23   John Phillips' involvement in that crime?

24        A    Yes, sir.

C-81

1      MR. DANIELIAN:  Nothing further, Judge.

2      THE COURT:  Any redirect?

3      MS. LIPINSKI:  Yes, Judge, if I may briefly.

4                 REDIRECT EXAMINATION

5                        BY

6                   MS. LIPINSKI:

7      Q    When you signed that statement in front of --

8 when you signed the statement, was a State's Attorney

9 there?

10     A    Yes.

11     Q    And was Sergeant Cooper there, also?

12     A    Yes, ma'am.

13     Q    Sean, at the Grand Jury, did anybody ever ask

14 you how you were being treated?

15     A    I can't recall.

16     Q    Did anybody at the Grand Jury ask you how you

17 were treated by the police?

18     A    Yes, ma'am.

19     Q    Who asked you?

20     A    The Judge or the -- the State's Attorney, one

21 of them.

22     Q    And what was your response?

23     A    Treated well.

24     Q    Pardon me?

1    A    I said I was treated well.

2    Q    John, did any police or State's Attorney ever

3  ask for your help in the apprehension of Black Dog?

4    A    No, ma'am.

5    Q    John, you stated that you received a letter, is

6  that correct?

7    A    Yes.

8    Q    When did you receive that letter?

9    A    March or April.

10    Q    Who was that letter from?

11    A    You.

12    Q    What was stated in the letter?

13    MR. DANIELIAN:  Objection, Judge.

14    THE COURT:  Objection is sustained.

15    MR. TARR:  Sidebar on this matter?

16    THE COURT:  No.

17    MS. LIPINSKI  Q  John, had I ever spoken to you

18  before Monday?

19    MR. DANIELIAN:  Objection.

20    THE COURT:  Objection overruled.

21    THE WITNESS:  No, ma'am.

22    MS. LIPINSKI  Q  Has Mr. Tarr ever spoken to you

23  before Monday?

24    A    No.

C-83

1       Q    Did I at any time since Monday ever tell you to

2  tell anything but the truth today?

3       MR. DANIELIAN:  Objection.

4       THE WITNESS:  No.

5       THE COURT:  Objection overruled.  The answer may

6  stand.

7       MS. LIPINSKI  Q  John, this letter that you

8  received, were there any threats in this letter?

9       MR. DANIELIAN:  Objection, your Honor.

10      THE COURT:  Objection sustained.

11      MS. LIPINSKI:  Judge, at this time I'm going to ask

12  for a sidebar if I may.

13      THE COURT:  All right.

14                      (Whereupon the following

15                       proceedings were had out of the

16                       presence and hearing of the

17                       jury:)

18      MS. LIPINSKI:  Your Honor, the reason I asked for a

19  sidebar is because I don't want to create a fiasco out

20  there.  Earlier I did tell you in court I was not going

21  to go into the fact that Sean talked to his -- to John's

22  mother at the police station, your Honor.  However,

23  because the State's Attorney did ask if his family

24  members were present and if he talked to them, I do feel,

C-84

1   your Honor, that now the door was opened, and I would

2   like to pursue that line of questioning.

3       THE COURT:  What's the line of questioning that

4   you're going to pursue?

5       MS. LIPINSKI:  They talked to Sean, and Sean did

6   tell John's mother, your Honor, that the police were

7   abusing him.

8       THE COURT:  He already said -- he testified to that,

9   but he also testified that he did not say that he was

10  lying about John Phillips' involvement.  He didn't tell

11  his parents anything about that.

12      MS. LIPINSKI:  That's right, Judge.

13      THE COURT:  So I don't see any probative value.

14  It's already been put in -- I imagine you can because

15  Mr. Danielian went into it.  You can go into it since he

16  brought it up, so I guess you can go into that, but as

17  far as any prior consistent statements relative to this

18  statement --

19      MS. LIPINSKI:  No, I'm not going to ask about

20  statements.

21      MR. DANIELIAN:  I impeached him.  He said on the

22  stand today, and I asked him, well did you tell them

23  about A, and he said no.  So that creates an impeachment,

24  they want to put in --



1        THE COURT:  They want to ask him a question.

2        MS. LIPINSKI:  I want to ask the mother --

3        THE COURT:  You're going to bring the mother in.

4        MS. LIPINSKI:  Yes, because Sean told this mother

5   that he was being beaten.

6        THE COURT:  No, that's a collateral witness.

7        MS. LIPINSKI:  I could ask this witness --

8        THE COURT:  He's been asked that, and he answered

9   it.

10        MS. LIPINSKI:  I like to ask if he's seen John's

11   mother.

12        MR. DANIELIAN:  The defendant's mother?

13        MS. LIPINSKI:  Right.

14        MR. DANIELIAN:  He said he met with his own family.

15        MS. LIPINSKI:  And you asked him who else did he

16   meet at the police station.

17        THE COURT:  The objection is sustained.

18        MR. TARR:  Also, one other issue.  We should be

19   allowed to get into what was in that letter because we

20   don't want to leave the jurors with the impression that

21   there was a bribe, a threat, a promise, any coercion,

22   whatever in that letter from Ms. Lipinski to Sean McCree,

23   and, therefore, Sean McCree is now coming in because of

24   improper actions of Miss Lipinski.  We would like to

C-86

File Date: _____8/1/2008_____

Case No: _____08 CU 4389_____

ATTACHMENT # ____PART  1____

EXHIBIT  _____

TAB (DESCRIPTION)

_____

(Victe.)

Tracy Brown, stated that the person that approached him asked, "Who owned the White Eldorado". Afterwards, he asked Mr. Brown if "he", would ask "that person", to move their vehicles. This alone, proves the State's "allegation's" of Mr. Brown being "Singled out" by Mr. Phillips because he was Flashing a huge roll of money, to be "False". (See "B-31", 15-21, and "B-32", 1-2)

Mr. Brown also Confirmed the fact that, the parking lot where the incident took place, was accross the parking lot of Mannies which was filled with Car's parked, a "2 way" street filled with traffic going back and forth, and into an additional parking lot of the "Big 10" night Club, which was also filled with parked Car's. Which therefore, "severely Compromised" a positive identification of an assailant being made by "anyone", alleging to have witnessed the incident from the parking lot of Mannies night Club, under these particular Circumstances. Proving Timothy Spaght and Ted Griffin's allegation of being "eye witnesses" to the incident in question, to be "False" as well. Which is "why", they were both "discredited" as Credible witnesses by, Sgt. James Cooper, who was the "Chief Investigative Officer" of the Case. (See "B-37", 1-24 thru — B-38", 1-2)

Mr. Brown also, "unknowingly" Confirmed the fact that, Mr. McCree was being "truthful" during his "Recantation Testimony" at Mr. Phillips Trial, in describing how the "true" assailant "Black Doe", was holding Mr. McCree around his neck when Mr. Brown was approached by the two individual's. Proving the fact that, though Mr. McCree was "identified" even by Mr. Brown —

himself as one of his "offender's", he was "never" Charged with
a single offense concerning the incident in question. (See "B-40", 10-18"
and "C-59", 8-10)

Mr. Brown also, "unknowingly" Confirmed another part of
Mr. McCrea's recantation testimony to be "truthful", in stating
that his "true" assailant told him to give the Car key's to
Mr. McCrea, then told Mr. McCrea to start the Car. Which was
the same testimony that Sean McCrea gave to the Court stating
the fact that, the person that gave Yancy Brown, and "himself"
these order's was the individual known as "Black Dog". Not, John
Phillips, as Mr. Brown Committed "Perjury" at trial ~~stating~~ stating
(See "B-43", 3-13 and "C-48", 8-24 thru "C-49", 1-5)

Mr. Brown "unknowingly" Confirmed more of Mr. McCrea's
"recantation testimony" as "truthful", in stating that, Mr. McCrea
told the assailant (Black Dog) I'm not Starting the Car, make
him (Mr. Brown) start the Car. Which is what Mr. McCrea stated
during recantation. (See "B-43", 18-20)

Mr. Brown stated that a "third" offender jumped on top of the
Car and stated, "give me your jewelery bitch", then snatched
his jewelery and took off running. Which Contradict's the
testimony of Timothy Speight, who alleged to be an "eyes witness"
but made no mention whatsoever of these account's. Proving
the fact that, either Yancy Brown, who was the victim of
the incident, Committed "Perjury" under oath, or that, Mr. Speight
"was not" an eye witness as he'd alleged, and also as the
state manipulated the jury into believing. (See "B-44", 19-24,
"B-45", 1-5, "B-51", 10-18) and ("C-24", 5-18)

3

Mr. Brown testified that, the man that held the "Gun" on him, also went through his pocket's. Therefore, "both" Yancy Brown, and Timothy Speight, being "witnesses" for the state, had again given "Conflicting" testimonies under oath, regarding the Same matter, in Mr. Speight stating that he'd "witnessed", one person holding a gun on Mr. Brown, as another person went through Mr. Brown's pocket's. Proving "again" that, either Yancy Brown Committed "Perjury" under oath, or that, Timothy Speight "was not" an "eye witness" as he'd alleged, and as the "State", manipulated the jury into believing at the trial of, John Phillips, in Mr. Brown and Mr. Speight "both" being the State's "witnesses". (See "B-45", 10-19, "B-46", 9-21) and also, ("C-22", 13-24, "C-24", 5-18)

Therefore, Mr. Brown "again" Committed "perjury" under oath stating that Mr. Phillips shot him. (See "B-47", 13-18)
Sean McCree, as a "State's witness", who also admitted to being "personally involved" in the incident in question stated during his "initial" investigation by police, and also during his "recantation testimony", the fact that, the individual known as "Black Doo", was who actually shot Mr. Brown.

Even as a "state's witness", Mr. McCree never once implicated John Phillips as the shooter. he always implicated "Black Doo" as the shooter, and was beaten into stating that, Mr. Phillips went through Mr. Brown's pocket's. Which "separates" the "two" individual's, proving the fact that they "are not," ████ one person, as the Prosecutor Committed "Perjury" stating to the jury during "Closing Argument's", Illegally "Voicing Opinion's".

4

Mr. Brown stated "under oath", at the trile of, John Phillips, that his assailant wore a "Braided" hairstyle. But Mr. Brown's "Police Report" stated the fact that, Mr. Brown beforehand had described his assailant as, "a man wearing a "Tan shirt, and a "Ponytail hairstyle". Which therefore prove's that Mr. Brown Committed "Perjury" under oath. (See "B-61", 23-24, thru "B-62", 1-8, and "Yancy Brown's" Police Report)

The attorney for the defense, asked Mr. Brown if he'd told Sgt. Thomas Cooper, the "Chief Investigator" of the Case, that his assailant had a "Ponytail", and wore a "Tan" shirt? Mr. Brown "again" Committed "Perjury" under oath, in stating, "NO". (See "B-70", 22-24, thru "B-71", 1-6) (see Police Report)

When asked if he'd stated that, the person wearing the "Tan" shirt, and the "Ponytail" hairstyle, was the one pointing the "gun" at him? Mr. Brown "again" Committed "Perjury" under oath in stating, "NO". (See "B-71", 7-10) (See Police Report)

When he was asked if he'd stated that, a guy with long braids, (of whom he described Mr. Phillips to be) grabbed him, and made him return to the vehicle? Mr. Brown "again" Committed "Perjury" under oath in stating, "NO". (See "B-71", 11-14) (see B-61, 23-24 thru "B-62", 1-8) (See Police Report)

When asked if he'd stated that, as the guy with the gun (Tan shirt, and Ponytail) told him to open the door of the vehicle, it was the other guy with the "braids", that was going through his pocket's? Mr. Brown "again" Committed "Perjury" under oath in stating,

"No". (See "B-71", 15-22) (see Police Report)

When asked if he'd stated that, it was this person that took a "Thousand dollars" from his back pocket? Mr. Brown "again", Committed "Perjury" under oath in stating, "No". (See "B-71", 23-24, thru "B-72", 1, "B-84", 9-11)(See "B-45", 6-24, "B-50", 18-24, thru "B-51", 1-18) (see Police Report)

When asked if he'd stated that, this person also took a "gold chain" from him? Mr. Brown "again", Committed "Perjury" under oath in stating, "No". (See "B-72", 2-3) (See "B-44", 18-24, thru "B-45", 1-5) (see Police Report)

And finally, when asked if he'd told Sgt. Cooper, "any" of the above? Mr. Brown "again", Committed "Perjury" under oath in stating, "No". (See "B-72", 7-11) (see Police Report)

The only thing that Yancey Brown would "Confess" to, was the fact that he'd spoken to Sgt. Cooper while he was in the hospital, but then Committed "Perjury" under oath, regarding the "date", that he'd spoken to him. (See "B-72", 9-11) (See "B-61", 1-6) (See "B-72", 12-17) (see Police Report)

Mr. Brown "alleged" that he'd spoken to Sgt. Cooper on August 13th, though his "police report" was dated August 12th. (See Police Report)

Mr. Brown was also asked, if he'd told Sgt. Cooper that, he told his assailants not to shoot because he was alone or he was told? Mr. Brown "again" Committed "Perjury" under oath in stating, "No I didn't." (See B-73, 1-6) (See Police Report)

Mr. Brown admitted that "one", of the "Two" photo's that he had selected from the "5-photo" line up that was shown to him by Sgt. Cooper at the hospital turned out to be, "Sean McCrea", though he was still never Charged with a Single offense. (see "B-74", 4-13)

In offender number #1, being identified as the man with the "Tan shirt", the "Ponytail hairstyle", and also the "Gun" in the "Police Report", of whom Mr. McCrea states was the "true assailant" known as "Black Doe", and in offender #2, being described as having long "Braid's", of whom Mr. Brown even at trial stated was "allegedly" Mr. Phillips, it was therefore proven through Yancy Brown's "very own trial testimony", which was supported by his "police report", that Mr. Phillips "was not" even selected by Mr. Brown as one of his offender's.

Mr. Brown's police report state's that he was shown a "5-photo" line up, and of those "5-photo's", Mr. Brown selected "2" as his assailant's. (See "B-73", 15-20, thru "B-74", 4-8)

Mr. Brown's police report also stated that, offender #1, "shot" Mr. Brown, (Tan shirt and Ponytail) as offender's #2 and #3, allegedly jumped into the vehicle and drove away. #2, "allegedly" being Mr. Phillips, while #3, "admittedly" being, "Sean McCrea", though he was, "still never Charged".

Mr. Brown, selected as his "assailant's", (#1), of whom "was not" Mr. Phillips, in the police report "itself" stating that, number "one" was the person with the "Tan shirt", "Ponytail", and the "Gun", and also, (#3), of whom was admittedly Sean McCrea, as Mr. Brown Cooberated this fact. (See "B-74", 10-13, "B-85", 17-23, "B-43", 3-24, thru "B-44", 1-5) (see Police Report)

In Yancy Brown testifying that, Mr. Phillips had "Braids", and in the "police report" reflecting the fact that, the person with braids was, #2 in the line up, it is "Clear", and also "Evident" that, Mr. Phillips was "never" identified by Mr. Brown as an assailant.

Therefore, his entire testimony under oath regarding what he'd alleged Mr. Phillips had done to him was "Perjury Testimony".

By Yancy Brown's own testimony, and police report, Mr. Phillips as the person with "braids", of whom was (#2 in the police report) was "Charged" of being an offender, in the "Police Report" reflecting the "fact" that "only" (#1, and #3) were selected as "offender's" in this Case by Mr. Brown. (See Police Report)

Even when the places of the alleged offender's were "Switched" in the line up "30 minute's later", for a new alleged eye witness, Mr. Otis Nutall, Seam McCrea was "still" selected as the "driver" of the "Stolen Vehicle", (Though never Charged) while John Phillips, was "still" unable to be identified as an offender in the Case. Simply because, as Mr. Phillips has stated since the very beginning of this travesty of injustice, he was, and still is, an "innocent man". (See Police Report)

When asked, what he did after being asked for the "Car key's" by his assailant, Yancy Brown stated that, he looked at the guy, then looked at the "Gun", then he looked at the guy again and "Smiled" then stated to him, "Here take the key's, it aint my Car". Which is hardly the "natural", or "normal" reaction of someone staring down the barrel of a 45 cal. pistol, of a "Complete Stranger", with their "life flashing before them. (See "E-41," 11-18)

8

This alone, proves the fact that, Yancy Brown "knew" his assailant, And in "knowing" him, he never thought that his assailant would "shoot him".

In Mr. Brown "volunteering" to knowing the individual known as, "Black Doe", of whom Sean McCree has "always" stated, was the "True Assailant", who "also" forced him to "participate" in the Crime's as well, it is therefore "Clear and Evident" that, Mr. Brown's true assailant was in fact "Black Doe". (See "B-83", 18-20 and "B-84", 2-4)

In Mr. Brown on "numerous occasion's", stating that he'd never seen Mr. Phillips before, it was "impossible" for Mr. Phillips to have been the assailant. Otherwise, in Mr. Phillips being a "Complete Stranger", there would have been a different reaction to a "Gun" being pointed at Yancy Brown that would not have included "Smiling". (See "B-86", 14-20)

Yancy Brown's testimony of these accounts, are "all" from the "B" transcripts of John Phillips' trial. Which is therefore separated from Sean McCree's account's of the incident, during "Recantation", which are located in the "C" transcripts. Both individual's account's, were taken "day's apart" from one and other. Meaning that, neither Mr. Brown, or Mr. McCree, were at Mr. Phillips' trial at the same time. Which give's "Credibility" to Sean McCree's "recantation testimony", in Mr. Brown "unknowingly" Cooberating Mr. McCree's exact account's of the incident in question. Therefore proving the "fact" that, Mr. McCree's testimony of the "True Assailant" being the individual known as "Black Doe", was "True". This "Black Doe" person was also never apprehended. By Sean McCree being in prison, and severed from Communication with anyone, and also by he "himself" being an offender in this Case, there was no way that his "recantation testimony" Could have been "unknowingly" Cooberated by the victim himself, unless of Course he was telling the "Truth".

SUPPLEMENTARY REPORT    Case: 08-6-04389    Document 2    Filed 08/01/2008    Page 130 of 321

**SUPPLEMENTARY REPORT**

| | |
|---|---|
| 4. DATE OR ORIG. OCCURRENCE - TIME | 02:16 |
| 3. BEAT OF OCCUR | 305 |

OBGNS POLICE

INCIDENT/OFFENSE CLASSIFICATION LAST PREVIOUS REPORT

#66 (RAVATED) Battery

UCR OFF. CODE | ADDRESS OF ORIG. INCIDENT OFFENSE: 0440 | 2911 Broadway

| VERIFIED YES/NO | CORRECTED YES/NO | BEAT ASSIGNED 3 |

VICTIM/SUBJECT'S NAME AS SHOWN ON LAST PREVIOUS REPORT

Brown, Yancy

VICTIM'S/SUBJECT'S ADDRESS

7840 W 139 Blue Island    TYPE OF LOCATION OR PREMISE WHERE INCIDENT OFFENSE OCCURRED: Parking Lot    LOCATION CODE

DESCRIBE PROPERTY IN NARRATIVE    R = RECOVERED

| 1 MONEY | 3 JEWELRY | 7 FURS | 4 CLOTHING | 5 OFFICE EQUIPMENT | 6 TV, RADIO, STEREO | PROPERTY INVENTORY NO(S). |
|---|---|---|---|---|---|---|
| T $ | T $ | T $ | T $ | T $ | T $ | |
| R | R | R | R | R | R | |
| 9 HOUSEHOLD GOODS | 8 CONSUM GOODS | 13 FIREARMS | A NARC DANGEROUS DRUGS | 2 OTHER | 6 PHONE | |

11. OFFENDER'S NAME (OR DESCRIBE CLOTHING ETC.) | 12 HOME ADDRESS | 13 SEX-RACE-AGE HEIGHT WEIGHT EYES HAIR COMPL

PHILLIPS, JOHN | 7025 San Ramon Cº140 | M B 25 600 175 BRN BLK MED

14 C B NO | FH NO, V D NO OR ID'S NO | OFFENDER ILLS CODE | CB NO | IR NO, V D NO OR I.D.S. NO | OFFENDER IS NO / ARREST UNIT NO

OFF. | OFF | STATE LICENSE NO. | STATE

16. OFF'S VEHICLE YEAR / MAKE | BODY STYLE | COLOR | VIN
USED STOLEN

IV. NARRATIVE

12 AUG 1995 11:00 HRS Reporting Officer spoke with
victim at Christ Hospital Oak Lawn IL. Who in summary
related that he had just moved his friends vehicle,
when he was approached by 3/m/blks as he walked
✓ across the street. One offender wearing a tan shirt
✓ and a pony tail pointed a weapon at victim, another
✓ with long braids grabbed victim and made him return
✓ to the vehicle, offender #1 with the weapon advised
victim to open the door on the vehicle. During this
✓ time offender #2 was going thru victim's pockets
✓ and took one thousand dollars (1,000) gold rope necklace
offender #3 was made to get into the vehicle
by offender #1 or he would be shot. Victim at this time
requested offender not to shot him because he also
the door as offender requested

| IV. EXTRA COPIES REQUIRED (NO. & RECIPIENT) NORMAL | VI. DATE THIS REPORT SUBMITTED DAY 11 MO AUG YR 95 | TIME 18:00 | VI SUPERVISION APPROVING (PRINT NAME) LT Gunn | STAR NO. |
|---|---|---|---|---|
| VI. REPORTING OFFICER (PRINT NAME) 567 Jones, Cooper 002 | STAR NO. | VI REPORTING OFFICER (PRINT NAME) | STAR NO. | |
| SIGNATURE | | SIGNATURE | VI. DATE APPROVED (DAY=MO=YR) 15 AUG 96 | TIME 19:40 |

CONTINUED OTHER SIDE

MUST BE COMPLETED IN ALL CASES

CONTINUATION OF NARRATIVE

OFFENDER SHOT VICTIM IN THE LOWER SIDE.
OFFENDER 2 AND 3 GOT INTO THE VEHICLE AND DROVE
AWAY. R/O SHOWED VICTIM A PHOTO LINE UP AT
WHICH TIME VICTIM PICKED PHOTO #1 AND PHOTO #
3 AS OFFENDERS.

Important

1                          YANCY BROWN,

2   called as a witness herein, after having been

3   first duly sworn, was examined and testified

4   as follows:

5                     DIRECT EXAMINATION

6                     BY

7                     MS. BANKHEAD:

8       Q    Mr. Brown, could you please state

9   your name and spell your first and last name

10  for the court reporter.

11      A    Yancy Brown, Y-A-N-C-Y, B-R-O-W-N

12      Q    And, Mr. Brown, where do you live?

13      A    Blue Island.

14      Q    And how old are you?

15      A    Twenty-five.

16      Q    Who do you live in Blue Island

17  with?

18      A    My mother, father and three

19  brothers.

20      Q    On August 11th of 1995 in the early

21  evening hours, where were you?

22      A    At Barrel Bowling.

23      Q    Where is that?

24      A    In Blue Island.

                        B-29

1        Q    And who were you with?

2        A    A couple of friends, Ted Griffin,

3  Otis Nutall, Todd Payne, Byron Williams.

4  That is about it.

5        Q    A group of guys?

6        A    Yes.

7        Q    And you guys boweled some games?

8        A    Yes.

9        Q    Do you recall what time you left

10  the bowling alley?

11        A    It was about 1:00 o'clock, 12:45.

12        Q    And where did you go?

13        A    Manny's Blue Room.

14        Q    And where is Manny's Blue Room?

15        A    In Robbins.

16        Q    And where is Robbins from Blue

17  Island?

18        A    It's about three minutes.

19        Q    Is that something that you guys

20  commonly did?

21        A    Yes.

22        Q    What is Manny's?

23        A    It's a club.

24        Q    And what is in Manny's?

1          A      What do you mean?

2          Q      What is in the club?

3          A      Pool tables, alcohol, the usual.

4     Dance floor.

5          Q      It's like a lounge or bar?

6          A      Like a bar.

7          Q      Did Ted Griffin and the other guys

8     that you had been bowling with, did they

9     also go to Manny's?

10         A      Yes, they did.

11         Q      And when you arrived there, what

12    did you do?

13         A      We went in the club and shot a game

14    of pool, shooting pool.

15         Q      While you were there, did something

16    unusual happen?

17         A      Yes, it did.

18         Q      What happened?

19         A      This guy walked up to me and asked

20    me did I know who owned a white Eldorado and

21    I told them yes.

22         Q      And whose Eldorado was it?

23         A      Ted Griffin's.

24         Q      Now, what did you do after that?

1          A     He asked me could I get the guy to

2     move his car and I went into the basement,

3     where we were shooting pool at, I asked Ted

4     for the keys to his car.

5          Q     When the guy approached you, where

6     were you?

7          A     Standing right at the door, the

8     entryway of Manny's.

9          Q     Was there anyone else at the

10    entryway of Manny's?

11         A     Yes, there was.

12         Q     Do you see that person in court

13    today?

14         A     Yes, I do.

15         Q     And would please point to him and

16    describe what he is wearing?

17         A     Right there, a blue jacket with a

18    blue tie on, is what it looks like from

19    here.

20         THE COURT:  Would you please point.

21                    The person with the --

22         THE WITNESS:  With the glasses, on the

23    right of me.

24         THE COURT:  Right.

B-32

1              The record will reflect an

2    in-court identification.

3         MS. BANKHEAD:   Thank you, Judge.

4              Was he in Manny's?

5         A    Yes.

6         Q    And did you know him?

7         A    No, I didn't.

8         Q    Had you ever seen him before?

9         A    No, I didn't.

10        Q    At that point you went downstairs

11   and got the keys from Ted, is that right?

12        A    Correct.

13        Q    And where did you go after you got

14   the keys from Ted?

15        A    Came back up the stairs and walked

16   out the door.

17        Q    And when you walked back towards

18   the door, who did you see there?

19        A    I seen him.

20        Q    He was still standing there?

21        A    Yes, he was.

22        MS. BANKHEAD:   And, Judge, may the

23   record reflect that the witness pointed

24   again to the defendant?

1       THE COURT:  The record will so reflect.

2       MS. BANKHEAD:  Q Did you walk past him?

3       A      Yes, I did.

4       Q      How close did you get to him when

5   you walked past him?

6       A      Touched shoulders.

7       Q      And what was the lighting like in

8   the doorway?

9       A      It was about like this.  The light

10  in here.

11      Q      And what did you do after you

12  passed him in the doorway?

13      A      Kept walking.

14      Q      Where did you go?

15      A      Looked at him and kept walking.

16              I walked out the door and I

17  pushed the door hard enough, because he

18  turned around and walked out behind me, some

19  it was like I was holding the door for him,

20  I pushed it and I just kept walking.

21              I looked back and I seen him

22  and I kept walking and let the guy out that

23  was blocking in.

24      Q      Now, when you say you looked back

B-34

1    and saw him, was he now inside or outside of

2    Manny's?

3         A    He was outside, coming out the

4    door.

5                   We all was coming out the

6    door.

7         Q    And where did you go?

8         A    I walked across the street to the

9    car.

10        Q    Can you describe for the ladies and

11   gentlemen of the jury the layout of Manny's

12   and the parking lot and where Ted's car was

13   parked?

14        A    Sure.

15        Q    Describe it to them.

16        A    Well, this is the club here, this

17   is the parking lot and then there is the

18   street right here and after the street it's

19   another parking lot and then there is

20   another club.

21                   And when I walked out the door

22   I walked straight to the car, because his

23   car was parked going, I guess that is

24   westbound, and when I got to the car, the

B-35

1    other guy got in his car and that is how the

2    set-up is.

3         Q    I will ask you come down, now, out

4    of the witness box.

5              Your Honor, if he may, into

6    the well of the courtroom?

7         THE COURT:   All right.

8              You are using this as what, a

9    demonstrative aid?

10        MS. BANKHEAD:   Yes, it's not to scale.

11        THE COURT:   Would this diagram help you

12   explain your testimony?

13        THE WITNESS:   Yes, it would, a little

14   better for them.

15        THE COURT:   Then you may use it.

16        MS. BANKHEAD:   Thank you, Judge.

17        THE COURT:   This exhibit is being used

18   only to help you understand the witness'

19   testimony, it is not being used as an

20   exhibit for evidence.

21             You may proceed.

22        MS. BANKHEAD:   Q Would you show the

23   ladies and gentlemen of the jury, based upon

24   this diagram, where the door of Manny's

1       would be?

2           A      Right here.

3           Q      Okay.

4                  And then this is a parking

5       lot?

6           A      This is Manny's parking lot here.

7           Q      And how wide is this parking lot?

8           A      I mean, it's about two car lengths.

9           Q      All right.

10                 And then this is what?

11          A      This is the street.

12          Q      And how wide is that street?

13          A      Two car lengths, one going this

14      way, one coming this way.

15          Q      Going in each direction?

16          A      Each direction.

17          Q      And then what is this?

18          A      Across the street, this is the

19      other parking lot to another tavern.

20          Q      Okay.

21                 Now, when you came out of

22      Manny's, where did you go?

23          A      Came up the door here, walked

24      through the parking lot, across the street.

B-37

1                    Ted's car was parked here

2     facing this way, going this way.

3         Q     That would be west?

4         A     West.

5         Q     And if up is north?

6         A     Right, going westbound.

7                    So I enter his car, I pulled

8     up, the guy came out, he went eastbound.

9                    I pulled back, backed his car

10    in, got out of the car and looked back

11    across the street.

12        Q     I am going to stop you right there.

13                   When you backed Ted's car in,

14    the front of his car was facing Manny's?

15        A     Facing Manny's.

16        Q     And the street?

17        A     Correct.

18        Q     And how far was his car from the

19    street, the front of his car from the

20    street?

21        A     This is the street, this is the

22    front of his car right here.

23        Q     Okay.  Thank you.

24                   After you reparked Ted's car,

B-38

1    what did you do next?

2         A    I got out of the car.

3         Q    And where did you go?

4         A    I was going back up in Manny's.

5         Q    As you were walking back towards

6    Manny's, what did you see?

7         A    I seen two male blacks standing in

8    my way.

9         Q    Do you see one of those individuals

10   in court today?

11        A    Yes, I do.

12        Q    And would you please point to him

13   and describe what he is wearing?

14        A    Glasses and a blue tie.

15        Q    Is that the individual that you

16   earlier identified as having passed in

17   Manny's?

18        A    Yes, it is.

19        Q    Now, where was he when you saw him?

20        A    When I got out of the car?

21        Q    Yes?

22        A    Standing in front of Manny's.

23        Q    Okay.

24             And what did you do?

1    A    Kept walking.

2    Q    Towards Manny's?

3    A    Towards Manny's.

4    Q    And what did he do?

5    A    Walked towards me.

6    Q    And was he alone or with someone?

7    A    He was with someone.

8    Q    And as they walked towards you,

9 what happened?

10    A    When we met face-to-face I looked

11 at him and he looked at me and he had the

12 other guy around the neck and he pulled up

13 his shirt and came out with a gun and said,

14 "Give me the keys to that car."  And I

15 looked at him.

16    Q    I will stop you right there.

17         Where were you when he

18 confronted you?

19    A    In Manny's parking lot.

20    Q    You had gotten back across the

21 street to Manny's parking lot?

22    A    Yes.

23    Q    And did you get a look at the gun?

24    A    Yes, I did.

B-40

1      Q     What color was it?

2      A     Black.

3      Q     And do you recall how big it was or

4 small it was?

5      A     It was a .45.

6      Q     What?

7      A     A .45 caliber.

8      Q     How do you know?

9      A     I have seen that type of gun

10 before.

11      Q     After he pulled the gun on you and

12 told you to give him your keys, what did you

13 do?

14      A     I looked at him, I looked at the

15 gun and then I looked at him again, kind of

16 smiled and I said, "Well, here, take the

17 keys, it ain't my car." I told him like

18 that.

19      Q     How close were you to him when he

20 pulled the gun on you?

21      A     We could have kissed. That is how

22 close.

23      Q     How close is that?

24      A     Like --

1    Q    Within inches?

2    A    Inches, yes.

3    Q    After you told him to take the car,

4    it wasn't yours, what did he do or say?

5    A    He said, "Oh, your a smart mother

6    fucker, walk back to the car."

7    Q    And what did you do at that point?

8    A    I looked at him, I turned around

9    and I saw him walking back towards the car.

10    Q    And that was back across the street

11    to the other parking lot?

12    A    Correct.

13    Q    Did you get all the way back to the

14    car?

15    A    Yes, I did.

16    Q    And what happened when you got to

17    the car?

18    A    As we was going back across the

19    street, he gave me the keys and said, "Hit

20    the alarm on the car."

21                So I hit the alarm on the car

22    and when we got to the car, he said, "Now

23    you start the car up."

24    Q    And did you start the car?

B - 4 2

1          A      No, didn't.

2          Q      What happened?

3          A      He said, as a matter of fact, give

4     him the keys, told me to give the keys to

5     his friend and so I gave the keys to his

6     friend, he told his friend, he said, "You

7     start the car."

8          Q      Was that the same guy, the person

9     that you are referring to as his friend, was

10    that the same person that he had his arm

11    wrapped around his neck and as they

12    approached you? *Coaching*

13         A      Yes.

14         Q      And, so, did you give that person

15    the keys?

16         A      Yes, I did.

17         Q      And then what happened?

18         A      Then his friend looked at him once

19    he said that and said, "I am not starting

20    the car, make him start the car."

21         Q      When he said, "Make him start the

22    car," about whom was he referring?

23         A      Referring to me.

24         Q      Okay.

*Leading*

1                   And then what happened?

2          A     That is when he looked at his

3     friend again and cocked his gun and said,

4     "If you don't start this car, I am going to

5     shoot your ass right now."

6          Q     When you say he cocked the gun, who

7     cocked the gun?

8          A     The man sitting right there.

9          MS. BANKHEAD:   Judge, may the record

10    reflect the witness has pointed to the

11    defendant?

12         THE COURT:   The record may so reflect.

13         MS. BANKHEAD:   Q Now, what did he, the

14    individual that you refer to as his friend,

15    do at this point?

16         A     He started to get inside the car

17    once he did that.

18         Q     And then what happened?

19         A     And then right as he was getting

20    into the car, I was on the car with my hands

21    like this and it was another male came out

22    of nowhere and jumped on top of the car and

23    said, "Give me your jewelry, bitch."

24                He snatched my jewelry and

B-44

1    took off running.

2    Q    And when you say jewelry, what kind

3    of jewelry was that?

4    A    It was a little gold chain with my

5    initial on it.

6    Q    Did you say anything to the

7    defendant while you were standing there with

8    regard to what was going on?

9    A    Yes, I did.

10    Q    What did you tell him?

11    A    I told him I had money in my

12    pocket, I told him I had a brand new jogging

13    suit on, I said you can have all of it, you

14    can leave me out here naked, just don't

15    shoot.

16    Q    And then what happened?

17    A    Once I said that, that is when the

18    guy started the car and he put his hand into

19    my pocket.

20    Q    And what pocket was that?

21    A    It was my back pocket.

22    Q    Is that the pocket that you had the

23    money in?

24    A    Yes, it was.

B - 45

1      Q      And then what happened?

2      A      And then once he put his hand into

3   my pocket --

4      MR. TARR:  Excuse me.  Objection,

5   identificaton.

6      THE WITNESS:  The guy sitting right

7   there.

8      THE COURT:  You may proceed.

9      MS. BANKHEAD:  Q Who put his hand in

10   your pocket?

11      A      The man sitting right there.

12      Q      Where was the other guy at this

13   point.

14      A      Inside the car.

15      Q      What happened after the defendant

16   put his hand in your pocket where your money

17   was?

18      A      I heard like a loud boom and I

19   looked back towards Manny's and that is when

20   I seen my friends come running out of the

21   club and that is when he pulled the trigger.

22      Q      When you say you heard a loud boom,

23   you mean a boom like a gun shot?

24      A      No, it was a boom, somebody hitting

1    something.

2         Q      Okay.

3                       And you looked back and saw

4    what?

5         A      My friends coming, running out of

6    the club.

7                       The door opens like this.

8    They hit the door real hard and I looked and

9    that is when he pull the trigger.

10        Q      When you looked, who did you see?

11        A      The first person I seen was Ted

12   Griffin.

13        Q      And when you say he pulled the

14   trigger, who pulled the trigger?

15        A      The man sitting right there.

16        MS. BANKHEAD:   Judge, may the record

17   reflect that the witness has pointed to the

18   defendant?

19        THE COURT:   The record will so reflect.

20        MS. BANKHEAD:   Q And when the defendant

21   pulled the trigger, what happened?

22        A      Once he pulled the trigger, I threw

23   my hands up and fell to the ground.

24        Q      Why did you fall?

B-47

1          A      It was the impact of the gun.

2          Q      What happened, what did you see

3     after that?

4          A      After I fell, I seen a lot of

5     commotion going on.

6                 I seen his friend slowly

7     pulling off in the car and I seen him take

8     off running.

9          Q      Okay.

10                Where were you, which parking

11    lot were you in when this happened?

12         A      I was in a parking lot across the

13    street from Manny's.

14         Q      What happened as you laid in the

15    parking lot?

16         A      As I laid there I had a few people

17    come over to me.

18                I had this one female, she put

19    my head into her lap and I laid there and

20    she kept talking to me and told me to stay

21    awoke, don't go to sleep.

22         Q      What did you feel?

23         A      Pain.  It was a pain that I can't

24    describe.

B-48

1              You know, it was -- I laid

2    there for about fifteen or twenty minutes

3    with internal bleeding and it started

4    burning, it was burning so bad, I told

5    whoever was around me to take off my

6    clothes, that is how bad it was burning.

7              I said just let me lay there,

8    take off the clothes.  Let me lay here, give

9    me some water or something.

10        Q    Did an ambulance eventually arrive?

11        A    Yes, it did.

12        Q    And when the ambulance arrived,

13   what happened?

14        A    Well, they told me if I could come

15   from up under, get my legs from up under the

16   other car, my legs went up under another

17   car, and I looked and I seen my mother, my

18   father and a couple of my brothers standing

19   around and I told my friends, you know, get

20   me mother away from here.

21        Q    Why didn't you want you mother

22   around?

23        A    I didn't want her to see me like

24   that.

1      Q     Did they put you in the ambulance?

2      A     Yes, they did.

3      Q     Did someone ride to the hospital

4  with you?

5      A     Yes, they did.

6      Q     What hospital did you go to?

7      A     Christ.

8      Q     How long were you in Christ

9  Hospital?

10     A     Back and forth for about three

11  months.

12     Q     The first time that you went to

13  Christ, do you recall how long you stayed?

14     A     About 20 days, 21 days.

15     MS. BANKHEAD:  Could I have a moment,

16  Judge?

17     THE COURT:  Sure.

18     MS. BANKHEAD:  Q Mr. Yancy, I would like

19  to take you, if I can, to the scene when the

20  defendant put his hand in your pocket.

21          Did you have -- you had money

22  in your pocket?

23     A     Yes, I did.

24     Q     How much money did you have?

1      A      A thousand dollars.

2      Q      When he put his hand in your

3  pocket, did he take his hand out of your

4  pocket?

5      A      Yes, he did.

6      Q      And when he took his hand out of

7  your pocket, did you have the money in your

8  pocket?

9      A      No, I didn't.

10      Q      With regards to the jewelry that

11  was taken, what was that, exactly?

12      A      What was what?

13      Q      The jewelry that was taken?

14      A      It was a gold rope chain with my

15  initial on it.

16      Q      That was another person who

17  snatched that off your neck?

18      A      Correct.

19      Q      When you were at the hospital, what

20  did they do to you?

21      A      They give me surgery.

22                I had, due to the times that

23  I was going back and forth I had three

24  operations, blood transfusion.



1              I lost so much blood, I had
2    tubes running all through my body.

3              They had to feed me through a
4    tube and I was in pain, so much pain.

5       Q    Yancy, if this is not going to
6    embarrass you, I would like for you to come
7    down into the well of the courtroom and show
8    the ladies and gentlemen of the jury where
9    the bullet entered your body.

10       MS. LIPINSKI:  Objection, your Honor.

11       THE COURT:  Please have a sidebar.

12                     (Whereupon, the following
13                      proceedings were had
14                      at sidebar.)

15       THE COURT:  What, exactly, are you
16    seeking to do?

17       MS. BANKHEAD:  He is going to lift his
18    shirt and show where the scar he had from
19    where the bullet went in.

20       THE COURT:  What does the scar look
21    like?

22              Have you already seen it?

23       MS. BANKHEAD:  No.

24       THE COURT:  Why don't you ask him to

R-52

1    come in here.

2        MR. TARR:  In camera inspection?

3        THE COURT:  Sure.

4                    (Whereupon, the witness

5                     was brought into

6                     chambers.)

7        THE COURT:  Sir, would you show us what

8    you are going to show the jury.

9                    Just the wound where the

10   bullet went in.

11       THE WITNESS:  It went in here.

12       THE COURT:  Is that where it went in?

13       THE WITNESS:  Yes.

14       THE COURT:  And it came out here?

15       THE WITNESS:  It exited here.

16       MR. TARR:  Sorry.  Once again, please.

17       THE WITNESS:  It entered here and exited

18   here.

19       THE COURT:  The other scar, is that the

20   result of the surgery?

21       THE WITNESS:  I had surgery here, they

22   put the tubes in me here to drain out all

23   the dry blood and I had a tube up here, due

24   to the bullet put a hole in my lung, it was

1    pumping my lungs back up and they fed me

2    through here.

3                    They cut me open right here

4    and fed me through here.

5                    They cut me twice here and

6    cut me ones.

7        THE COURT:  So the record is clear, it

8    appears to be a surgical scar in the middle

9    of his stomach area up and down.

10                   There is also another scar

11   approximately, I would say, about three to

12   four inches away from there that appears to

13   be like a bullet hole and there is another

14   scar on his back approximately, I would say,

15   about eight inches down from the back, would

16   you say?

17       MS. BANKHEAD:  Yes.

18       THE COURT:  It shows another bullet

19   hole.

20                   You can just take the stand

21   out there.

22                   Why don't you have him stand

23   out there for a second.

24       THE COURT:  All right.

1          The objection?

2      MS. LIPINSKI:  My objection is they're

3  going to see that, you know, it's going to

4  arouse their sympathies.

5          They are going to see that

6  surgical scar, he is talking all about the

7  surgeries that he has had due to this

8  bullet.

9          I think it just serves no

10 purpose, Judge, just to inflame the jury.

11         You see all of those scars on

12 that man, we're not just seeing a bullet

13 hole here, we're seeing that man, he has a

14 scar that is over 12 inches long, that is

15 what I object to.

16         The testimony is going on, he

17 was shot.  I don't see any necessity to

18 enhance it by showing the bullet wound.

19    THE COURT:  State.

20    MS. BANKHEAD:  We feel it's much more

21 probative than prejudicial.

22         The defendant is charged with

23 attempt murder and the severity of the

24 victim's injuries certainly go to that

B-55

1   charge.

2              It was not a graze wound to

3   his side where he went to the hospital, was

4   treated and released, but he almost died as

5   a result of the defendant's actions and I

6   think that the jury has a right to see that.

7       THE COURT:  All right.

8              Any response?

9       MS. LIPINSKI:  Yes, Judge.

10             I mean, the fact that he

11  almost died is not at issue, Judge.

12             He has got a surgical scar on

13  him, Judge, that has nothing to do with him

14  showing the bullet holes.

15             She wants him to show a

16  bullet hole, she does not want to show a

17  graze.

18             That bullet hole, by showing

19  that she can't prove whether the bullet

20  grazed over, went in.  I just don't get it.

21             I think it's going to inflame

22  the jury.  I don't want those surgical scars

23  for them to see that.

24       THE COURT:  Wait, wait.

1           Mr. Tarr, I don't mind you

2    jumping in, but we will have to, at some

3    point in time, just have the parties that

4    are involve in arguing.

5           I can't have this going on

6    and on like this.

7           I have looked at it, it is

8    not gruesome, in my opinion, and as far as

9    the surgical scars, it's related to the

10   shooting.

11          It is not, in and of itself,

12   gruesome, either, as far as the bullet hole,

13   itself.

14          It is of probative value

15   because there is an attempt first degree

16   murder, the State has to show the intent to

17   kill.

18          They don't have to just show

19   the intent to do great bodily harm, they

20   have to prove that it was the person that

21   did the shootings intent to kill the victim

22   in this particular case and, therefore, I am

23   going to allow it.

24      MR. TARR:  That includes the surgical

1  scars in the front?

2      THE COURT: I can't eliminate it. I

3  don't think there is anything -- I think it

4  should be explained to the jury that it is a

5  surgical scar so they don't think it is

6  something other than that, but I don't see

7  anything wrong with displaying the surgical

8  scar as a result of the shooting.

9              I have another count, I

10 believe it is showing that there was an

11 aggravated battery.

12             I mean it's relevant,

13 probative that you are going to have surgery

14 as a result, of even that is probative as

15 far as the degree of the injury, that they

16 had to cut open your abdomen to repair an

17 injury.

18             So, in my opinion it's

19 relevant.

20                 (Which were all the

21                  proceedings had at

22                  sidebar.)

23     THE COURT: All right, Ms. Bankhead, I

24 will allow the witnesses to step down and he

                    B-58

1    may display the things that you wish to

2    display.

3        MS. BANKHEAD:  Q Yancy, would you come

4    down into the well of the courtroom.

5        THE COURT:  Could you move this off to

6    the side so it is not obstructing.

7        MS. BANKHEAD:  Q Yancy, would you show

8    the ladies and gentlemen of the jury where

9    the bullet went into your body?

10       A     It went in here.

11       Q     And then show where it came out?

12       A     It came out here.

13       Q     And with regard to that linear scar

14   that runs --

15       MS. LIPINSKI:  Objection.

16       THE COURT:  Objection is overruled.

17       MS. BANKHEAD:  Q -- down the front of

18   your stomach, could you explain to them what

19   that is?

20       A     This is where they had to cut me

21   open twice to put tubes in me here to drain

22   out all the internal bleeding I had.

23           They cut me open here to put a

24   tube in me here.

1          MS. LIPINSKI:  Your Honor, I am going to

2     object again.

3          THE COURT:  Objection overruled.

4          THE WITNESS:  Because the bullet put a

5     hole in my lung so they had to put a tube up

6     in here and they cut me open here to feed me

7     through a tube.

8          MS. BANKHEAD:  Thank you, Yancy.

9                    Yancy, you have indicated

10    that the defendant took a thousand dollars

11    from you, is that right?

12         A     Correct.

13         Q     How did you come to have a thousand

14    dollars in your pocket?

15         MR. TARR:  Objection, relevance.

16         THE COURT:  Objection is overruled.

17         THE WITNESS:  My mother.

18         MS. BANKHEAD:  Q Your mother just gave

19    you a thousand dollars?

20         A     No, I was suppose to be going to

21    pay bills and I got with the fellows and it

22    just lost my mind, I just held the money on

23    me.

24         Q     When you were at the hospital, did

1    you, did Detective Sergeant Cooper from the

2    Robbins Police Department come to the

3    hospital to see you?

4         A    Yes, he did.

5         Q    Was that on August 13th of 1995?

6         A    Yes, it was.

7         Q    When he came to see you, did he

8    show you any photographs?

9         A    Yes, he did.

10        Q    Do you recall how many he showed

11   you?

12        A    Five.

13        Q    And of those five photographs did

14   you pick anybody out of those photographs?

15        A    Yes, I did.

16        Q    And who did you pick out of those

17   photographs?

18        A    I pick that man right there with

19   the glasses and blue tie on.

20        MS. BANKHEAD:  May the record reflect an

21   in-court identification of the defendant?

22        THE COURT:  The record may so reflect.

23        MS. BANKHEAD:  Q On the night that you

24   saw the defendant in the parking lot and he

B-61

1    stuck you up, did he look the same as he

2    looks today?

3        A    No, he don't.

4        Q    How did he look different than he

5    does today?

6        A    He had braids in his hair then.  He

7    didn't have those glasses on.

8        Q    And as you sit there today and look

9    at the defendant, are you sure that this is

10   the same person that you saw in the parking

11   lot?

12       A    Yes, it is.

13       Q    That is the same person that robbed

14   you?

15       A    Exactly.

16       Q    And shot you?

17       A    Correct.

18   MS. BANKHEAD:  Judge, may I have a

19   moment?

20   THE COURT: . Sure.

21   MS. BANKHEAD:  Nothing further, Judge.

22   THE COURT:  Cross examination.

23              CROSS EXAMINATION

24              BY

1              MR. TARR:

2        Q    Yancy, you were shot with a 45,

3   right.

4        A    Correct.

5        Q    And you know what a .45 looks like?

6        A    Yes, I do.

7        Q    And you are able to tell the

8   difference between, say, a .45, a .38 and a

9   9 millimeter?

10       A    Yes, I can.

11       Q    Now, the person who was holding

12  this gun, did you see which hand they were

13  holding it in?

14       A    Yes, I did.

15       Q    And which hand was it?

16       A    His right-hand.

17       Q    His right-hand.

18            Can you step down please.

19  Thank you.

20            Okay.  Now, rather than

21  embarrassing you again by -- the record

22  should reflect that he has steped down.

23       THE COURT:  All right.

24       MR. TARR:  Q Rather than embarrassing

B-63

1    you with having you lift your shirt up

2    again, turn around, please, facing the jury.

3                   Now, could you point out to

4    me, under your shirt, where the entrance

5    wound, the entrance hole is?

6                   Okay, sorry, I am missing it

7    here.

8         A    Here.

9         Q    Sorry about this.

10        A    Right here.

11        Q    And he is holding it in his right

12   hand, correct?

13        A    Right.

14        Q    And the exit wound is where?

15        A    Here.

16        Q    So, he is pointing the weapon at

17   your back?

18        A    Correct.

19        Q    And it traveled straight through,

20   exiting your front, correct?

21        A    Not correct.

22                   He had the gun to me, on me.

23        Q    The gun was on you?

24        A    The gun was on me.

B-64

1      Q      And what were you wearing on that

2  day?

3      A      I had on a Fila jogging suit.

4      Q      Fila jogging suit and a tee-shirt

5  underneath?

6      A      I didn't have a tee-shirt on.

7      Q      Okay.

8             If I may.  Now, could you

9  point this to the jury, again, please, your

10  back.

11            Now, the gun was held up

12  right to your, I mean contact range, right?

13      A      It was held right here.

14      Q      And you could feel it?

15      A      Yes.

16      Q      And there are no powder, there are

17  no additional powder burns or stippling

18  around that wound, is there?

19      MR. DANIELIAN:  Objection, Judge.

20      THE COURT:  If he knows.

21      THE WITNESS:  I don't know.

22      MR. TARR:  You seen this, correct?

23      A      Seen what?

24      Q      Your scar, correct?

1          A      Correct.

2          Q      Again, you don't know if there are

3     any additional powder burns?

4          A      I don't recall right now.  I mean --

5          Q      Thank you.

6                 Now you can travel on back.

7                 Now, you went to the hospital

8     on August 11th?

9          A      Yes.

10         Q      And they operated on you?

11         A      Correct.

12         Q      And the doctors at the hospital

13    operated on you?

14         A      Correct.

15         Q      And that is what gave you the

16    surgical scar that goes up and down your

17    front, correct?

18         A      Yes.

19         Q      And it was the -- and you just

20    gotten shot, you were in a lot of pain?

21         A      Right.

22         Q      I believe you characterized the

23    pain to the nurse on the scale of one to ten

24    as being a ten?

1        A      Correct.

2        Q      Which means it was basically

3    unbearable?

4        A      Right.

5        Q      And they had to give you some

6    painkillers?

7        A      Yes, they did.

8        Q      And, now, among the painkillers

9    that you got, you got what was called a PCA,

10   is that right?

11       A      I don't recall.  I don't know what

12   that is.

13       Q      Patient controlled analgesic

14       A      They gave me Demoral.  What you are

15   saying, I don't know what that is.

16       Q      I am sorry.

17              Do you remember them putting a

18   little -- taping a little button to your

19   hospital gown?

20       A      I don't remember.

21       Q      That if you push it you would get a

22   one cc of Demoral?

23       A      They had it in my hand.

24       Q      You had it in your hand.

1                   And you were in a lot of pain?

2        A      Correct.

3        Q      And you could push it, as

4   necessary, to get the Demoral?

5        A      Correct.

6        Q      Which is a painkiller?

7        A      Exactly.

8        Q      And narcotic.

9        A      True.

10        Q      As a matter of fact, the nurse had

11   to change the -- had to change the canister

12   or the vial for Demoral something like three

13   times that -- three times, or three times

14   over three days, correct?

15        MR. DANIELIAN:  Objection, relevance.

16        THE COURT:  If he knows.

17        THE WITNESS:  I don't know.

18        MR. TARR:  Q It had to be changed a

19   number of times?

20        MR. DANIELIAN:  Objection.

21        THE COURT:  Again, if he knows.

22        THE WITNESS:  I don't know.

23        MR. TARR:  Q But you know that the

24   Demoral took the pain away?

B-68

1      A    True.

2      Q    And kind of sent you, kind of made

3   you feel lightheaded?

4      A    True.

5      Q    Now, it was August 12th, it was --

6   how many times did Sergeant Cooper come to

7   speak to you at the hospital?

8      A    Once.

9      Q    Once.

10          And I know you said that

11   answer on direct examination that it was

12   August 13th.

13          Could it have been August

14   12th?

15     A    No.

16     Q    It was August 13th?

17     A    Yes.

18     Q    How do you remember August 13th?

19     A    It was two days after.

20     Q    It was about 11 o'clock in the

21   morning, is that correct?

22     A    I don't recall the time.

23     Q    And he came up to your room?

24     A    Yes, he did.

1    Q    And he asked you what had happened?

2    A    True.

3    Q    And you were still in pain?

4    A    Somewhat, yes.

5    Q    And you were darned ticked off that

6 you got shot?

7    A    Yes.

8    Q    Though that might not have been the

9 accurate word to describe how you felt, but

10 we all know what the feeling is, right?

11    A    I hope so.

12    Q    And you wanted the person who shot

13 you to get caught?

14    A    Correct.

15    Q    You wanted that person to be caught

16 as soon as possible?

17    A    Correct.

18    Q    You told Sergeant Cooper everything

19 that you remember that happened that night,

20 right?

21    A    True.  To the best of my knowledge.

22    Q    Now, do you recall telling Sergeant

23 Cooper that -- if I may.

24               That one of the people who

1     attacked you had a pony tail? IN The police reports (grand jury, Transcripts)

2          A     That is not what I said.

3          Q     You didn't tell him that one of the

4     people who -- that somebody had a, was

5     wearing a tan shirt and had a pony tail?

6          A     No. He told me that in our phone conversation

7          Q     And that this person with a tan

8     shirt and pony tail was the one pointing the

9     gun at you?

10         A     No.

11         Q     And that it was another guy with

12    long braids who grabbed you and made you

13    return to the car?

14         A     No.

15         Q     And that the guy with the gun told

16    you to open the door of the car?

17         A     I told him that part.

18         Q     And that while the guy with the gun

19    told you to go to open the door of the car,

20    it was the other guy who was going through

21    your pockets?

22         A     No.

23         Q     And that this guy took a thousand

24    dollars?

1        A       No.

2        Q       And a gold rope necklace?

3        A       No.

4        Q       And it was somebody else who made

5   you get back into the vehicle?

6        A       No.

7        Q       And you never told them that?

8        A       No.

9        Q       But you did speak with them on that

10  date, correct?

11       A       Correct.

12       Q       Which day is that?

13       MR. DANIELIAN:  Objection.

14       MR. TARR:  Q The Wednesday that you saw

15  it?

16       A       Yes, on the 13th, I did speak to

17  him on the 13th.

18       THE COURT:  Objection is overruled.  The

19  answer may stand.

20                 If you hear the word,

21  "objection," wait until I rule on the

22  objection before you answer the question.

23       MR. TARR:  Q Excuse me, I am not trying

24  to confuse you on the days.

1              And do you remember telling

2      Sergeant Cooper that you said something to

3      the effect of, "Don't shoot me because I

4      opened the door like he told me to"?

5              A     No, I didn't.

6              Q     When did you find out that this

7      man's name is John Phillips?

8              A     I don't recall.

9              Q     Was it at the hospital?

10             A     I don't recall.

11             Q     I am not looking for an exact time

12     or date, but roughly how much later after

13     the incident?

14             A     I don't recall.

15             Q     Do you recall how many photos

16     Sergeant Cooper showed you?

17             A     Yes.

18             Q     And how many photos did Sergeant

19     Cooper show you?

20             A     Five.

21             Q     And did you, if you recall, do you

22     remember how many people out of those five

23     photographs you identified as having been

24     there on August 11th of 1995?

B-73

1       A     Been where?

2       Q     At Manny's Blue Room?

3       A     Yes.

4       Q     And how many photos did you

5  identify were of people at Manny's Blue Room

6  on August 11th of 1995?

7       A     Two.

8       Q     And did you learn the name of that

9  other person?

10      A     Yes, I did.

11      Q     And the other person was Shawn

12  McCree, is that correct?

13      A     Correct.

14      MR. TARR:  If I may have a second,

15  Judge?

16      THE COURT:  Sure.

17      MR. TARR:  Q Now, do you recall how far

18  Sergeant Cooper was from you when you picked

19  this photo out of the photo array?

20      A     Yes.

21      Q     And how far was he when you picked

22  this photo out of the photo array?

23      A     I was laying in my bed, my food

24  tray was over me, he was standing right on

1    the side of the bed.

2          MR. TARR:  If I may approach, Judge?

3          THE COURT:  You may.

4          MR. TARR:  Thank you.

5                     Now, Mr. Brown, could you

6    stop me when I am about as close as Sergeant

7    Cooper was?

8                     Was it closer than this?

9          A    A little bit closer.

10                    He was right on the side of

11   the bed.

12         Q    And you are laying down on the bed?

13         A    Correct.

14         Q    And you have the IVs in your arm?

15         A    Correct.

16         Q    And maybe one or two taps on the

17   PCA, correct?

18         A    I don't recall.

19         Q    Do you recall how, and do you

20   recall how -- excuse me a second.

21                    Do you recall how the photos

22   were spread out in front of you?

23         A    Yes.  He lined them across my tray.

24         Q    He lined them across your tray in

B - 7 5

1    front of you?

2         A    Correct.

3         Q    And he is just a little to your

4    side?

5         A    Yes.

6         Q    And do you recall what he asked you

7    to do?

8         A    He said take your time and if you

9    see a person in these photos, please pick

10   them out.

11        Q    And you picked two people out?

12        A    Correct.

13        Q    And did you see the expression on

14   Sergeant Cooper's face when you picked them

15   out.

16        MR. DANIELIAN:  Objection.

17        THE COURT:  I am sorry, there is --

18   again if you hear the word, "objection,"

19   wait until I rule on the objection before

20   you answer the question.

21                  The objection is overruled.

22        THE WITNESS:  No, I didn't.

23        MR. TARR:  Q Did you notice if he

24   smiled?

B-76

1          A       No, I didn't.

2          Q       Did you notice if he said, "thank

3     you"?

4          A       No, I didn't.

5          Q       Do you remember if he said

6     anything?

7          A       Well, he said what I just told you.

8                  He came in there with another

9     lady, I don't know who she was, and he asked

10    me what had happened.

11                 I was telling him what

12    happened and the lady was writing down what

13    I was saying.

14         Q       And this lady was an Assistant

15    State's Attorney, correct?

16         A       I don't know.

17         Q       She was not a nurse?

18         A       No, she wasn't.

19         Q       She was not a doctor?

20         A       No, she wasn't.

21         Q       Wasn't a rehab therapist?

22         A       No, she wasn't.

23         Q       And you remember this?

24         A       Yes, I do.

1          Q      Now, I hope I am not confusing you

2     by jumping around, but when you spoke to

3     Sergeant Cooper and you still did want to

4     tell him everything that happened, is that

5     right?

6          A      Repeat that.

7          Q      You wanted to tell Sergeant Cooper

8     everything that happened?

9          A      Correct.

10         Q      And do you remember telling

11    Sergeant Cooper that the guy who shot you

12    said you are a smart mother fucker?

13         A      Yes.

14         Q      And when you are telling him this

15    you say you seen him with a piece of paper,

16    right?

17         A      Seen who with the piece of paper?

18         Q      Sergeant Cooper?

19         A      No.

20         Q      You saw him with a pen?

21         A      No.

22         Q      You saw him making notes?

23         A      No.

24         Q      And did you remember telling

1  Sergeant Cooper that the guy who shot you

2  said, "Hit the alarm on the car"?

3      A   Yes.

4      Q   Do you remember telling Sergeant

5  Cooper that one of them said, "I am not

6  starting the car, make him start the car,"

7  referring to you?

8      MS. BANKHEAD:  Objection.

9      THE WITNESS:  Yes.

10      THE COURT:  Objection is overruled at

11  this point in time.

12      MR. TARR:  Q And do you remember telling

13  Sergeant Cooper that the guy who shot you

14  and went through your pockets cocked the

15  gun?

16      A   Yes.

17      MR. TARR:  If I may have one more

18  minute, Judge?

19      THE COURT:  Sure.

20      MR. TARR:  Q Do you remember speaking

21  with John Phillips about a month and a half

22  ago?

23      A   No.

24      Q   On the phone?

1          A      No.

2          Q      Excuse me.  Sorry.

3                 A month and a half after the

4     incident happened?

5          A      Yes.

6          Q      You did speak with him on the

7     phone?

8          A      Briefly, yes, he called me.

9          Q      And this was a three-way call,

10    correct?

11         A      It had to be.  He didn't call

12    collect.

13         Q      And do you remember telling -- Now,

14    you were still at the hospital?

15         A      No.

16         Q      You were home at this time?

17         A      Correct.

18         Q      And you recall telling Sergeant

19    Cooper that you had gotten a call from

20    somebody who identified himself as John

21    Phillips?

22         A      Yes.

23         Q      Or, I am sorry, I don't mean to

24    jump ahead of myself.

1                      How did you know who called

2     you?

3          A     He gave me his name.

4          MR. TARR:  If I may have a second,

5     again, Judge?

6          THE COURT:  Sure.

7          MR. TARR:  Sidebar or we can just

8     approach.

9          THE COURT:  Are you asking for a

10    sidebar?

11         MR. TARR:  Could we just approach?

12         THE COURT:  You need the court reporter?

13         MR. TARR:  Not really.

14         THE COURT:  All right.  We will have a

15    sidebar.

16                      (Whereupon, a sidebar

17                      was had off the record.)

18         THE COURT:  Ladies and gentlemen, we

19    will take a short recess at this time.

20                      It has been a little bit over

21    an hour, anyway, so please, again, as I told

22    you earlier, please do not discuss this case

23    until the case has been given to you for

24    your deliberation.

1                    We will take a short recess.

2                    The witness can go back into

3      the witness room.

4                    Please do not discuss your

5      testimony with anybody.

6                    You understand that?

7                    We will take about ten,

8      fifteen minutes.

9                    If you see any problems, let

10     me know.

11                    (Whereupon, a recess was taken.)

12         THE COURT:  Bring out Mr. Phillips.

13         MR. TARR:  Before that is done, so

14     everything is clear --

15         THE COURT:  Well, basically, you told me

16     that you were going to ask some questions of

17     this witness.

18                    You told me what the

19     questions you were going to ask and I will

20     allow you to ask those questions.

21         MS. LIPINSKI:  That is correct.

22         THE COURT:  Okay.

23                    Are both sides ready for the

24     jury?

1          MS. LIPINSKI:  Yes, Judge.

2          THE COURT:  Let's bring them in.

3                  (Whereupon, the jurors were

4                  returned to open court.)

5          THE COURT:  You may be seated.

6                  Do you understand you are

7     still under oath?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.

10                 You may proceed, Mr. Tarr.

11         MR. TARR:  Q I think I left off, there

12    was a telephone conversation between you and

13    John Phillips?

14         A     Barely.

15         Q     And in the telephone conversation

16    did you say that you know Shawn McCree?

17         A     No.

18         Q     Did you say that you know a guy by

19    the name of Black Dog?

20         A     Yes.

21         Q     And did you tell -- and did you say

22    in this telephone conversation, "I ain't

23    tripping on the guy who took my money, I am

24    tripping on the guy who shot me"?

A       No.

Q       Now, subsequently, did you tell Sergeant Cooper that you know Black Dog?

A       Yes.

Q       And did you tell Sergeant Cooper that Black Dog was one of these guys on August 11th of 1995?

A       No.

Q       By the way, this thousand dollars, that was to pay some bills, is that right?

A       Correct.

Q       And you went to a bar?

A       Yes.

MR. TARR:   Thank you.

                No further questions.

THE COURT:   Any redirect?

MS. BANKHEAD:   Just a couple questions.

THE COURT:   Sure.

                REDIRECT EXAMINATION

                BY

                MS. BANKHEAD:

Q       Just so we're clear, when Sergeant Cooper brought you the photographs in the hospital, there were five photographs, is

that right?

    A    Correct.

    Q    And of those five photographs you said you picked out two people, is that right?

    A    Correct.

    Q    Did you pick out the defendant?

    A    Yes, I did.

    Q    And who did you pick out the defendant as being?

    A    John Phillips.

    Q    And what is it that he did?

    A    Pulled the trigger.

    Q    Now, did you tell Sergeant Cooper that he was the one that pulled the trigger?

    A    Yes, I did.

    Q    Now, the second person that you identified, you found out later that his name was Shawn McCree, is that right?

    A    Correct.

    Q    And what did you tell Sergeant Cooper that he did?

    A    He was the one that drove the car.

    Q    Did Sergeant Cooper suggest, in any

1    way to you, who you should pick of those

2    photos?

3         A    No, he didn't.

4         Q    Did he wink?

5         A    No, he didn't.

6         Q    Did he smile?

7         A    No, he didn't.

8         Q    Did he point?

9         A    No.

10        Q    Did he say anything to you?

11        A    No.  The only thing he said is take

12   your time and go over these pictures

13   correctly.

14        Q    Before August 11th of 1995 had you

15   ever seen the defendant before?

16        A    No, I haven't.

17        Q    And before August 11th of 1995 had

18   you ever seen Shawn McCree before?

19        A    No, I haven't.

20        Q    When you went out into the parking

21   lot to move the car, was there anyone else

22   out in the parking lot besides yourself and

23   the defendant and Shawn McCree that you saw?

24        A    The guy that asked me to move the

1    car.

2         Q    Did you see where he went?

3         A    He got in his car and he went

4    eastbound on Claire Boulevard.

5         MS. BANKHEAD:  Nothing further, Judge.

6         THE COURT:  Any recross?

7                   RECROSS EXAMINATION

8                   BY

9                   MR. TARR:

10        Q    Did you also tell Sergeant Cooper

11   that there were a total of four guys

12   involved in this incident?

13        A    No.

14        Q    How many times did you talk to

15   Sergeant Cooper about this?

16        A    I don't recall, you know, I don't

17   recall.

18        Q    It was more than once?

19        A    I don't recall.

20        Q    But you do recall that you were

21   shot, right?

22        A    Can you repeat that?

23        Q    You do recall you were shot?

24        A    Correct.

1    Q    And you do recall that you been

2    pretty hot about this since August 11th of

3    1995?

4    A    What do you mean by that?

5         I am not understanding that

6    question.

7    Q    Ticked off, upset?

8    A    Upset being shot?

9    Q    Yes.

10   A    Yes, I was.

11   Q    And you have followed what has

12   happened and you have talked to the State's

13   Attorney since August 11th of 1995, correct?

14   A    Can you repeat that question?

15   Q    And you have talked to the State's

16   Attorneys since August 11th of 1995,

17   correct?

18   A    Yes, I did.

19   Q    And you recall that?

20   A    I recall it.

21   Q    And do you recall ever hearing

22   whether or not Shawn McCree was ever charged

23   with anything on this case?

24   MR. DANIELIAN:  Objection, Judge.

B-88

1        THE COURT:  Objection sustained.

2        MR. TARR:  Thank you.

3               No further questions.

4        THE COURT:  Anything further?

5        MS. BANKHEAD:  No, Judge.

6               You may step down.

7            (Whereupon, the witness was

8            excused.)

9        THE COURT:  You may call your next

10   witness.

11       MR. DANIELIAN:  The People would call

12   Ted Griffin.

13       THE COURT:  Ted Griffin.

14               Sir, if you raise your right

15   hand.

16               (Witness sworn.)

17       THE COURT:  Take a seat there.

18               Please keep your voice up

19   loud enough for everybody in the courtroom

20   to hear.

21               If you hear the word,

22   "objection," wait until I rule on the

23   objection before you answer the question.

24               As far as that microphone, it

B-89

14

## Ted Griffin

Ted Griffin, when asked if he'd gone bowling with person's
whom was Yancy Brown? Stated, "Yes" I did.

When asked; "After you got done bowling in Blue Island, where
did you go"? Mr. Griffin stated, "We went to Mannings".

But when asked if Yancy Brown was with him? Mr. Griffin stated,
"He met me up there". Which "Conflicted" with the victim, Yancy Browns
statement, who said that "he", Mr. Griffin, Otis Nutall, Todd Payne, and
Byron Williams, "all" went to Mannings Blue Room "together", after they
finished bowling. Therefore, Ted Griffin Committed "Perjury" under oath,
at Mr. Phillips Trial. (See "B-93", 3-19) (See "B-29", 20-24, B-30", 1-13, and
"B-31", 7-10)

Mr. Griffin stated that, he'd observed an offender "Standing Over"
the victim, Yancy Brown. Which would have been "After" he
had already been shot by someone, then Mr. Griffin stated; "or
next to Mr. Brown, and just standing there". Which proves the
clearly the fact that, Mr. Griffins alleged "positive I.D." of an
assailant, was nothing more than a "Guess" and an "assumption".
Which is "not enough", to be considered "Evidence", in a
Court of law.

This "automatically" diminishes Mr. Griffins "Credibility", as an alleged
"eye witness", in Mr. Griffin "not" being able to accurately recall
whether he'd seen an Offender "Standing Over" Mr. Brown, or "Next to"
him, prompting the state to ask again. Therefore, "leading" the witness
into stating what was possibly "Rehearsed". Which suggests that, "Perjury"
was possibly being Committed "here" as well. (See "B-99", 11-18) (See "B-104", 8-11)

26

When asked, after he'd heard the "gunshot", what did you do? Mr. Griffin stated that, he just "Backed up", and hoped that nothing came his way. Therefore, Committing "Perjury" under oath. (See "B-123", 3-13, "B-127", 20-24, thru "B-128", 1-2, and B-161", 9-13)

Mr. Griffin "admitted" to, only seeing Mr. Brown's assailant running "further away" from his "view". Therefore, making a positive I.D. of this individual, "Impossible". Though Mr. Griffin still", elected to point to, John Phillips, as the person that he'd allegedly "seen", Committing the crime's. Therefore, he "again" Committed "Perjury" under oath. (See "B-112", 1-13, 17-24, thru "B-113", 1-3)

Mr. Griffin then, "unknowingly discredited" the testimony to the "police", of the victim "himself", Yancy Brown, in regard's to his "very own" description of his assailant.

Mr. Griffin stated that, Mr. Brown's assailant had on a "Black" shirt, (in order to match Mr. Phillips' photo) but the victim himself, Yancy Brown, who had a better view of his assailants than "anyone" stated that, the person that shot him had on a "Tan" shirt. Therefore, Mr. Griffin "again" Committed "Perjury" under oath. (See "B-116", 18-24, thru "B-117", 1-4, also Yancy Brown's Police Report)

Mr. Griffin also stated that, the incident in question took place in the parking lot "across the street" from the parking lot where he was, after 1:00 am, while "also" admitting the fact that, it was "very dark" outside.

This alone, made it "impossible" for a positive I.D., to be made of anyone. Therefore, he "again" Committed "Perjury" under oath. (See B-122, 1-14)

38

Mr. Griffin also stated that, he could only see the person that was in his Car "A little Bit", and when asked who this person was he stated "I'm not Sure". Mr. Griffin also admitted the fact that he'd only seen the person that he'd "alleged" was standing next to Yoncy Brown, "running away" from his "view" after the gunshot, but "never Saw him again", nor at all that evening. That, he'd never seen anyone get into his Car, and though he caught up with it, he "never" Caught up with the person inside. Also admitting the fact that he'd Seen only "1-person" in his vehicle the whole time, Which prove's that Timothy Speight Committed "Perjury" in stating that the Car stopped and picked up John Phillips, but does not explain "how" it was that, after all of Mr. Griffin's "uncertainty", and never actually "seeing" anyone, he was "still" able to amazingly give a "Positive I.D.", of not "one", but "Two" individual's, to the police during a line up, and at the trial of Mr. Phillips. Proving that, Mr. Griffin's I.D. of "any" assailant, especially John Phillips, was "Perjury". (See "B-126", 6-12, "B-130", 9-13, 23-24 thru "B-131", 1-4, 10-15, "B-132", 1-6 and 9-12) (See "B-129, 15-24, thru "B-130", 1-11, 23-24, thru "B-131", 1-15)

Mr. Griffin also "admitted" that, he'd only "heard" a shot fired, but he did not "see" a shot fired, and that, he did not "see" a gun that night. He "also" stated that, he'd never seen Mr. Phillips.


Therefore, according to his "very own" testimony at trial, he "never saw" anyone, Shoot anyone, and neither did he See anyone with a "Gun" that evening. All that he'd actually "Seen", was Someone running away after they'd heard gunshots. Of which, he "himself" admitted to alone. Therefore, Mr. Griffin's "I.D." of anyone at all besides the actual "Shooter" in question, was "Perjury Testimony", that was in fact Submitted "under oath". (See "B-135", 10-17 and "B-136", 10-14)

McGRAW TED - KILLING        0410   2911 Broadway   Redding        305

BROWN YANCY        3

2840 W 139th Queensland        Parking Lot

| 11. OFFENDER'S NAME (OR DESCRIBE CLOTHING) ETC | 12. HOME ADDRESS | SEX | RACE | AGE | HEIGHT | WEIGHT | EYES | HAIR | COMP |
|---|---|---|---|---|---|---|---|---|---|
| Phillips, John | 1025 S Sandman | M | 1 | 25 | 600 | 175 | Bro | Blk | Med |

**NARRATIVE**

ON 13 AUG 1995 14:00 HRS REPORTING OFFICER
ALONG WITH GRIFFEN, TED, VIEWED A
PHYSICAL LINE UP AT WHICH TIME HE PICKED
OFFENDERS # 2 AND 3 WHO WERE INVOLVED IN THE
SHOOTING NUMBER 2 WAS THE DRIVER, #4 WAS
THE OFFENDER GOING THRU THE VICTIMS POCKETS.


ON 13 AUG 1995 14:30 HRS OTS, NUTALL VIEWED
A PHYSICAL LINEUP WITH R/O, AT THIS TIME
BOTH OFFENDERS PLACE IN THE LINE UP
WAS CHANGED, AT WHICH TIME NUTALL PICKED
#4 AS THE DRIVER, BUT WAS UNABLE TO PICK
THE OTHER OFFENDER (This is Me & Shann)
(They made me as the defendant and Sean McCree change numbers)

| 90. EXTRA COPIES REQUIRED IND. & RECIPIENT | 91. DATE THIS REPORT SUBMITTED MO. DAY YR | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| NORMAL | 13 AUG 95 | 16:20 | | |
| 93. REPORTING OFFICER (PRINT NAME)   STAR NO. | 94. REPORTING OFFICER (PRINT NAME)   STAR NO. | | SIGNATURE | |
| SETH JAMES Cooper | | | DATE APPROVED (MO.-DAY-YR) 15 AUG 95 | TIME 19:41 |

1　　　　　　　　　　TED GRIFFIN,

2　called as a witness herein, after having been

3　first duly sworn, was examined and testified

4　as follows:

5　　　　　　　　　DIRECT EXAMINATION

6　　　　　　　　　BY

7　　　　　　　　　MR. DANIELIAN:

8　　　Q　　Would you please speak loudly and

9　clearly so everybody in the courtroom can

10　hear.

11　　　　　　　　　I would like you to state your

12　name for the record and spelling your last

13　flaming for the court reporter.

14　　　A　　Ted Griffin, G-R-I-F-F-I-N.

15　　　Q　　Mr. Griffin, where do you live?

16　　　A　　3741 West 176th Street in Country

17　Club Hills.

18　　　Q　　I would like to direct your

19　attention back to August of 1995, where were

20　you living at that time?

21　　　A　　3741 West 176th Street.

22　　　MS. LIPINSKI:　I can't hear him.

23　　　THE COURT:　You will have to keep your

24　voice up loud enough for everyone to hear.

1          THE WITNESS:  3741 West 176th Street,

2    Country Club Hills.

3          Q    Sir, I would like to direct your

4    attention to August 10th of 1995, that would

5    have been a Thursday evening during the

6    summer of 1995.

7                   During the evening hours of

8    that day do you know where you were and with

9    whom you were?

10         A    That evening I went bowling.

11         Q    How was it that you know that that

12   evening you were bowling?

13         A    That is something that I

14   consistently do on Thursday nights, I go

15   bowling.

16         Q    Is it something that you

17   consistently would do with certain people?

18         A    Yes.  Certain people, sometimes

19   different people, also.

20         Q    On the 10th of August were you with

21   a person by the name of Yancy Brown?

22         A    I was.

23         Q    And how was it that you know Yancy

24   Brown?

1        A     He is a neighborhood friend from

2    the playground.

3        Q     And on that evening did you go

4    bowling with persons, among whom was Yancy

5    Brown?

6        A     Yes, I did.

7        Q     And about what time did you finish

8    up bowling that evening?

9        A     I would say between the area of 12

10   o'clock between, 12, 11:30, 12 o'clock,

11   right in that area.

12       Q     And where had you been bowling that

13   evening?

14       A     Burr Ridge Bowel in Blue Island.

15       Q     After you got done bowling in Blue

16   Island, where did you go?

17       A     We went to Manny's.

18       Q     Was Yancy Brown with you?

19       A     He met me up there.

20       Q     And could you tell the ladies and

21   gentlemen of the jury what Manny's is?

22       A     I would say a bar, a lounge.

23              We shoot pool or dance, have a

24   drink or things like that.

1          Q    Could you generally describe the

2    interior of Manny's, where you were and how

3    the set up is of Manny's?

4          A    It is a bar.

5               If you want to go shoot pool,

6    right there when you walk in there is a

7    couple steps you can go down to shoot pool,

8    upstairs to take pictures and down at the

9    end of the bar is a, there is a dancing

10   area.

11         Q    And when you went into Manny's,

12   what area of Manny's did you make yourself

13   towards?

14         A    I walked around for a minute and

15   then I was basically shooting pull that

16   night, bottom of the stairs.

17         Q    How did you get to Manny's that

18   evening?

19         A    I drove.

20         Q    And in what vehicle did you drive?

21         A    A white Cadillac.

22         Q    Is that your vehicle?

23         A    Yes.

24         Q    And do you recall where you parked

1    your vehicle when you arrived at Manny's?

2         A    I parked it, I would say, I can't

3    really say directly right now, but I know I

4    parked facing Manny's, in front of Manny's

5    pointing this way on the street.

6         Q    Okay.

7         A    On the side of the street.

8         Q    Did anything happened with regard

9    to your vehicle when you were in Manny's

10   after you had arrived at that location?

11        A    As far as what?

12        Q    Did anyone request anything of you

13   regarding your vehicle?

14        A    Yes.

15             Yancy came to me and said

16   somebody wanted, needed to be let out.

17        Q    Could you speak loud enough?

18        A    Yancy came to me and told me that

19   someone needed me to move the car so they

20   could get out.

21        Q    And what were you doing at the time

22   that Yancy told you this?

23        A    Shooting pool.

24        Q    You were in the middle of a game?

B-95

1      A    Yes.

2      Q    So, what did you do regarding your

3  vehicle?

4      A    He just said, do you want me to

5  move it, and I said yes.

6      Q    So what did you do when he agreed

7  to move your vehicle?

8      A    I went to my coat and grabbed my

9  keys and gave him my keys.

10     Q    Okay.

11            And is there also an alarm

12  mechanism on your keys?

13     A    Yes, there is.

14     Q    And that was attached to your keys?

15     A    Yes, it was.

16     Q    And those were also given to Yancy

17  Brown?

18     A    Yes, it was.

19     Q    Did anything unusual happen at

20  about three minutes after you had given your

21  keys to Yancy?

22     A    Yes.

23            About three minutes after that

24  another neighborhood friend came running in.

B-96

1          Well, I didn't really see him

2    running, but by the way he came in he

3    hollered from the top of the stairs and told

4    me that Yancy was getting robbed or

5    something was going on out there, some type

6    of commotion outside.

7          Q    Okay.

8               Now, how was it that your

9    attention was drawn to this individual by

10   the name of Floyd Jackson?

11        MS. LIPINSKI:  Objection, your Honor.

12        THE COURT:  Objection sustained.

13               I don't believe that is in

14   evidence.

15               Is that the objection?

16        MS. LIPINSKI:  Yes, your Honor.

17        MR. DANAIELIAN:  Q Was your attention

18   drawn to him?

19        THE COURT:  There has been no evidence

20   that there was a Floyd Jackson.

21        MR. DANIELIAN:  I am sorry, I apologize.

22               What was the name of the

23   person that came in and whose attention --

24   strike that.

1                    Who is the person that called

2       to you?

3            THE WITNESS:  Floyd Jackson.

4            MR. DANIELIAN:  Q Floyd Jackson?

5            A    Yes.

6            Q    And he is the neighborhood friend

7       that you just testified about?

8            A    Yes, he is.

9            Q    And how is it that your attention

10      was drawn to him?

11           A    Well, I was shooting pool and he

12      just yelled my name and saying some words

13      about Yancy having a problem outside.

14           Q    When he yelled your name, did you

15      look towards him?

16           A    Yes, I did.

17           Q    And how would you describe his

18      demeanor or his expression on his face?

19           A    Probably like I would say he was

20      excited.

21                    Not as excited as happy, he

22      was excited like a scared situation.

23           Q    And based upon what he told you and

24      what you observed, what did you then do?

1        A        I just ran outside, out of the

2    club.

3        Q        Where was Floyd when you ran

4    outside?

5        A        He was at the top of the stairs.

6        Q        And where is the top of the stairs

7    in relation to the exit that you ran outside

8    from?

9        A        Maybe about -- maybe about five or

10   six feet.

11       Q        When you ran outside, what did you

12   observe?

13       A        I observed a guy standing over --

14   standing over Yancy or next to Yancy and

15   just standing there, it happened so quick.

16       Q        What did you observe?

17       A        I observed someone standing next to

18   Yancy and I next heard a gunshot.

19       Q        And where were you standing when

20   you made these observations regarding the

21   person standing next to Yancy?

22       A        Well, I was not definitely standing

23   in one specific position because I ran out

24   so I was in the progress of coming to see

1    what was going on and see what was the

2    commotion out there.

3        Q    When you first saw Yancy, where

4    were you?

5        A    I was coming out of the club.

6        Q    And where were you returning

7    towards as you -- did you continue to keep

8    your eye on Yancy and this other individual?

9        A    Yes, I did.

10       Q    Did you run towards that

11   individual?

12       A    Yes, I did.

13       Q    And where were you in relation to

14   Manny's when you made these observations?

15       A    Just coming, I would say, between

16   the door and almost I got to the street

17   before, that is when I heard the gunshot, I

18   stopped and backed up. I thought he dropped to the ground

19       Q    Okay.

20            When you say you stopped and

21   backed up, did you observe where Yancy was

22   when you heard the gunshot?

23       A    Yes.

24       Q    And where was he standing?

B-100

1      A     I would say maybe a foot or two

2   next to the car, you know, and yes, he was

3   about a foot or two away, real close to the

4   car.

5      MR. TARR:  I didn't hear that, if that

6   could be --

7      THE WITNESS:  He was a foot or two next

8   to the car.

9      MR. DANIELIAN:  Q Your vehicle?

10     A     Yes.

11     Q     Was your vehicle in the same

12  location it was where you had originally

13  parked it?

14     A     No, it wasn't.

15     Q     It had moved to another location?

16     A     Yes.

17     Q     And where was this location in

18  relation to where it had been parked?

19     A     Okay.

20              First the car was parked, I

21  would say, kind of like on the side of the

22  street by the parking lot where the car was

23  parked when I came out, but this time it was

24  backed in, in a parking position across the

1   street from the club.

2        Q    Did you see -- you indicated that

3   you saw another individual standing next to

4   Yancy?

5        A    Yes.

6        Q    Where was that individual standing

7   in relationship to where Yancy was standing

8   and where your vehicle was parked?

9        A    Right next to him.

10       Q    Okay.

11              Next to him, to his left or

12  next to him to his right?

13              The front of him, the back of

14  him?

15       A    If you were Yancy, I would say to

16  your right.

17       Q    Indicating this side of me?

18       A    Yes.

19       Q    Indicating over my right shoulder.

20  THE COURT:   The record will so reflect.

21  MS. BANKHEAD:   Q Could you describe what

22  the lighting conditions were at this time?

23       A    The lighting conditions were

24  regular street lights.

1          You also have like, I guess,

2   you know how different clubs or lounges

3   display their signs or whatever, you know

4   what is going on for that evening, events or

5   whatever, and also you have lighting from

6   the other parking lot because there is

7   another lounge or club where the car was

8   backed in at so it was not a great deal of

9   light, but it was decent enough so I could

10  see.

11      Q    Now, about how far were you from

12  Yancy and the individual standing behind him

13  when you heard the gunshot?

14      A    Like I said, the only thing that

15  was between me and Yancy was, I would say,

16  mainly the street.

17      Q    And what street is that?

18      A    I think it's Claire Boulevard.

19          I am not sure, whatever street

20  that is right in front of the club.

21      Q    And what type of a street is that?

22          In other words, in terms of

23  lanes?

24      A    There is one lane going east and

B-103

1    one lane going west, I guess you could say,

2    and maybe a car length.

3        Q    And after you heard the gunshot,

4    what did you then do?

5        A    I just banged up and, you know,

6    kind of hoping that nothing was coming my

7    way.

8        Q    What did you then observe happen?

9        A    I observed Yancy fall to the ground

10   and the guy that was standing over him just

11   kind of like ran away.

12       Q    And in what direction did you see

13   that person run?

14       A    In, I really, the only thing I seen

15   was go like in the opposite direction where

16   I was and I really couldn't see after that.

17       Q    What did you observe occur after

18   you observed this person run in the opposite

19   direction of where you were standing?

20       A    I observed another occupant or

21   another person driving off in my car.

22       Q    What direction did you see that

23   person drive?

24       A    Okay.

1              From where you are standing,

2    the car would be -- the car, and the car is

3    facing me, came up and made a right turn on

4    your right.

5        Q    What, if anything, did do you when

6    you saw the car turn towards you and then

7    away from you to your left?

8        A    I grabbed a beer bottle and threw

9    it at the car.

10       Q    Where did you find this beer

11   bottle?

12       A    It was just laying on the ground in

13   the parking lot.

14       Q    What did you then observe take

15   place?

16       A    I just observed that the car was

17   kind of like driving real slow and it just

18   turned, you know, and that was really,

19   mainly, that is about it.

20       MS. DANIELIAN:  Your Honor, at this time

21   I ask permission for the witness to be able

22   to step down into the courtroom.

23       THE COURT:  For what purpose?

24       MR. DANIELIAN:  For purposes of using

1   the demonstrative evidence.

2        THE COURT:  Is there anything that would

3   help you, if you had a diagram, would that

4   help you describe your testimony here today?

5        THE WITNESS:  Pardon me?

6        THE COURT:  Could a diagram help you

7   describe your testimony today?

8        THE WITNESS:  Yes.  It depends on what

9   the question is.

10       THE COURT:  Again, as I told you, ladies

11  and gentlemen, the witness may use the

12  diagram or the chart during this testimony.

13            The diagram is not evidence

14  and should not be considered by you as

15  evidence.

16            It's being used to help you

17  follow the witness' testimony.  It may be

18  considered for only that purpose.

19            The witness may step down.

20       MR. DANIELIAN:  Thank you, your Honor.

21            Mr. Griffin, I am going to

22  ask you to stand to the left of this

23  diagram.

24            Do you recognize this

1    diagram?

2         A    Yes, I do.

3         Q    As a matter of fact, I showed this

4    to you earlier today?

5         A    Yes.

6         Q    And would this assist you in

7    telling the ladies and gentlemen of the jury

8    about the events that you just testified to

9    regarding your vehicle, Yancy Brown and the

10    individual you observed?

11         A    Yes.

12         Q    I would like you to take a look,

13    and first, if you could tell the ladies and

14    gentlemen of the jury where is the exit that

15    you, well, both the entrance and exit door

16    on Manny's?

17         MR. TARR:    Excuse me.

18         THE WITNESS:    I would say right up in

19    this area here.

20         MR. DANIELIAN:    Q Could you make kind of

21    a mark on there showing the door, if you

22    will, on the exhibit indicating where the

23    door is located?

24              Okay.    Indicating, for the

B-107

File Date: ____08/1/2008____

Case No: ____08 CV 4389____

ATTACHMENT # ____PART 2____

EXHIBIT _____

TAB (DESCRIPTION)

_____

1    record, the witness has marked an X on the

2    diagram.

3               Now, you told the ladies and

4    gentlemen of the jury that you drove your

5    vehicle and parked it, correct, prior to it

6    being moved, is that correct?

7       A    Yes.

8       Q    Could you draw some type of a

9    rectangular figure as to where your vehicle

10    was parked and make an arrow as to what

11    direction your vehicle was parked when you

12    first parked it when you arrived at that

13    location.

14               You can draw a box, if you

15    will.

16       A    Say right up about in here.

17       Q    And in what direction was your

18    vehicle facing when you parked it?

19       A    That way.

20       Q    Okay.

21       MR. DANIELIAN:  Indicating, Judge, that

22    this arrow indicates the direction of the

23    front of your vehicle.

24       THE WITNESS:  Yes.

B-108

1        MR. DANIELIAN:  When you went into the

2   parking lot, when you exited from Manny's

3   and went into the parking lot, could you

4   mark where you observed your vehicle parked

5   at that time?

6        A    I would say about right here.

7        Q    Now, just so that the record is

8   clear, do these, do the objects that you

9   have drawn in the parking lot area, are

10  those the actual sizes and dimensions of the

11  areas and does Claire Boulevard show the

12  actual size of that area?

13       A    I guess just about.  This diagram

14  would be right.

15       Q    How big is the parking lot in front

16  of the Manny's?

17       A    I would say no more than three car

18  lengths.

19       Q    Three car lengths in which

20  direction?

21       A    In the direction of this car.

22       Q    Three car length going across?

23       A    No.  One, two, three, if that.

24       Q    If that.

1                    And going in the direction

2     along the boulevard, how long is the parking

3     lot?

4          A    I don't understand that question.

5          Q    How long in this area, indicating

6     to the side, how long is it?

7          A    I would say it is probably six cars

8     parked this way.

9          Q    Okay.

10         A    That would be, probably.

11         Q    And with regard to the parking lot

12    across the street, how does that compare in

13    size to the parking lot right in front of

14    Manny's?

15         A    Just abourt the same size.

16         Q    Now, could you, with this pen,

17    actually I will ask you to utilize a red

18    marker, I would like you to show the ladies

19    and gentlemen of the jury the path that you

20    took when you first exited Manny's and the

21    direction you walked if you can show in

22    relation to your vehicle?

23                    Just drawing a line, if you

24    can use that marker.

B-110

1          A     I can't really recall exactly the

2     way, but to the best of my ability --

3          Q     Yes, sir.

4                And then at what point, at

5     some point you indicated that you stopped

6     when you heard the gunfire?

7          A     Just about maybe right here.

8          Q     Okay.

9                And then what area did you

10    make yourself towards?

11         A     I backed up about this area.

12         Q     Okay.

13               And what direction did you

14    observe your vehicle travel after you heard

15    the gunfire and after you made your way to

16    this area?

17         A     Would you repeat that?

18         Q     In which direction did you observe

19    your vehicle travel after you heard the

20    gunfire?

21         A     Oh, up.

22         Q     Could you just draw an arrow to

23    which direction that took place.

24               And then, once again, using

1    the red marker could you show in what

2    direction you observed the person who was

3    standing behind and to the right of Yancy

4    Brown, what direction you observed that

5    person until you can no longer observe him?

6         A    Repeat that, please.

7         Q    Sure.

8              Could you use this marker and

9    show, using the diagram, show the direction

10   that you observed the person travel that you

11   observed standing behind Yancy?

12        A    Right here, exiting that way.    That

13   is all I seen.

14        Q    Okay.    Thank you.

15             You may take the witness

16   stand.

17             Mr. Griffin, I will ask you to

18   take a look around the courtroom and I am

19   going to ask you if you see the person who

20   you saw standing behind and to the left of

21   Yancy Brown as you exited Manny's and

22   proceeded towards your vehicle?

23        A    It was behind and to the right of

24   Yancy Brown.

1  Q Behind, to the right?

2  A Yes.  The defendant with the blue

3 tie on.

4  Q Okay.

5  THE COURT:  Would you please point to

6 him?

7  THE WITNESS:  Right there.

8  THE COURT:  He is the person on the

9 right?

10  THE WITNESS:  Okay.  Yes, to my right.

11  MR. DANIELIAN:  The record will reflect

12 an in-court identification.

13

14   Mr. Griffin, did you meet

15 with Sergeant Cooper of the Robbins Police

16 Department in the afternoon hours of the

17 13th of August of 1995?

18  A Yes, I met with him.

19  Q Pardon me?

20  A Yes, I did.

21  Q And for what purpose did you meet

22 with him at that time and at that location?

23  A What purpose?

24   To pick a lineup or whatever,

B-113

1    to see if I could see if I see anybody that

2    was by my car at the time of the incident.

3         Q    And did Sergeant Cooper ask you to

4    come to the Robbins Police Department?

5         A    Yes, he did.

6         Q    Did you go to that location?

7         A    Yes, I did.

8         Q    And did you have an opportunity to

9    view persons standing in the lineup?

10        A    Yes, I did.

11        Q    And do you recall how many persons

12   you were able to observe standing in a

13   lineup?

14        A    Five.

15        Q    Now, prior to viewing that lineup

16   what, if anything, did Sergeant Cooper tell

17   you?

18        A    He just told me that he is going to

19   have a lineup and just to take my time and

20   see if I seen who might have shot Yancy.

21        Q    What, if anything, did he caution

22   you about in terms of you making a possible

23   identification of anyone in that lineup?

24        A    He just made sure to make sure that

1    I was -- make sure that I was correct in who

2    I picked and that to take my time.

3                 He mainly wanted me to take my

4    time to make sure I was correct.

5        MR. DANIELIAN:  Your Honor, could I have

6    permission to apporach?

7        THE COURT:  Sure.

8        MR. DANIELIAN:  The record should

9    reflect I have shown what I am about to mark

10   for identification purposes as People's

11   Exhibit No. 1 to defense counsel.

12       THE COURT:  What was that chart?

13       MR. DANIELIAN:  We will ask the chart be

14   marked as People's No. 1 for identification

15   purposes and ask to mark this as People's

16   Exhibit No. 2 for identification.

17       THE COURT:  Sure.

18       MR. DANIELIAN:  Q Mr. Griffin, I will

19   ask you to take a look at what I have marked

20   for identification purposes as People's

21   Exhibit No. 2.

22                 Do you recognize People's

23   Exhibit No. 2?

24       A    Yes, I do.

B-115

1      Q    And what do you recognize it to be?

2      A    This is the photo lineup that

3  Officer Cooper showed me.

4      Q    And how is it that you are able to

5  recognize this exhibit as the photo lineup

6  that you -- photograph of the lineup that

7  you observed?

8      A    Mainly by the people that is in it.

9      Q    And you remember having looked at --

10  does this truly and accurately depict the

11  makeup or the composition of the lineup that

12  you looked at the day that we just talked

13  about?

14      A    Yes, pretty much.

15      Q    And does this truly and accurately

16  depict what you observed that day?

17      A    Yes.

18      Q    And do you see in People's Exhibit

19  No. 2 the photograph of the person who you

20  identified when you viewed that lineup as

21  the person who you saw standing behind and

22  to the right of Yancy Brown and who you saw

23  leave in the opposite direction of where you

24  were standing?

1          A     Yes.

2          Q     And which person is that in there?

3          A     The person, I would say with the

4     black shirt holding up the No. 4.

5          Q     Okay.

6                Could you -- all right, very

7     well.

8                And do you see that person who

9     is depicted in People's Exhibit No. 2, who

10    you have identified as the person holding up

11    No. 4, present in open court today?

12         A     Yes, I do.

13         Q     And would you identify that person

14    for the record by an article of clothing he

15    is wearing?

16         A     Like I said, the blue tie and, I

17    guess, he has a pony tail

18         THE COURT:  The record will reflect an

19    in-court identification of the defendant.

20         MR. DANIELIAN:  Q Mr. Griffin, is it not

21    true that you are a convicted felon?

22         A     No, it is not true.

23         Q     Is it not true that you have a,

24    that you received a period of probation

                      B-117

1    after pleading guilty to the offense of

2    possession of a controlled substance?

3         A    No, that is not true.

4              I was never convicted on

5    anything and I never received probation for

6    anything.

7         MR. DANIELIAN:  Judge, may we have a

8    sidebar?

9         THE COURT:  Sure.

10                  (Whereupon, the following

11                   proceedings were had

12                   at sidebar.)

13        MR. DANIELIAN:  I asked him the other

14   day if he was, he had a prover for

15   possession of a controlled substance and he

16   told me it was, now --

17        MS. BANKHEAD:  Maybe it's 14.10?

18        THE COURT:  I mean, you should have

19   checked it out.  I don't know.

20        MR. DANIELIAN:  That is what he fronted

21   to me the other day.

22              Am I losing my mind?

23        MS. BANKHEAD:  That is what he said.

24        THE COURT:  Well, if you want, I will

B-118

1   let you ask a limited number of questions to

2   clear it up, if you want.

3        MR. DANIELIAN:  Well --

4        THE COURT:  Do you have a certified or

5   did you check?

6        MR. DANIELIAN:  I got it on PROMIS and

7   he got it on probation.

8                  I asked is this you that went

9   down for probation.

10       THE COURT:  Regular probation?

11       MR. DANIELIAN:  It said regular

12  probation, it did not say 14.10.

13       THE COURT:  Well, I think you are going

14  to have to front him with that or confront

15  him with what your conversation was.

16                 I know you are impeaching

17  your own witness.  I don't know what else

18  you can do unless you want the agree that he

19  is, but I imagine, though, you are also

20  telling me that is what he said.

21                 I think you are going to have

22  to make that known, anyway, out there,

23  anyhow, or otherwise he will be called as a

24  witness for them.

B-119

1    MR. DANIELIAN:  Could I have just a

2    moment?

3         THE COURT:  Yes.

4                          (Which were all the

5                           proceedings had at

6                           sidebar.)

7         THE COURT:  You may proceed, Mr.

8    Danielian.

9         MR. DANIELIAN:  I have no further

10   questions.

11        THE COURT:  Cross.

12        MR. LIPINSKI:  Yes, if I may.

13             CROSS EXAMINATION

14             BY

15             MS. LIPINSKI:

16        Q    Mr. Griffin, you stated that a

17   friend came and got you in that club and

18   told you that Yancy was in an argument or

19   something was going on with Yancy and that

20   car?

21        A    Yes.

22        Q    And that friend was Mr. Floyd

23   Johnson, correct?

24        A    Yes.

1    Q    Okay.

2         And then you went out of

3    Manny's, you left Manny's?

4    A    Yes.

5    Q    After this friend gave you this

6    information?

7    A    Yes, I did.

8    Q    Okay.

9         And you stated that you could

10   see Yancy and somebody standing next to

11   Yancy, correct?

12   A    Yes.

13   Q    Okay.

14        Now, if you may, Judge, I

15   would like to use this diagram that was used

16   over and over.

17   THE COURT:   Sure.

18   MS. LIPINSKI:   Q Can you see that?

19   A    Yes.

20   Q    Okay.

21        So you are over here, that is

22   your X, you are right outside Manny's,

23   correct?

24   A    Yes.

1       Q    And you stated that you could see

2  Yancy and a man standing next to Yancy.

3             Where is Yancy at, over here

4  by your car?

5       A    (Nodding head.).

6       Q    So, this parking lot across the

7  street and the middle of this parking lot,

8  right?

9       A    Yes.

10       Q    And that is one in the morning,

11  right?

12       A    Yes.

13       Q    An it's dark outside, right?

14       A    Yes.

15       Q    Okay.

16             And you say when you got out

17  here, you say that you start walking there,

18  you heard shots, right?

19       A    No, I heard a shot.

20       Q    You heard a shot?

21       A    Yes.

22       Q    Okay.

23             You heard a gunshot?

24       A    Yes.

1        Q     Or what you believed to be a

2   gunshot.

3               And when you heard that

4   gunshot you backed up?

5        A     Yes.

6        Q     So, you went back towards the door

7   of Manny's, right?

8        A     Parking lot area, not to the door.

9        Q     Back towards the door, back where

10  you came from.  You backed up.

11              In fact, you dropped to the

12  ground, didn't you?

13       A     No, I did not drop to the ground.

14       Q     You didn't drop to the ground,

15  okay.

16              But you backed up, right after

17  you heard these shots?

18       A     Yes.

19       Q     The shot.

20              Okay.  You then say that you

21  saw your car, somebody get in your car?

22       A     I didn't say I saw somebody get in

23  my car.

24       Q     What did you say?

1          A     I said my car pulled off.

2          Q     You saw your car pull off, right?

3          A     Yes.

4          Q     And, now, you couldn't see too good

5     at this point, now, could you?

6          A     There was nothing blocking my view.

7          Q     But you couldn't see, could you?

8          A     Yes, I could see.

9          Q     What could you see?

10         A     As far as what?

11         Q     The car?

12         A     Pardon me?

13         Q     Did you see the car?

14         A     Yes, I seen the car.

15         Q     A-humm.  But you say, now, this car

16    pulled towards you, you're here, the car

17    pulled towards you and then it made a right

18    turn, correct?

19         A     Yes.

20         Q     Okay.

21               And after that you couldn't

22    see too much, correct?

23         A     You see what?

24         Q     The car or who was in the car?

B-124

1      A    Yes, I came up, I was right down

2    the street, and I threw the bottle.

3      Q    You threw the bottle?

4      A    Yes.

5      Q    You were over here, right?

6      A    I didn't say I threw the bottle

7    before the gunshot, after the gunshot.

8      Q    I know that, sir.

9                Where were you?

10     A    You are pointing over there.

11     Q    Where were you when you threw the

12    bottle?

13     A    Just about up back on the street

14    again.

15     Q    This street?

16     A    Yes.

17     Q    Okay.  All right, sir.

18               Now, you say you saw somebody

19    in the car and somebody standing next to

20    Yancy, correct?

21     A    I --

22     Q    I am sorry?

23     A    I didn't notice anyone in the car

24    until it started pulling off.

B-125

1      Q    All right.

2           But you did know it was

3      somebody in that car, correct?

4      A    Yes, I did.

5      Q    Okay.

6           And could you see who was in

7      that car?

8      A    A little bit.

9      Q    Who was it?

10     A    I am not sure.

11     Q    You are not sure who was in that

12     car, okay.

13          And this person that was

14     standing next to Yancy, you say just walked

15     away, right?

16     A    Ran.

17     Q    Ran?

18     A    Ran.

19     Q    Okay.

20          So, when you were looking at

21     this person running away, you were looking

22     at the back of him, right?

23     A    When he ran?

24     Q    Yes?

1     A     I was kind of backing up, yes.  I

2     could see the back of him.

3     Q     You could see the back of him?

4     A     Yes.

5     Q     Okay.

6     Now, you spoke to Sergeant

7     Cooper of the Robbins Police Department

8     about this incident, didn't you?

9     A     Yes, I did.

10     Q     And, sir, when was that?

11     A     The night of the shooting.

12     Q     The night of the shooting, that was

13     August 11th?

14     A     Yes.

15     Q     And you told Sergeant Cooper, as

16     best you could, everything about this

17     incident, correct?

18     A     Yes.

19     Q     Okay.

20     And you told Sergeant Cooper,

21     did you not, that when you heard the shots

22     or shot you dropped to the ground?

23     A     No, I did not.

24     Q     You never told that to Sergeant

1    Cooper?

2        A    No, I did not.

3        Q    Okay.

4                Now, you also told Sergeant

5    Cooper about the shot you heard, correct?

6        A    Yes.

7        Q    And you told Sergeant Cooper that

8    you heard several shots?

9        A    No.

10       Q    What did you tell Sergeant Cooper

11    about the shots or shot?

12       A    I told him I heard a gunshot.

13       Q    You heard a gunshot.

14               You never said that you heard

15    several shots?

16       A    No, I did not.

17       Q    And did you tell Sergeant Cooper

18    that you saw the person who was standing

19    next to Yancy get into this car and drive

20    off?

21       A    Could you repeat that?

22       Q    Did you tell Sergeant Cooper that

23    you saw the person, who was next to Yancy,

24    get into this car?

1     A    No, I did not.

2     Q    Okay.

3              Now, sir, you stated that you

4    viewed a lineup, correct?

5     A    Yes, I did.

6     Q    And what day did you view the

7    lineup?

8     A    The same night or early morning.

9     Q    August 11th?

10    A    Yes.

11    Q    Or August 12th?

12    A    It would have been August 12th, if

13    you count the morning.

14    Q    All right.

15              Sir, did you, after you saw

16    this car drive off, did you ever get into

17    another car and try to follow it?

18    A    Yes, I did.

19    Q    And you got into a car with

20    somebody named Otis Nutall, correct?

21    A    Nutall, yes.

22    Q    Pardon?

23    A    Nutall, yes.

24    Q    I am sorry, Nutall.

1                           And, sir, you were trying to

2      follow this car, so you were behind this car

3      that you saw drive off, correct?

4           A     Once I caught up to it, yes.

5           Q     And this is the car that you said,

6      your car, or this car, sir, this was the car

7      that you saw one person get into, correct?

8           A     Say that again.

9           Q     That was the car that you saw one

10     person get into or you saw --

11          A     I never saw one person get into it.

12          Q     I am sorry, you never saw anybody

13     get into that car.

14                          You saw the car moving and

15     then you saw somebody in that car, is that

16     correct?

17          A     Yes.

18          Q     Okay.

19                          Is that the car that you

20     followed that you saw somebody in that car?

21          A     Yes, it is.

22          Q     Okay.

23                          Now, sir, you never caught up

24     with that car, did you?

B-130

1          A     Yes, I did.

2                      Did you catch up with the

3     person inside the car?

4          A     No, I didn't.

5          Q     No, you didn't.

6                      So you didn't see that person,

7     after you saw him in that car, you never saw

8     him again, did you?

9          A     No, not until the lineup.

10          Q     And you saw one person, correct?

11          A     Pardon me?

12          Q     One person, correct?

13          A     One person when, as of when?

14          Q     That car, one person you saw?

15          A     That is all I seen, one person.

16          Q     Okay.

17                      If I may have a moment, Judge.

18          THE COURT:   Sure.

19          MS. LIPINSKI:   Q At the lineup, Mr.

20     Griffin, you identified the two people,

21     correct?

22          A     Yes, I did.

23          Q     Okay.

24                      And this person that was

B-131

1    standing next to Yancy, you saw him run

2    towards that way, but never saw him that

3    evening again, did you?

4        A    After the gunshot?

5        Q    Yes?

6        A    I never seen him.

7        Q    That evening?

8        A    Until the lineup.

9        Q    Did you ever see him that evening?

10        A    That evening?

11        Q    A-humm?

12        A    No, I did not.

13        MS. LIPINSKI:  Okay.

14                Nothing further at this time,

15    Judge.

16        THE COURT:  Any redirect.

17                REDIRECT EXAMINATION

18                BY

19                MR. GRIFFIN:

20        Q    Mr. Griffin, could you describe

21    what position Yancy Brown was standing in

22    when you first observed him as you got, as

23    you walked out of Manny's.

24        A    He was standing, if you can turn

1    maybe sideways.

2        Q    Sideways, okay.

3                Are you now leaving Manny's?

4        A    I am leaving Manny's.

5        Q    If you were to be leaving Manny's

6    and I am Yancy Brown, where would I be

7    facing?

8        A    That direction, towards that wall.

9        Q    Okay.

10               Where would your car be in

11    relation to where I am standing?

12        A    Say where this stand is at.

13        Q    Judge, indicating, for the record,

14    I am standing sideways, facing the jury with

15    the podium, which is next to the jury box,

16    facing it, correct?

17    THE COURT:  That is correct.

18    MR. DANIELIAN:  Q And where was the

19    person, the defendant, who you have

20    identified, where was he now standing in

21    relation to where I am standing facing the

22    vehicle, as me being Yancy Brown, where

23    would he be standing?

24        A    He would be standing face-to-face,

1    eye-to-eye next to Yancy.

2        Q    So, he would be standing to the

3    right of you, behind him, but yet facing

4    you, like this, facing you?

5        A    Yes, just about, yes.

6        Q    Now, do you notice anything

7    different about the defendant's appearance

8    today in open court from the time that you

9    observed him the time of the shooting and

10    later on in the lineup?

11        A    Well, I ran out, I seen -- the only

12    difference I can mainly see is that he has

13    on a suit and he had braids.

14        Q    Okay.

15            And his dress today?

16        A    No, he wasn't dressed up, maybe a

17    tee shirt or something.

18        Q    After you observed the defendant

19    outside standing behind Yancy, from that

20    time, when was the last time that you -- the

21    next time that you observed the defendant

22    after that?

23        A    Repeat that, please?

24        Q    When was the next time that you

1    observed the defendant after you observed

2    him standing behind Yancy out in the parking

3    lot across from Manny's?

4         A    The lineup.

5         MR. DANIELIAN:   Nothing further, Judge.

6         THE COURT:   Any recross?

7                   RECROSS EXAMINATION

8                   BY

9                   MS. LIPINSKI;

10        Q    Mr. Griffin, you say that you heard

11   a shot.

12                  You didn't see a shot fired,

13   though, did you?

14        A    No, I did not.

15        Q    And you didn't see any gun that

16   night, did you?

17        A    No, I did not.

18        Q    You stated taht when the State's

19   Attorney was talking to you, the State's

20   Attorney was standing here, this is your

21   car?

22        A    Yes.

23        Q    That was the car and Yancy is here,

24   is that correct?

B-135

1    A    Pardon me?

2    Q    And Yancy would be here.

3         I am sorry, Yancy is here and

4    the guy that you say that you saw standing

5    next to him was here?

6    A    Yes.

7    Q    Okay.  All right.

8         And Yancy is here and that is

9    the car.

10        Now had you ever seen Mr. John

11   Phillips?

12   A    No, I have never seen him.

13   Q    You had never seen him before?

14   A    No.

15   Q    Had you ever seen that night a

16   third person that night near Yancy or near

17   your car?

18   A    It has been so long now that I

19   can't definitely recall.

20        I don't want to say because I

21   can't definitely tell.

22   Q    You are not sure whether there was

23   a third person there?

24   A    No, I am not sure.

1          Q       You have talked to the State's

2    Attorney before you testified today in

3    court, is that correct?

4          A       Yes, I did.

5          MS. LIPINSKI:  I have nothing further.

6          THE COURT:  Anything further?

7          MR. DANIELIAN:  No, your Honor.

8          THE COURT:  All right.

9                  Mr. Griffin, you may step

10   down.

11                 You are subject to recall,

12   though.  You have to be available to the

13   Court.

14         THE DEFENDANT:  Yes.

15         THE COURT:  You may step down.

16                 (Whereupon, the witness was

17                 excused.)

18         THE COURT:  You may call your next

19   witness.

20         MR. DANIELIAN:  Judge may we have a

21   short sidebar?

22         THE COURT:  Sure.

23                 (Whereupon, a discussion was had

24                 off the record.)

B-137

18

Sgt. James Cooper

Sgt. Cooper stated the fact that, he himself did not observe neither, John Phillips, nor anyone else exit the vehicle in question, Which had Claimed to have been in pursuit of. (See "B-144", 4-11 and "B-158", 10-15)

Sgt. Cooper also stated that, himself, along with the Robbins P.D., the Blue Island P.D., Cal Park P.D., and also the Dixmoor Illinois P.D., Sealed off the entire area, and began their Search of the whole area, in pursuit of the alleged suspects. (See "B-144", 12-21, "B-145", 3-24, thru "B-146", 1-4)

Sgt. Cooper stated that, their technique's, along with the landscape, helped them to keep everyone Contained in one area, that there were officer's in Car's, and on foot, so no one could get neither in, nor out. (See "B-146", 5-17 and 19-22) And yet, there was "never" a single piece of "Physical Evidence" recovered by anyone. No Gun, No Jewelry, and No Money. Neither was there ever a "Powder Burn" test administered to Mr. Phillips, in order to determine whether or not he actually was the shooter though he was detained at the Robbins P.D. under "Investigation" for 4 day's (which exceeded the legal limit) before he was ever Charged, and without ever being administered a "Powder" test, which is a "Forensic procedure" that's Considered "Routine", whenever there has been a Shooting, and an alleged offender has been detained and placed under investigation, in order to accurately pinpoint, "who" the actual shooter was. Just as "finger print's" are taken in order to Connect an offender to a weapon, and a "ballistics Check" determines whether or not a weapon was used in a Crime, a "Powder Burn" test is administered in order to prove for Certain whether or not a suspect fired a weapon. Especially, when the "gun" that was said to be used by a possible assailant was not recovered by police,

28

Sgt. Cooper "admitted" the fact that, Mr. Phillips showed up "after" the area that he'd emerged from, had already been checked and also "Cleared" by police. Proving the fact that, Mr. Phillips never attempted to "Conceal" himself from the police, which someone who was "guilty" of an offense would have done. Seen McCraw for example. Otherwise, "exposing" himself to the police, from the safety of his place of hiding, which was already "Checked," and "Cleared" by the police beforehand, would have been the last thing that, John Phillips would have done because, he would have had no reason to have given himself up. (See "B-147", 15-20)

Sgt. Cooper unknowingly Cooborated Sean McCraw's "incentatious testimony" stating that Mr. McCraw came from under a truck saying; "He had a gun on me". Which was the same statement that Mr. McCraw made at the Robbins P.D. during his "illegal" interview. But of the "true assailant" known as "Black Dre", who was still at large, and "not" of Mr. Phillips, who was an "innocent man". Both, of whom were "proven" by all witnesses, and also by Sgt. Cooper himself, to be two different people. (See "B-147", 8-12, and "B-157", 3-8)

Sgt. Cooper admitted the fact that, Mr. Phillips approached a police Car "on his own". ("B-157", 21-24, thru "B-158", 1)

Sgt. Cooper also stated that, Mr. Phillips was taken to the Robbins P.D. "not" under arrest, but for the purposes of an "interview" only. Proving the fact that, Timothy Specht allegedly identifying Mr. Phillips as the person that shot Henry Brown during an alleged "on scene" indentification procedure, was "Perjury Testimony", given by Sgt. Cooper "under oath". If Mr. Specht had actually identified Mr. Phillips as the shooter,

38

rather than being taken to the police station to be interviewed as Sgt. Cooper alleged, Mr. Phillips would have in fact been Charged with the offense on the scene, which would have also reflected in his "police report's" where the actual "Charges" are specified, and also "Test's" to Connect Mr. Phillips to the actual "firing" of a weapon, would have in fact been administered upon his arrival to the police department, in order to "Cooberate" Mr. Speights allegation's. (See "B-158", 16-20) (See Police Report's)

In a "shooting" offense, only the "Body of Evidence", Can support a Claim in a "Court of law". An identification of an alleged offender by an alleged eye witness, "Is Not" sufficient enough to "stand alone" in a "Court of law". It Can only serve as the "Probable Cause" needed in order for "Law Enforcement" to legally administer the "Battery" of test's necessary to give "Credibility" to the alleged eye witnesses Claims. Without the "Battery" of test's (Powder Burn, Finger Printing and Weapon Ballistic's Check) those Claims under the "Color of law", are in fact, "unsubstantiated".

In no weapon "ever" being recovered in Mr. Phillips' Case, a "Powder Burn" test was therefore, "Critical" on the part of the Robbins P.D., in order to Cooberate any Claim's by an alleged witness that Mr. Phillips was the shooter of Yancey Brown. Otherwise, there was "never" any evidence Submitted that was Substantial enough to have even Charged Mr. Phillips with a "Shooting" Crime.

In the States Attorney "Prejudicial" the jury during "Closing Arguments", by "Giving Opinion's", which was "Perjury testimony" on it "Conflicting" with the "Evidence", as well as the testimony of the State's own witnesses, the "State's Attorney" made the jury believe that, John Phillips, and

4 of 6

the only person that the "evidence proved", was connected to the "gun", and the crime's, which was the "actual assailant" known as "Black Doe", were actually "one person".

Sgt. Cooper stated that he swear's by his police report's, which were the "first statement's" of witnesses, and that held investigative note's of the case. All of which, "proved" the fact that, Mr. Phillips was "never" looked upon, neither was he "ever" identified by "anyone" as the shooter, including "Yancy Brown himself".

This is "why", upon the conclusion of the investigation, Sgt. Cooper had no other alternative but to appear before the Grand Jury, and admit the "Truth", which "was not" based on his own opinion, but on the "actual investigation" of the "alleged" eye witness account's, which was the fact that, it was someone "other than" Mr. Phillips that shot Yancy Brown, and that, that person was "still at large".

This not only "discredited" anyone's testimony who had previously identified John Phillips as the shooter, but also, this fact according to "law", had automatically disqualified these alleged witnesses from the case as "credible sources" to the account's in question.

Leaving the state's Attorney's on the Case, with no other legal alternative but to "dismiss" these individual's as witnesses, from the case according to law.

But, rather than doing so, the state's alerted to ignore that obligation. And instead, "manipulate" these individual's who were "discredited" by Sgt. James Cooper, the "Chief Investigating Officer"

5g

of the Case, at the Grand Jury "under oath", into Committing "Perjury", in order to Secure a Conviction based on "Circumstantial" evidence that was illegally "manufactured" by the state, through witnesses who's alleged account's of the incident in question, were already discredited by the Case's "Chief Investigator", as "non-believable", "unfounded", "Not Credible", and without merit. Therefore, having a believability percentage of "zero", and who according to law, were to be "Dismissed" from the Case altogether. (See "B-160", 8-13)

In stating that he'd remembered, Mr. Griffin telling him that he'd heard only "one-shot" and dropped to the ground, before he was asked to read the "police report" where he then, admitted the fact that, Ted Griffin had actually stated "Several shot's", and after he'd heard them, he dropped to the ground. Sgt. Cooper had been "proven" to have Committed "Perjury" under oath. (See "B-161", 9-13, "B-162", 2-11, and 19-22)

Confronted with the "police report", Sgt. Cooper admitted that Ted Griffin stated that, he'd seen "Three" individual's involved in the incident in question. Proving the fact that, there was "Two" other's beside's Sean McCrae that were involved in the Crime's and yet, police "never" went after them. Instead, they settled for a "bird in the hand", despite the fact that John Phillips was an "innocent man" (See "B-165", 3-11)

Sgt. Cooper stated that, he did not recall Toney Brown telling him that he'd heard his assailant say, "You are a Smart motherfucker", or that Mr. Brown was ordered to turn the alarm off on the Car, neither Could he remember Sean McCrae being said to Say by Mr. Brown, "I'm not starting the Car, make him start the Car", neither did he

remember Mr. Brown telling him that the guy who shot him Cocked the gun. Sgt. Cooper also claimed that Mr. Brown told him that a "third" offender stated; "Give me your jewelery bitch". But he does recall Mr. Brown telling him that he was "shot" by one individual, as another individual went through his pockets. Proving the fact that, either Sgt. Cooper, or Yoncy Brown, Committed "Perjury" under oath. See "B-167", 14-17, and 18-21, "B-168", 1-23)

Sgt. Cooper then blamed the "illegal interview" of, Sean McCree as a "minor", on the State's Attorney, though it was "he" who was in Charge. See "B-169", 3-16.

This was because, in Mr. McCree being a "minor", according to his right's as a "Suvenile", his parent's or legal Council were to be present before questioning (which they were not) otherwise, any information obtained would be "inadmissible". Which Mr. McCree's, should have been due to the fact that it was gained "Unlawfully". Still, Sgt. Cooper admitted to being present while the State's Attorney broke the law and violated Mr. McCree's, Miranda, "Suvenile", and Constitutional right's. (See "B-169", 17-18)

Sgt. Cooper "admitted" to actually knowing this individual named "Black Doe", along with the fact that, during the Course of the investigation, he himself "had determined that "Black Doe" was a "suspect" in the Case, and that, this individual "was not", John Phillips (See "B-169", 19-21, 23-24, thru "B-170", 1-8)

Sgt. Cooper "also" admitted the fact that, there was no gun found on Mr. Phillips, no gold Chain found, and neither was there ever a gun

recovered from the "area" where Mr. Phillips ran up to the Police car.
(See "B-190", 15-24, "B-171", 1-5, and "B-173", 2-14)

When asked, "when" his report's were generated, Sgt. Cooper stated
after they (his team) accumulated "all", of the Cases information,
"including" the account's from, Sean McCraZ, Yancy Brown, Ted Guckio, Timothy
Spreight, and the account's of other "investigator's" (B-181", 10-23)

When Sgt. Cooper was asked if he kept "detailed" note's to the sum
and substance of the conversation's that he'd had with each of
these people that were subjects of the rape's generated, he stated,
"To the best of my knowledge." (See "B-181", 24, thru "B-182", 1-5)

"All of which", was "disregarded" at the Grand Jury by Sgt. Cooper,
"after" he and his team's "investigation's" into the alleged account's
of the incident in question was "Completed."

Sgt. Cooper "also", admitted to knowing the individual Black Doe's "real"
name, and that Mr. Phillips was definately "not" this individual.
(See "B-182", 17-24, thru "B-183", 1-6)

"Again", proving the fact that, the "State's Attorney", as an "Officer" of the
Court, "intentionally" Prejudiced the Jury against Mr. Phillips, in "Voicing"
Opinion's, that was not supported by, nor found within, the Evidence,
which therefore made the State's Attorney's "very own" statement, saying
to, as well as "ordering" the Jury to; "Don't be fooled, Mr. Phillips is
Black Doe", "Perjury Testimony". Which was used in order to secure
a Conviction against Mr. Phillips because, the individual "Black Doe", was
who "all" of the State's Circumstantial evidence actually pointed towards.

8/

Sgt. Cooper "admitted" that, he'd discovered during his investigation the fact that, the individual known as "Black Doe", took the victim, Yancy Brown, at "Gun Point". Proving the fact that, Sgt. Cooper "knew" that John Phillips was an "innocent man" the entire time, but still never "Cleared" him of the Charges. (See "B-184", 8-24, thru "B-185", 1-14)

When the Attorney for the "Defense" stated the fact that, "Black Doe", and John Phillips, were "Two different people", the trial Judge agreed. Though the state's Attorney, "still" elected to later, "prejudice" the Jury against Mr. Phillips in stating that, the "Two people", were actually "one person". (See "B-186", 16-20)

"Proof", that Sgt. Cooper was committing "Perjury" under oath, was given during a "Side Bar", when the Attorney for the "Defense" pointed out the fact that, Sgt. Cooper had testified under oath that, it "was not" Black Doe who shot Yancy Brown. But according to Sgt. Cooper's previous testimony, it was "Black Doe", who "is not" John Phillips, that took Mr. Brown at "Gun Point". Of which, were Clearly "Conflicting" statement's. Then, Sgt. Cooper was "also" shown at trial through his "Grand Jury Transcripts", that he'd admitted "under oath" the fact that, it was someone "other than" Mr. Phillips, that shot Yancy Brown, and that, that person was "Still at large". (See "B-186", 21-23, thru "B-187", 1-4, "B-188", 15-24, and "B-189", 1-17)

Proving the fact that, the testimony that Sgt. Cooper was giving at trial, about "Black Doe" not being the shooter, was, "Perjury Testimony", that was given by Sgt. Cooper in effort's to assist the prosecution in Securing a Conviction against John Phillips, though they "all" knew that he was in fact, an "innocent man".

9 of

Either the state's Attorney "knowingly" committed "Perjury" against Mr. Phillips in order to secure a Conviction against him, in saying that he "was", actually the individual known as "Black Joe", or "all" of the state's own witnesses Committed "Perjury" in stating "under oath" that Mr. Phillips "was not". Of which, was clearly a "Conflict of Interests" on the state's behalf.

Therefore, if it is the state's "own witnesses", though they were already "discredited" beforehand by the Cases, Chief Investigative Officer," Sgt. James Cooper, at the Grand Jury "under oath", and therefore they should have been "dismissed" by the state as Credible eye witnesses to the incident in question, that must fall upon the blade of "Guilt", and be subjected to the "penalties for Perjury" by this Honorable Court, it would have only "added" to the long list that legally Called for their "dismissal" from the Case to begin with. But if it is the "state's Attorney's" of the case, that should bare the "blame", then they should "both" be sent to the same place that their "Unlawful Act's" have sent an "innocent man" (John Phillips) for the past "13 yrs.", which is to "prison" where they rightly belong for "manipulating" these witnesses into taking the stand, and Committing "Perjury" under oath, in giving testimony that the state knew beforehand was "discredited" as being true and accurate by the Cases's own "Chief Investigative Officer", Sgt. James Cooper.

And finally, in Sgt. Cooper making efforts to Cover these Fact's, he also Committed "Perjury" under oath which was exposed when he Confronted with his very own "Grand Jury" transcripts. Sgt. Cooper was later forced to retire from the Robbins P.D., and is "Currently" serving a lengthy prison sentence in I.D.O.C. for "Corruption's Charge's". Proving that

10 of 10

Seen McCrea's allegation's of "Police Brutality", that was administered by Sgt. Cooper, which "forced" Mr. McCrea into implicating an "innocent man" in the Crime's in question, "was True". The innocent man was, John Phillips.

And also, in Sgt. Cooper Committing "Perjury" against John Phillips at trial and "under oath" until he was Confronted with his very own "Grand Jury" transcripts, these act's prove what Mr. Phillips has been stating all along. That he is infact an "innocent man", who was Set up to take the fall by Sgt. Thomas Cooper, who is now serving a lengthy prison Sentence for "Corruption's Charge's", but who was not yet Caught when administering these same Corrupt tactics to Sean McCrea, and John Phillips, regarding this Case, but no one would listen. Instead, everyone gave this Corrupted officer the benefit of the doubt, and prosecuted John Phillips, on "both", "illegally manufactured," as well as "Perjury Testimony", which was in fact, a direct violation of his "Constitutional Right's".

CHICAGO POLICE  | DAY MO YR  11 AUG 95 02:15

1. CLASSIFICATION OF OFFENSE CLASSIFICATION LAST PREVIOUS REPORT
AGGRAVATED BATTERY  0440  2911 Broadway Robbins  | 3. BEAT OF OCCUR 305

5. VICTIM'S/SUBJECT'S NAME AS SHOWN ON LAST PREVIOUS REPORT
BROWN YANCY  | BEAT ASSIGNED 3

8. VICTIM'S/SUBJECT'S ADDRESS
2840 W 39th Blue Island

7. TYPE OF LOCATION OR WHERE THIS INCIDENT OFFENSE OCCURRED
Parking Lot

11. OFFENDER'S NAME (OR DESCRIBE CLOTHING ETC)
Phillips, John  | 1025 S. Sangamon  | M | 1 | 25 | 600 | 175 | Bro | Blk | Med

90. NARRATIVE

ON 11 AUG 1995 02:13 HRS Reporting Officer's were Dispatched to Mannys Bluekoom For A Man Down, on Arrival R/O observed A M/Blk Known to R/O as Yancy Brown, Laying on the Ground Bleeding From the Back, R/O was Advised over the Radio By CPD Franklin that He was Chasing the offenders E/B on Broadway, R/O Got Back into Vehicle And Started Traveling in That Direction, R/O on Arrival to the Area where the vehicle Stopped, Observed that the Vehicle was Blocking the Middle of the Street with Both Doors Open. R/O Along with Blue Island Searched the Area For offenders as R/O walked toward a Ford Pickup Truck, R/O observed A M/Blk Come From under the

▢ CONTINUED OTHER SIDE

91. DATE THIS REPORT SUBMITTED  15 AUG 95  TIME 1940

92. SUPERVISOR APPROVING (PRINT NAME) LT Gunn  STAR NO.

93. REVIEWING OFFICER (PRINT NAME)  James Cooper Jr  STAR NO.

94. REPORTING OFFICER (PRINT NAME)  TIME

95. DATE APPROVED (DAY-MO-YR)  15 AUG 95  TIME 1940



TRUCK SAYING DON'T SHOOT, AT THIS TIME A
ON THE STREET ID WAS MADE BY
SPEIGHT, TIMOTHY OF THE ABOVE SUBJECT HE
OBSERVED GET INTO THE VEHICLE AND DRIVE
AWAY. AT THIS TIME ANOTHER M/BLK CAME
OUT OF NOWHERE TRAVELING W/B ON BROADWAY
ON FOOT. R/O STOPPED THE SUBJECT AND DURING
A STREET INTERVIEW HE STATED HE WAS AT MANNYS
AND WHEN THE SHOOTING STARTED HE RAN UNTILL
HE GOT LOST. SO WHEN HE OBSERVED THE LIGHTS
FROM THE POLICE CARS HE STARTED WALKING TOWARD
THEM. TO ASK DIRECTIONS TO CH60, AT THIS
TIME BOTH SUBJECTS WERE TAKEN TO THE
STATION WHERE THEY COULD BE INTERVIEWED

HAVE REVIEWED THIS REPORT AND BY MY
IGNATURE INDICATE THAT IT IS ACCEPTABLE.        SUPERVISOR'S SIGNATURE        STAR NO.    [DATE (DAY-MO.-YEAR)

```
 1                     SGT. JAMES COOPER,

 2   called as a witness herein, after having been

 3   first duly sworn, was examined and testified

 4   as follows:

 5                   DIRECT EXAMINATION

 6                         BY

 7                   MR. DANIELIAN:

 8        Q    Sir, would you please state your

 9   name for the record and spelling your last

10   name for the court reporter giving your star

11   and your rank and the police department for

12   which you are now employed.

13        A    James Cooper, C-O-O-P-E-R,

14   Sergeant, Robbins Police Department, Star

15   No. 002.

16        Q    Sergeant Cooper, how long have you

17   been so employed for the Robbins Police

18   Department?

19        A    Fifteen years now.

20        Q    I would like to direct your

21   attention to the 11th of August of 1995,

22   were you then working and employed for the

23   Robbins Police Department

24        A    Yes, I was.
```

1    Q    And were you working approximately

2    one to two p.m. in the morning?

3    A    Yes, I was.

4    Q    Where were you at approximately,

5    between the time of 1:00 o'clock and 2:00

6    o'clock that morning of the 11th of August?

7    A    At the Robbins Police Station.

8    Q    And are you familiar with a place

9    called Manny's Lounge in Robbins?

10    A    Yes, I am.

11    Q    And where is Manny's Lounge located

12    in relation to the Robbins Police

13    Department?

14    A    It's somewhat northeast of the

15    police station.

16    Q    About how far?

17    A    I would say about a half a mile,

18    three-quarters of a mile.

19    Q    At the aforementioned time, did you

20    respond to a call regarding a matter which

21    occurred at Manny's Lounge?

22    A    Yes, I did.

23    Q    And what was the nature of that

24    call?

1      A      It was man down, a man had been

2  shot.

3      Q      And at that time were you in

4  uniform?

5      A      I was in plain close.

6      Q      And were you in a marked or

7  unmarked squad?

8      A      Unmarked squad car.

9      Q      And at that particular time, was

10  there marked, in uniform officers in marked

11  squads working?

12      A      Yes, there were.

13      Q      And approximately how many were

14  working at that time?

15      A      Maybe two to three cars.

16      Q      What, if any, action did you take

17  regarding the investigation once you

18  received this call?

19      A      I responded to the scene.

20      Q      Okay.

21             And did you become aware of

22  what the patrol officers were doing

23  regarding that call as well?

24      A      One of my officers advised us that

1    he was pursuing a white vehicle, I believe

2    eastbound on Claire Boulevard, which is

3    Broadway.

4         Q    Okay.

5              And what, if anything, did you

6    do?

7         A    I responded to the same area.

8         Q    And what, if any, observations did

9    you make?

10         A    I made a stop in front of Manny's,

11    observed that there was a subject shot and I

12    advised the car that was coming behind me to

13    stay there and I went on with the patrol car

14    that was pursuing the other car.

15         Q    And where did that pursuit take you

16    to?

17         A    To an area in Blue Island called

18    Old Western.

19         Q    And did that vehicle finally come

20    to a stop?

21         A    Yes, it did.

22         Q    And where did that vehicle come to

23    a stop?

24         A    Maybe about 500 feet north of the

1    intersection of Old Western and Broadway.

2        Q    Okay.

3                Could you tell the ladies and

4    gentlemen of the jury anything -- what, if

5    anything, is peculiar about that particular

6    area of Old Western and Broadway in Robbins?

7        A    That is in Blue Island, but once

8    you make that left-hand turn, it looks like

9    a dead-end street because there is railroad

10   tracks and the canal and there is a train

11   overpass directly in front of it.

12       Q    Okay.

13               Is that, in fact, a dead end

14   street?

15       A    No, it is not.

16       Q    Okay.

17               How is it that a car would be

18   able to make its way past through that area?

19       A    You maybe go further, a half a

20   block north and there is a street on your

21   right-hand side that would take you out of

22   the area.

23       Q    Now, regarding the vehicle which

24   was the object of the pursuit, you observed

1      that vehicle come to a stop at that

2      location?

3           A     Yes, I did.

4           Q     And what, if anything, did you

5      observe regarding that vehicle?

6           A     The vehicle was in the middle of

7      the street and both doors were open.

8           Q     You, yourself, did you observe the

9      person or persons who exited or may have

10     exited or may have been driving?

11          A     No, I did not.

12          Q     What, if any, action did you take

13     regarding the observations that you made

14     regarding that vehicle?

15          A     We sealed off the area and started

16     a search of the area.

17          Q     And when you say, "we," at this

18     time did you employ any other police

19     departments?

20          A     Yes.   We had assistance from Cal

21     Park, Blue Island and a Dixmoor unit.

22          Q     And how was it that you, or why is

23     it that you came to employ the assistance of

24     those departments?

1        A        Because we was chasing two subjects

2    in reference to a shooting.

3        Q        And do you know how many and what

4    departments responded to the call?

5        A        Yes, I do.

6                        Blue Island, Cal Park and

7    Dixmoor.

8        Q        And what, if any, action did you

9    take regarding the pursuit of the

10   individuals who were involved in the

11   shooting?

12       A        We started checking the area to

13   make sure that we could apprehend the

14   offenders.

15       Q        When you say you were checking the

16   area, did you take into account that

17   particular area regarding tracks or streets

18   or canals or any other objects that are

19   located in that area?

20       A        Yes, we did.

21       Q        And tell the ladies and gentlemen

22   of the jury what steps you took in

23   furtherance of this pursuit?

24       A        We had a car to seal off the north

1    end of the street and we had one just east

2    of the intersection and we started a foot

3    canvass of the area looking for the

4    offenders.

5         Q    And what, if any, role did the --

6    are there other railroad tracks located in

7    that area?

8         A    Yes, there are.

9         Q    And is there also a canal located

10   in that area?

11        A    Yes, there is.

12        Q    And what canal is that?

13        A    The Sag Canal.

14        Q    And what role, if any, did the

15   canal and the tracks play in this pursuit

16   that you are engaged in?

17        A    It helps us to keep everybody

18   contained to one area.

19        Q    And the police officers that were

20   assisting in this pursuit, were the officers

21   in squads or on foot?

22        A    Both, in squads and on foot.

23        Q    And approximately how many officers

24   did you have engaged in this pursuit?

B-146

1        A        It could have been ten or better.

2        Q        Did this pursuit result in your

3    apprehension of anyone involved in this

4    incident?

5        A        Yes, it did.

6        Q        And tell the ladies and gentlemen

7    of the jury what occurred.

8        A        We were checking the area just west

9    of where the car had stopped, we was walking

10   in the alley, all of a sudden a male black

11   subject jumped out from under a car and he

12   said he had a gun on me, he had a gun on me,

13   at which time we checked him on placed him

14   into custody.

15                 While we were questioning him

16   another male black subject came walking

17   westbound from around the corner in the area

18   where we had known we had already checked,

19   at this time we put this subject in custody,

20   also.

21       Q        Do you see the person standing

22   present -- Strike that.

23                 Do you see the person present

24   in open court today, any of those persons

1    present in open court today?

2        A    Yes.   The gentleman in the suit

3    with the tie on.

4        THE COURT:   Please point to him.

5        THE WITNESS:   The first gentleman, your

6    Honor.

7        THE COURT:   That would be the gentleman

8    to the right, the person to the right?

9        THE WITNESS:   Yes, sir.   The person with

10   the white pen in his hand.

11       THE COURT:   The record will reflect an

12   in-court identification of the defendant.

13

14       MR. DANIELIAN:   Q And which of the two

15   individuals that you just referred to as the

16   defendant, who you have just identified?

17       A    He was the one that was walking

18   towards us across the street.

19       Q    Now, what did you do in furtherance

20   of the investigation once the defendant was

21   now in your presence?

22       A    We contacted another unit that was

23   down in Manny's to bring Tim Speigt to the

24   scene because he could identify the

1   defendant.

2        Q    Tim --

3        A    Speigt.

4        Q    Would that be a person with the

5   last name S-P-E-I-G-T?

6        A    Yes, it was.

7        Q    And what did your investigation

8   reveal?

9             Do you know who that person

10  is?

11       A    Yes, I do.

12       Q    And who is that person?

13       A    That was the doorman at Manny's at

14  the time of the incident.

15       Q    And what did you do regarding your

16  investigation, now, with particular regard

17  to Tim Speigt?

18       A    We bought him directly to the scene

19  for on-scene identification.

20       Q    And what was the result of that

21  on-scene identification?

22       A    He ID'd him as --

23  MR. TARR:  Objection.

24  THE COURT:  Objection sustained.

1          MR. DANIELIAN:  Q Who was present --

2     when did this take place?

3          A     On the scene.

4          Q     And who was present when this took

5     place?

6          A     Myself and several other officers.

7          Q     And where did this take place?

8          A     The area of Broadway and Old

9     Western.

10         Q     And do you know approximately what

11    time this took place?

12         A     Sometime after 2:00 o'clock.  I am

13    not sure of the exact time.

14         Q     And what was the result of this

15    investigation?

16         MR. TARR:  Objection.

17         THE COURT:  We will have to have a

18    sidebar.

19                    (Whereupon, the following

20                     proceedings were had

21                     at sidebar.)

22         THE COURT:  I called for a sidebar

23    because there is an objection.

24                    I guess the objection is on

B-150

1    the basis, is this guy, Speigt, going to

2    testify or not?

3        MR. DANIELIAN:  He is supposed to be

4    here, Judge.

5            He is one of our witnesses

6    and Cooper said he is going to be here, but

7    as long as I don't go into the hearsay, can

8    I get into what the result thereafter was

9    without him?

10       THE COURT:  The difficulty you have is

11   that not so much the identification, you are

12   constantly putting in though the testimony

13   that this is another witness to the shooting

14   and, I mean, that is what you are putting

15   in, not the identification, basically.

16           Do you understand what I am

17   saying?

18           Is that the basis of your

19   objection?

20       MR. TARR:  Yes, it was.

21       MR. DANIELIAN:  That is why I thought it

22   was foundation.

23       THE COURT:  By implication, by him

24   identifying him, you are bringing in his

1   testimony that he was involved in it and

2   this guy has not testified and I don't know

3   if he is going to testify.

4        MR. DANIELIAN:  Isn't it like one of

5   those situations, as a result of so and so,

6   what did you do?

7        THE COURT:  You can do that.  You can do

8   that, as far as investigative process, but

9   you can't go in there and say that he

10   identified him as being one of the persons

11  involved.

12       MR. DANIELIAN:  Okay.  I guess I jumped

13  the gun on it, Judge.

14             I apologize.  I will just --

15  I am trying to think how I can cure this

16  now.

17       THE COURT:  I don't think we have got

18  that far yet, but --

19       MR. DANIELIAN:  I am trying to think how

20  I can uncure it or still cure it.

21       THE COURT:  Whatever.  Whatever you want

22  to do.

23                       (Which were all the

24                        proceedings had at

B-152

1              sidebar.)

2      THE COURT:  You may proceed.

3      MR. DANIELIAN:  Q Sergeant, did all the

4  events that you just testified to take place

5  in Cook County?

6      A    Yes, they did.

7      MR. DANIELIAN:  I tender the witness for

8  cross, Judge.

9      THE COURT:  Cross-examination.

10              CROSS EXAMINATION

11              BY

12              MR. TARR:

13      Q    By the way, it's Detective

14  Sergeant, is that right?

15      A    Yes, sir.

16      Q    I just want to makes sure I am

17  doing it right.

18              Now, you responded to a call

19  of a man down?

20      A    That is correct.

21      Q    Which usually means that somebody

22  has been shot?

23      A    Yes, sir.

24      Q    So, you went there?

1       A     That is correct.

2       Q     And I am a little lost.

3               Did you begin pursuing this

4 white vehicle before or after you had

5 stopped by Manny's?

6       A     After I had stopped.

7       Q     And, so, you stopped by Manny's

8 first?

9       A     That is correct.

10      Q     And you saw Yancy Brown?

11      A     Yes, sir?

12      Q     And you knew Yancy Brown?

13      A     Yes, sir.

14      Q     And you recognize Yancy Brown?

15      A     Yes, sir.

16      Q     And you could see that he had been

17 shot?

18      A     Yes, sir.

19      Q     He had been shot in the back?

20      A     I knew he had been shot.  I wasn't

21 sure if it was in the back or not.

22      Q     But you saw him bleeding?

23      A     Yes, sir.

24      Q     And you received a call to go to

1    the Old Western area of -- well, you

2    received a call that there was a pursuit of

3    a white vehicle?

4        A    That is correct.

5        Q    And you joined into that pursuit?

6        A    Yes, sir.

7        Q    And you pursued this white vehicle

8    to the Old Western area of Blue Island?

9        A    That is correct.

10        Q    Now, this was a high speed chase?

11        A    Yes, sir, it was.

12        Q    And speeds exceeding sixty miles an

13    hour?

14        A    I believe so, yes.

15        Q    Over 90?

16        A    Somewhere, 65, 90, somewhere in

17    there, yes.

18        Q    And in the course of -- and this

19    car was already going pretty fast by the

20    time you got into the chase?

21        A    Yes, it was.

22        Q    And during this chase you couldn't

23    see how many people or -- could you see how

24    many people were in the car?

```
 1          A      No, I couldn't.

 2          Q      Could you see who was driving?

 3          A      At the time, no.

 4          Q      Then the vehicle came to a stop in

 5      the area of what was it, Broadway and?

 6          A      Old Western.

 7          Q      Broadway and Old Western in Blue

 8      Island?

 9          A      Yes, sir.

10          Q      And you were the ranking police

11      officer present at this time?

12          A      No, sir.  There was a lieutenant

13      there, also.

14          Q      And the lieutenant was not from

15      Robbins, was he?

16          A      Yes, he was.

17          Q      And what lieutenant was there?

18          A      Lieutenant Boston. ✓

19          Q      Boston?

20          A      Boston.

21          Q      For purposes of the court reporter,

22      B-O-S-T-O-N?

23          A      Yes, sir.

24          Q      Okay.
```

1                    And the area was sealed off?

2       A    That is correct.

3       Q    And you said somebody ran out

4  saying that he has a gun, he has got a gun,

5  he has got a gun?

6       A    That is correct, I did.

7       Q    And this person was Shawn McCree?

8       A    Yes, sir, he was.

9       Q    And did you know Shawn McCree at

10  this time?

11      A    No, sir, I didn't.

12      Q    This was the first time that you

13  ever met him?

14      A    Yes, that is correct.

15      Q    Then you also came into contact

16  with a John Phillips?

17      A    That is correct.

18      Q    And John Phillips was out of

19  breath?

20      A    I don't remember.

21      Q    He was -- he ran up to the -- he

22  ran up to one of the squad cars?

23      A    I don't remember if he walked.  I

24  just know he all of a sudden came up from

1    nowhere to one of the squad cars.

2        Q    And he told you that he had heard

3    gunshots?

4        A    I don't remember.

5        Q    And he told you that he had been

6    running?

7        A    I don't remember.

8        Q    And he was sweating?

9        A    He was not sweating, no.

10       Q    And you did not see whoever it was

11   that had bailed out of this car?

12       A    No, I didn't.

13       Q    You didn't know how many people had

14   bailed out of this car?

15       A    No, I didn't.

16       Q    Now, Shawn McCree and John Phillips

17   you took into custody -- well, strike that.

18            You took them to the police

19   station for purposes of interviews?

20       A    That is correct.

21       Q    And you responded -- now, about

22   what time were they -- did you transport

23   John Phillips to the Robbins Police Station?

24       A    No, I did not.

B-158

1       Q    Did you transport Shawn McCree?

2       A    No, I didn't.

3       Q    So, you returned back to the scene

4  of Manny's Blue Room?

5       A    Yes, that is correct.

6       Q    Where you talked to -- and it was

7  at Manny's Blue Room that you talked to Ted

8  Griffin?

9       A    That is correct.

10      Q    And this was about three o'clock in

11  the morning?

12      A    I believe so, yes.

13      Q    Now, you made out a police report

14  of this?

15      A    To my knowledge, yes.

16      Q    And you have been a -- how long

17  have you been a detective sergeant?

18      A    For the last seven years.

19      Q    So, over the last seven years and

20  the rest of the course of your service as a

21  police officer, you know what police reports

22  are?

23      A    Yes, that is correct.

24      Q    You know that they contain the

first statements of witnesses?

 A Yes, sir.

 Q That they're a document prepared in the normal course of your business.

 A Yes, sir.

 Q That you sign to it an swear to it?

 A Yes, sir.

 Q And that it contains the investigative notes of the case?

 A Yes, that is correct.

 Q And the State's Attorneys get them in preparation of their case?

 A That is correct.

MR. DANIELIAN:  Objection, Judge.

THE COURT:  We have gone pretty far into the background of the police reports.

MR. TARR:  Q Overall, police reports are pretty important?

 A That is correct.

 Q Now, do you -- Now, did Ted Griffin tell you -- and you interviewed Ted Griffin, right?

 A Briefly, yes, I did.

 Q And you had asked him what had

1    happened?

2         A    Yes, sir.

3         Q    And had you asked him to tell you

4    to the best of his memory?

5         A    Yes, sir.

6         Q    This was, roughly, about within an

7    hour after the incident had happened?

8         A    I believe so.

9         Q    And do you recall if Ted Griffin

10   had told you that he had heard several shots

11   as he left Manny's?

12        A    I remember him saying he heard a

13   shot, he dropped to the ground.

14        MR. TARR:  If I may approach, Judge?

15        THE COURT:  You may.

16                  It will be marked as defense

17   No. 1.

18        MR. TARR:  Please.

19        THE COURT:  For identification.

20        MR. TARR:  Q Sergeant Cooper, I am

21   showing you what I have marked as Defense

22   Exhibit No. 1.

23                  Do you recognize that

24   document?

1    A    Yes, I do.

2    Q    And do you recognize it as having

3    been the police report that you prepared

4    regarding your investigation at three

5    o'clock in the morning on August 11th of

6    1995?

7    A    Yes, I do.

8    Q    And in that police report you

9    indicate that Ted Griffin told you that he

10   heard several shots?

11   A    Yes, he did.

12   Q    Thank you.

13             Withdrawing the exhibit.

14   THE COURT:  Ladies and gentlemen, this

15   exhibit is not being admitted into evidence,

16   it is being used for the sole purpose of

17   refreshing the witness' recollection.

18

19   MR. TARR:  Q And he did tell you that

20   after this gunshot or gunshots, he

21   immediately dropped to the ground?

22   A    Yes, that is correct.

23   Q    And did he -- and did he also tell

24   you that he observed the offender get into

1      what you later, I mean, did he also tell you

2      that he saw the offender get into this

3      vehicle?

4           A     I do believe so.

5           Q     And did he also tell you that he

6      saw the offender drive off in this vehicle?

7           A     Yes, he did.

8           Q     Did he also tell you that he saw

9      several people jump out of this vehicle?

10          A     I don't remember.  I have to check

11     the case report.

12          Q     He did tell you that he was

13     following the car, correct?

14          A     That is correct.

15          Q     And you found out, and he also told

16     you that there were -- I just want to make --

17     excuse me.

18                Now, you also spoke to that

19     same Ted Griffin on November 11th of 1995,

20     correct?

21          A     That is correct.

22          Q     About three o'clock in the morning,

23     correct?

24          THE COURT:   November 11th?

1      MR. TARR:  Correct.

2      THE WITNESS:  Not November 11th.

3                  I only spoke to him once at

4   three o'clock in the morning, that was the

5   day of the incident.

6      THE COURT:  Is that also Defense No. 1?

7      MR. TARR:  This should be Defense No. 2

8   for purposes of keeping it straight.

9                  Sergeant Cooper, do you

10  recognize what I have marked as Defense

11  Exhibit No. 2?

12     A      Yes, I do.

13     Q      And is that another police report

14  that you prepared?

15     A      Yes, it is.

16     Q      And in the upper left-hand corner,

17  or I should say about one-third of the way

18  down, does it indicate an interview on 11,

19  November of 1995, 0300 hours?

20     A      That is correct.

21     Q      Withdrawing the exhibit.

22     THE COURT:  Ladies and gentlemen, the

23  exhibit is not being admitted or proffered

24  into evidence, it is being used to refresh

B-164

1    the recollection of the witness.

2         MR. TARR:   I am sorry.

3              But does it indicate an

4    interview with Ted Griffin?

5         A    Yes, it does.

6         Q    And does that interview indicate or

7    reflect him telling you that he saw three

8    male blacks involved in the incident on

9    August 11th of 1995?

10        A    Yes, that is correct, that had

11   three male blacks.

12        Q    Thank you.

13             Withdrawing the exhibit again.

14             And you also learned the

15   condition of Yancy Brown, correct?

16        A    Yes, I did.

17        Q    And you learned that he had been

18   taken to Christ Hospital?

19        A    That is correct.

20        Q    And he had been taken to Christ

21   Hospital for surgery?

22        A    I knew he had been taken to Christ

23   Hospital.

24        Q    And you learned that he had surgery

1    on that same day, August 11th of 1995?

2        A    That is correct.

3        Q    Did you learn that he -- I believe

4    that the doctors would have told you that he

5    tolerated the procedure well?

6        A    Yes, sir.

7        Q    Which means that he came through it

8    as well as can be expected?

9        A    Yes, sir.

10       Q    And you spoke to him on the 12th?

11       A    That is correct.

12       Q    Yancy Brown, right?

13       A    Yes, sir.

14       Q    And you saw him in the hospital --

15   meaning you saw him in his hospital room?

16       A    That is correct.

17       Q    And you identified yourself?

18       A    Yes, sir.

19       Q    Asked him how he was doing?

20       A    Yes, sir.

21       Q    And he probably indicated something

22   that he was in a lot of pain?

23       A    No, he didn't.

24       Q    You could tell that he was in pain?

1          MR. DANIELIAN:  Objection, Judge.

2          THE COURT:  Well, as to the form of the

3     question, sustained.

4          MR. TARR:  Q And you asked Yancy what

5     had happened, correct?

6          A    Yes, that is correct.

7          Q    And Yancy started answering

8     you questions?

9          A    That is correct.

10         Q    Now, at this time it was just you

11    and Yancy in there?

12         A    No.  I think a family member was

13    there, also.

14         Q    Do you recall if Yancy told you

15    that he heard the line from the guy who shot

16    him, "You are a smart mother fucker"?

17         A    No, I don't, I don't remember that.

18         Q    Do you recall if he told you -- if

19    he told you that he was ordered to turn off

20    the alarm on the car?

21         A    No, I don't remember, no.

22         Q    Do you recall if another one of the

23    people involved in the incident said --

24    strike that.

1          Do you recall if Yancy told

2    you that another one of the people involved

3    in the incident said, "I am not starting the

4    car, make him," referring to Yancy, "start

5    the car"?

6         MS. BANKHEAD:  Objection, Judge.

7         THE COURT:  Objection is overruled.

8         THE WITNESS:  No, I don't.

9         MR. TARR:  Q Do you remember Yancy

10   telling you that the guy who shot him cocked

11   the gun?

12        A    No, I don't.

13        Q    Do you recall Yancy telling you

14   that a guy, a third guy came up and said,

15   "Give me the jewelry, bitch"?

16        A    No, he didn't.

17        Q    Do you recall if Yancy told you

18   that it was -- that he was shot by one

19   person and another person went through his

20   pockets?

21        A    Yes, I believe so.

22        Q    He did tell you that?

23        A    I believe so, yes.

24        Q    Now, Lieutenant Boston, is he with

1    Robbins Police Department?

2        A    Yes, he is.

3        Q    But you have the honor of being the

4    chief investigating officer on this case,

5    correct?

6        A    That is correct.

7        Q    And you spoke to a Shawn McCree?

8        A    That is correct.

9        Q    During the course of this

10   investigation?

11       A    Yes, I did.

12       Q    And as a matter of fact, without

13   getting into the substance, you took a

14   statement from Shawn McCree?

15       A    The State's Attorney took a

16   statement from Shawn McCree.

17       Q    And you were present?

18       A    Yes, sir.

19       Q    You also know of a person in

20   Robbins who goes by the nickname of Black

21   Dog?

22       A    That is correct.

23       Q    And during the course of your

24   investigative process, you determined Black

Dog is a suspect in this case?

    A    Yes, sir.

    Q    And Black Dog is not John Phillips?

    A    Yes, that is correct.

    Q    I am sorry, it is unfair to phrase a question in the negative.

              Is Black Dog John Phillips?

    A    No, he is not.

    Q    Okay, good.

              And in the course of your investigation -- Oh, by the way, when John Phillips first appeared on the scene, who was approached, who did he approach first?

    A    I don't remember.

    Q    But there was no gun found on him?

    A    No, sir, there wasn't.

    MR. TARR:  I am sorry, was there an objection?

    THE COURT:  I didn't hear any.

    MR. TARR:  I am sorry.

              And you don't know of a gun being recovered from John Phillips?

    A    No, I don't.

    Q    And, to your knowledge, was any

1    money recovered from John Phillips?

2        A    No, there wasn't.

3        Q    So, a thousand dollars was not

4    recovered from him?

5        A    No, there wasn't.

6        Q    And was any gun recovered from

7    Shawn McCree?

8        A    No, there wasn't.

9        Q    Was any money, ranging up to a

10   thousand dollars, recovered from Shawn

11   McCree?

12       A    No, there wasn't.

13       Q    Now, let's jump ahead to the

14   Robbins Police Station.

15              You were questioning -- Strike

16   that.

17              You were investigating John

18   Phillips, correct?

19       A    And McCree, yes, sir.

20       Q    And during the course of the

21   investigation on John Phillips, there was a

22   Mrs. Joiner who came up to the police

23   station and asked to speak with you,

24   correct?

1          A      There was a lady that came up

2     there, I didn't know her name.

3          Q      And this lady was, and you learned

4     that this lady was John Phillips' mother?

5          A      No, I learned the lady came up to

6     talk to me, I didn't know whether it was his

7     mother, no.

8          Q      There was also another lady that

9     came up, correct?

10         A      Yes, it was.

11         Q      And that was identified as Regina

12    Walls, correct?

13         A      I am not sure of the name.

14         Q      And it was identified to you that

15    Regina Walls was the girlfriend of John

16    Phillips?

17         MR. DANIELIAN:   Objection, Judge.

18         THE COURT:   I don't see the relevance.

19                     Objection sustained, at this

20    point.

21         MR. TARR:   Q And at least Mrs. Joyner

22    asked if she could see John Phillips,

23    correct?

24         MR. DANIELIAN:   Objection, Judge.

B-172

1          THE COURT:   Objection sustained.

2          MR. TARR:   Q By the way, was a gold

3    necklace ever recovered from either, from

4    either John Phillips or Shawn McCree?

5          A     No, there wasn't.

6          Q     Was a gun ever recovered from the

7    area of Old Western and Broadway?

8          A     No, there wasn't.

9          Q     How about the thousand dollars?

10               Was a thousand dollars

11   discovered having been dumped somewhere?

12         A     No, it wasn't.

13         Q     Was a gun?

14         A     No, it wasn't.

15         Q     So, the only proceeds from the

16   incident that was recovered in the area of

17   Blue Island or Broadway and Blue Island was

18   this car?

19         A     Yes, it was.

20         Q     Roughly, since this incident, or I

21   should say since the day after this

22   incident, after you talked to him, how many

23   times have you spoken with Yancy Brown,

24   approximately, if you can't remember the

1          Q     And did Yancy Brown ever tell you

2     that he had a conversation with John

3     Phillips?

4          A     Yes, sir.

5          Q     Did you ever record that in any

6     police reports?

7          A     No, I didn't.

8          Q     Did Yancy Brown tell you -- wait,

9     excuse me.

10               This is a telephone

11     conversation?  I mean, did Yancy Brown tell

12     you that John Phillips called him?

13          A     He stated that Phillips had called

14     him.

15          Q     And you didn't see fit to put that

16     in the a police report?

17          MR. DANIELIAN:  Objection.

18          MR. TARR:  Sorry, I will rephrase it.

19               And you didn't put that in a

20     police report?

21          THE WITNESS:  No, I didn't.

22          MR. TARR:  Q Did he tell you whether or

23     not he had been threatened by John Phillips?

24          MR. DANIELIAN:  Objection, Judge.

1　　　　　THE COURT:　Objection sustained.

2　　　　　MR. TARR:　Q Did he tell you whether or

3　　not the name Black Dog came up in the

4　　conversation?

5　　　　　MR. DANIELIAN:　Objection, Judge.

6　　　　　THE COURT:　Objection sustained.

7　　　　　MR. TARR:　Q Did he tell you whether or

8　　not Shawn McCree ever showed up in the

9　　conversation?

10　　　　　MR. DANIELIAN:　Objection.

11　　　　　THE COURT:　Objection sustained.

12　　　　　MR. TARR:　Q Did you make a notation or

13　　a word to the State's Attorney that -- or

14　　members of the State's Attorney's Office

15　　that John Phillips and Yancy Brown ever had

16　　a conversation?

17　　　　　A　　No, I didn't.

18　　　　　MR. DANIELIAN:　Objection.

19　　　　　THE COURT:　Overruled.　The answer may

20　　stand.

21　　　　　MR. TARR:　Q Did you ever say this in

22　　front of a grand jury.

23　　　　　MR. DANIELIAN:　Objection, Judge.

24　　　　　THE COURT:　The objection, at this point

1    in time, is sustained.

2        MR. TARR:  Q You did testify in a front

3    of a grand jury, correct?

4        A    Yes, I did.

5        Q    And that was on August 29th of

6    1995?

7        A    Yes, sir.

8        Q    And had Yancy Brown told you that

9    this conversation had taken place by the

10    time that you had testified in front of the

11    grand jury?

12        A    That conversation was taken after,

13    I believe.

14        Q    But you never went back in front of

15    the grand jury to say anything about this

16    conversation, correct?

17        MR. DANIELIAN:  Objection, Judge.

18        THE COURT:  Objection is sustained.

19        MR. TARR:  To your knowledge, did Shawn

20    McCree ever testify in front of the grand

21    jury?

22        A    Yes, he did.

23        Q    Were you present when he testified

24    in front of the grand jury?

1          MR. DANIELIAN:  Objection, Judge.

2          THE COURT:  The objection is sustained.

3          MR. TARR:  Q As the chief investigating

4     officer on this case, did you ever determine

5     did you -- do you know -- strike that.

6                    As the chief investigating

7     officer on the case, do you know if Shawn

8     McCree was ever charged with anything

9     involving this case?

10         MR. DANIELIAN:  Objection, Judge.

11         THE COURT:  Objection sustained.

12         MR. TARR:  If I may have a moment,

13    Judge?

14         THE COURT:  Sure.

15         MR. TARR:  Thank you.

16                    No further questions.

17         THE COURT:  Any redirect?

18         MR. DANIELIAN:  Yes, your Honor.

19              REDIRECT EXAMINATION

20              BY

21              MR. DANIELIAN:

22         Q    Sergeant Cooper, this shooting took

23    place on the 11th of August of 1995, is that

24    correct?

1          A      That is correct.

2          Q      And you went out to the hospital,

3    Christ Hospital, to visit with Yancy Brown

4    the next day, is that correct?

5          A      Yes, that is correct, some time in

6    the afternoon.

7          Q      And then you also went out the day

8    afterwards, the 13th?

9          A      That is correct.

10          Q      And that is when you conducted the

11    identification?

12          A      That is correct.

13          Q      And there was an Assistant State's

14    Attorney present with you on that day?

15          A      Yes, there was.

16          Q      How would you characterize the

17    level of coherence of Yancy Brown from the

18    time that you talked to him on the 12th of

19    August to the time that you talked to him on

20    the 13th of August?

21          A      His level was much more better on

22    the 13th.

23          Q      Now, with regard to the date of

24    November 11th of 1995, did you have any

1    dealings with the investigation or this case

2    on November 11th of 1995?

3                      November 11th?

4        A    The day of the incident?

5        Q    No, sir, November 11th?

6        A    No, I didn't, no.

7        Q    So, if that were to appear

8    anywhere, it was shown to you, Defense

9    Exhibit No. 2, was that an error on your

10   part?

11       A    That was just a written error on my

12   part.

13       Q    And these reports that were

14   generated, are these verbatim,

15   stenographer's account of what witnesses

16   told you?

17       A    No.  I write what the witnesses

18   tell me.

19       Q    Okay.

20                      Now when you say you write,

21   are you writing as you are interviewing

22   witnesses on these reports?

23       A    No, I am not.

24       Q    As a matter of fact, when were --

                        B-180

1    how many separate reports did you generate,

2    if you know, or about how many?

3        A    Maybe five over six, I am not sure

4    how many.

5        Q    And were these, each and every one

6    of these reports generated immediately after

7    the incident that they're discussing or

8    summerizing?

9        A    No, they wasn't.

10       Q    Do you know, approixmately, how

11   many days or weeks, if that is the case,

12   after the incident that these reports were

13   generated?

14       A    Maybe or week or so after, a couple

15   weeks after we got all the information

16   together.

17       Q    And then that information would

18   include accounts from persons, including

19   Shawn McCree and Yancy Brown and Ted Griffin

20   and other investigators?

21       A    Yes, sir.

22       Q    Number of sources?

23       A    Yes, sir.

24       Q    And did you keep detailed notes as

B-181

1    to the sum and substance of conversations

2    that you had with each of the persons that

3    were the subject of these reports that were

4    generated weeks, or at least a week later?

5         A     To the best of my knowledge, yes, I

6    did.

7         Q     Do you have those with you?

8         A     No, I don't.

9         Q     Are those, in essence, the same

10   type of notes that these reports are the

11   product of?

12        A     Yes, sir.

13        Q     In regard to this person called

14   Black Dog, is that a person's real name?

15        A     No, sir.  That is a street name.

16        Q     Okay.

                 And do you know who Black Dog

18   is, real name wise?

19        A     Yes, I do.

20        Q     And with regard to this

21   investigation?

22        A     No, just in regards to I know a

23   Black Dog.

24        Q     And is that a common street name?

B-182

1      A      No, it is not.

2      Q      Is this person, or this Black Dog,

3   is this person considered a suspect with

4   regards to the person who shot Yancy Brown,

5   actually physically committed the shooting?

6      A      No, he is not.

7      Q      Now, you indicated that there is a

8   canal in the area where this incident took

9   place?

10     A      That is correct.

11     Q      Where is that canal located in

12  relationship to Manny's?

13     A      From Manny's, it is about a

14  thousand yards north of Manny's.

15     Q      Where is it in relation to where

16  the vehicle, which was the subject of your

17  chase, came to a stop?

18     A      Maybe about seven, eight hundred

19  yards from where the vehicle stopped.

20     Q      How far was the defendant located,

21  the defendant, John Phillips, how far was he

22  when you observe him in relation to where

23  the shooting took place?

24     A      Maybe a thousand yards or more.

1          MR. DANIELIAN:  Okay.

2                    I have nothing further,

3     Judge.

4          THE COURT:  Recross?

5                    RECROSS EXAMINATION

6                    BY

7               MR. TARR:

8          Q     In the course of your

9     investigation, you said that Black Dog was

10    not the shooter in this case?

11         A     To my knowledge, yes.

12         Q     Do you remember testifying in front

13    of the grand jury on August 29th of 1995?

14         A     Yes, I do.

15         Q     And you were asked questions?

16         A     Yes, that is correct.

17         Q     And asked questions by Assistant

18    State's Attorney Joel DeTella, correct?

19         A     That is correct.

20         Q     And before testifying, you were

21    sworn?

22         A     That is correct.

23         Q     To tell the truth?

24         A     That is correct.

1  Q  The whole truth?

2  A  Yes.

3  Q  And nothing but the truth?

4  A  Yes, sir.

5  Q  So help you God?

6  A  Yes, sir.

7  Q  And do you remember being asked

8 this series of questions?

9     Question:  Did you find that

10 Black Dog took the victim at gun point, told

11 the victim at gun point to turn the car

12 east?

13     And your answer being, yes?

14  A  Yes.

15  MR. DANIELIAN:  Objection, Judge.

16  THE COURT:  Objection sustained.

17  MR. TARR:  Judge, may we have a sidebar?

18  THE COURT:  Yes, we will have a sidebar.

19     (Whereupon, the following

20     proceedings were had at

21     sidebar.)

22  MR. DANIELIAN:  Judge, I am going to ask

23 that the jury be instructed to disregard.

24     That is not impeaching,

1    impeachment by prior inconsistent statement,

2    whatsoever.

3         THE COURT:  I don't know where you are

4    going.  I have no idea where we're going at

5    all about this Black Dog stuff.

6              I don't know why the State

7    went into it and the defense is going into

8    it now.

9              The State went into it, now

10   the defense wants to go back into it and all

11   with hearsay, all with hearsay.

12             All right.  It's just that

13   simple.  There is no testimony, whatsoever.

14   This is all hearsay testimony.

15             Where are we going?

16        MR. TARR:  Well, this, particularly,

17   Black Dog and John Phillips are two

18   different people, that is understood.

19        THE COURT:  We know that for sure, yes,

20   we do.  We had that pounded into our heads.

21        MR. TARR:  According to Sergeant Cooper,

22   it was Coopers testimony today it was not

23   Black Dog who shot Yancy Brown.

24        THE COURT:  Okay.

1          MR. TARR:   According to Cooper's

2     previous testimony, it was Black Dog,]who is

3     not John Phillips, who took Yancy Brown at

4     gun point.

5                    There is no testimony from

6     wherever that no guns were ever exchanged,

7     that there was a second gun involved.

8     Nothing of that nature.

9          MR. DANIELIAN:   That is not impeachment.

10    It has to say that in order for it to be

11    impeachment.

12                    I would think it would have

13    to say that he testified that Black Dog or

14    Mad Dog was the shooter.   That would be the

15    impeachment.

16                    You can't impeach by

17    inference.

18         MR. TARR:   If I would have proceeded

19    with my next question, would that not say

20    about Black Dog being the shooter.

21         MR. DANIELIAN:   There was no other

22    question in there about Black Dog being a

23    shooter.

24                    That is the basis of my

B-187
Important

*Important*

1    objection, Judge.

2        MR. TARR:   That was the only question.

3                There is no indication from

4    Cooper.

5        THE COURT:   We are too far afield

6    already.   We're way too far afield as far as

7    both sides, as far as this particular aspect

8    of it and the objection is sustained.

9                Move onto something else.

10               (Which were all the

11               proceedings had at

12               sidebar.)

13       THE COURT:   Any further questions, Mr.

14   Tarr?

15       MR. TARR:   Q Did you testify in front of

16   the grand jury that it was somebody else,

17   other than John Phillips, who shot Yancy

18   Brown?

19       A    I am not sure.

20       Q    Would anything refresh your

21   recollection?

22       A    The transcript from the grand jury.

23       MR. TARR:   Judge, if I may approach with

24   Defense Exhibit No.   -- this would be

1   Defense Exhibit No. 3.

2        THE COURT:  You may, but I am telling

3   you, you better obey what I said in the

4   sidebar.

5        MR. TARR:  Confirmed.

6                Page 4 of Defense Exhibit No.

7   3.

8                I would like you to read that

9   over and tell, let me know when your

10   recollection is refreshed as to whether or

11   not you told the gand jury, under oath, that

12   it was somebody else, other than John

13   Phillips, who shot Yancy Brown.

14        A    Yes, I did.

15        Q    You did you tell them that it was

16   somebody else, other than --

17        A    Yes, I did.

18        Q    Okay.  Thank you.

19                Now, I would like to mark this

20   as Defense Exhibit No.  -- Group Exhibit No.

21   4.

22        THE COURT:  For what purpose?

23        MR. TARR:  Offer of proof?

24        THE COURT:  Well, if you want to ask him

B-189

"B-30", 5-7, show's that the "State's Attorney", Ms. Bankhead, "told" the victim Yancy Brown what he'd done on the night in question so that he would know to agree, rather than "asking" Mr. Brown what he'd done.

"B-32", 9-11, manipulated Mr. Brown into placing "another person" (John Phillip) at the entryway of mannino's night club, which may not have happened if Mr. Brown was not lead by the "State's Attorney", Ms. Bankhead.

"B-33", 10-11, 17-18 show's that Ms. Bankhead "told" Mr. Brown what he'd done "again" rather than "asking", which was a means to prompt Mr. Brown to agree, or give the practical response. Then, after Mr. Brown stated that he'd "walked out", of the door's of Mannines lounge, Ms. Bankhead brought him back and "lead" him to implicate John Phillips, by "assuming" that Mr. Brown must have seen someone standing there. In this assumption "not" being supported by the "evidence", Ms. Bankhead's "introduction" of this matter, was therefore "Voicing Opinion's". Of which, was an "Unlawful Act".

"B-34", 2-5, show's that Ms. Bankhead "lead" Mr. Brown to state that he and his assailant was "Close" in passing one and other in order to give the "Credibility", of his allegation's to the Cases, that "was not" found beforehand by the Cases's "Chief Investigating Officer", Sgt. James Cooper.

"B-38", 3, 12-14, show's that Ms. Bankhead "told" Mr. Brown which direction the Car in question faced, rather than "asking" and giving him an opportunity to give his own answer's to these question's.

2²

"B-39", 4-6, show's that Yancy Brown stated that he was on his way back inside of manning's night Club, with absolutely "no mention" whatsoever of seeing "anyone", until Ms. Bankhead brought him back outside and assumed that he must have seen Someone. Which was again, "Voicing Opinion's" in this matter not being supported by the "evidence", and never being introduced until Ms. Bankhead introduced it.

"B-46", 15-17, show's that Ms. Bankhead "told" Yancy Brown what his assailant did to him, and made the assumption that he had money. Which was because of Yancy Brown's own testimony, "Voicing Opinion's", in this attempt at "landing" now not being Supported by the "evidence" in Mr. Brown denying that Someone went into his pocket's and took a "thousand dollar's", as well as denying that he'd ever even seen it. (See "B-71", 23-24, thru "B-72", 1, "B-84", 9-11)(See "B-45, 6-24, "B-50" 18-24, thru "B-51", 1-18)( See Police Report of Yancy Brown) Which prove's the fact that either the victim himself, Yancy Brown, Committed "perjury" under oath, without being "impeached" by Counsel for the Defense, or that Ms. Bankhead "Voicing Opinion's", she herself Committed "perjury" under oath.

"B-47", 3-4, show's that Ms. Bankhead "told" Mr. Brown that he'd seen Something, once again "assuming" that he must have, which was not Supported by the "evidence" nor introduced until it was done so by Ms. Bankhead herself.

"B-50", 21-24, show's that Ms. Bankhead "again", told Yancy Brown that he'd had money in his pocket. Which prompted him to state that he had a "thousand dollar's", though he Committed "perjury" in denying that he'd seen it later. (See "B-71", 23-24, thru "B-72" 1, "B-84", 9-11)

3.

"B-51", 10-15  Show's that Mr. Bankhead "then", lead Mr. Brown to state that "another individual" snatched a "gold cup Chain" with his initial on it from him. Of which, he "again" Committed "Perjury" under oath in Charging that he'd ever said it. (See "B-72", 1-2, 9-8) Which was an "Unlawful Act", on the State's behalf.

"B-61", 23-24, thru "B-62", 1-2, show's that Mr. Bankhead "told" Mr. Brown that he'd seen John Phillips in the parking lot, and that he'd robbed him, rather than "asking", and giving Mr. Brown an opportunity to express through his "own" account's, who he'd seen, and what occurred.

## "Part Seven"
## Jason Danielian

"B-96", 16-17, 19-21 show's that the State's Attorney Mr. Danielian, "told" the state's witness "Ted Griffin" during questioning at trile that, there was an "alarm mechanism" on his key's, and also that, he'd given it to Yancy Brown, rather than giving Mr. Griffin an opportunity to say for "himself" what he'd done in their case's.

Then Mr. Danielian asked Ted Griffin if anything unusual happened, while "telling" him that it should have taken place about "Three minutes later".

"B-97", 8-10, show's that Mr. Danielian "illegally" walked a person to the Crew, and "told" Mr. Griffin "who" this person should be, and what his "name" was, (though this person was not in evidence), in order to "lead" Mr. Griffin into doing the same. In this person never appearing in the "evidence" this person was "manufactured" through the State's Attorney Danielian "Voicing Opinion's". In the Counsel for the "Defense", never calling this person to either rebutt, or Corberate, these allegation's as they should have, it left the "Jury" with the impression that this person

actually existed though he "was not" in existance. Which not only suggested "Perjury", it also qualified as the state's Attorney own "Voicing Opinion's". Of which, is in fact an "Unlawful Act".

"B-98", 6-7, show's that Mr. Donnelion "told" Mr. Griffin what kind of relationship that he, and this "illegally" called person had, though according to the "evidence", this person's existance was "manufactured".

"B-99", 13-17, Show's that, after Paul Griffin stated "Clearly" what he alleged to have seen, Mr. Donnelion "again", asked "what happened", as if to prompt Mr. Griffin to give an answer that was more supportive of the account's in question. When Mr. Griffin did so changing his testimony, he had in fact committed a blatant act of "Perjury" under oath.

"B-101", 9-15 show's that, when Mr. Griffin stated that the alleged assailant was a "foot or two" next to the car, Mr. Donnelion told "him, "Your Car", rather than asking who's car.

"B-105" show's that Mr. Donnelion "told", Mr. Griffin what he'd seen, and also which direction his car went in "detail", rather than "asking" what he'd seen.

B-116, 18-24 show's that Mr. Donnelion "told" Mr. Griffin, "who" he'd identified in the line up, "where" Mr. Griffin had seen this person standing in relation to Yancy Brown (The Victom), "What Side" this person stood on, and that, this was the person that he'd seen running in the opposite direction of where Mr. Griffin was allegedly standing, in order to make this person, #4 in the line up (John Phillips) the shooter. Though Paul Griffin had previously testified to "only" seeing someone standing over Yancy Brown, which would have been "after the fact",

before that assailant ran in the "opposite direction" of where Mr. Griffin was standing. Of which, was as Mr. Griffin stated, "All I Seen". This was also "Perjury Testimony", in Mr. Griffin's very own "Police Report" proving that he'd stated that, he'd observed #2 and #3, as the people involved in the shooting. Neither of which, was John Phillips, who was #4 in the line up. (See "B-116", 18-24 thru "B-117", 1-17)

#2, was therefore Sean McGraw who'd "admitted" to driving off in the vehicle though he was never Charged, which leaves #3 as the actual shooter. Of whom, was never "Charged", nor "identified" by the "defense" during trial proceedings, and also who's identity remains a mystery till this very day, due to the "ineffectiveness" of the "Defense Council" in neglecting to investigate "this", as well as "numerous" other extremely important matter's of the Case, Of which may very well have altered the fate of John Phillips, and Changed the outcome of the Case, "dramatically".

"B-143", 23-24, thru B-144, 1-2, shows that Mr. Danielson now lead, Sgt. Samues Cooper during his testimony at trial, in telling Sgt Cooper what he'd seen regarding the vehicles in question. Orchestrating Sgt Cooper's testimony, so that it would follow suit, rather than Mr. Danielson "asking" Sgt Cooper what he himself had seen.

"B-145", 15-19, shows that, Mr. Danielson himself had introduced the "Trucks", "Street's", and "Canal's", to the "Court", and the "Jury", before Sgt Cooper had, in order to illegally remanufacture his testimony regarding the area in question.

"B-146", 5-18 shows that Mr. Danielson "orchestrated" this entire line of questioning, as well as "Telling" Sgt Cooper what he'd done so that he would "agree" and give a "practical response".

"B-179", 1-15, show's that Mr. Danielson "orchestrated" this entire line of questioning as well, "Telling" Sgt. Cooper what he'd done so that he would only have to agree with the "answer's" that were disguised as question's, so that he would not have to own his own answers if this section were posed as question's like it should have been, which would "Compromise" the state's Conviction of John Phillips if he were allowed to do so.

"C-102", 21-23, show's that Sgt. Cooper Committed "Perjury" under oath. According to the "victim" Yancey Brown, it was #1 who was in fact his Shooter, who was described as a person with a "ponytail" hairstyle. While #2, who he alleged went through his pocket's before dumping it later, was described as a person with "Braid's" in his hair. Of whom he'd "identified" John Phillips to be, at trial, as #3, was admittedly Sean McCrea, who was never Charged with a Single Crime. Yancey Brown, "only" selected #1 and #3 as his offender's. Both of whom, by Yancey Brown's own "Police Report", and also his "in Court" I.D. of Mr. Phillips as the person with the Braid's (#2) were "proven" to not be John Phillips. Timothy Speight alleged that #2 was in the Car that picked up the Shooter. Therefore, according to Mr. Speight's "Police Report", Sgt. Cooper had in fact, Committed "Perjury" under oath in stating that Mr. Phillips was identified as the Shooter by Mr. Speight.

"C-103", 8-12 and "C-104", 11-13. Prove's that, because Timothy Speight's account's of the incident in question were limited to him stating that he'd Seen "An Offender", which was too vague to "pinpoint" an offender or "positively identify" anyone, Mr. Danielson attempted to introduce an explanation to the problem, which prompted Sgt. Cooper to "agree", rather than testify that Mr. Speight never actually identified an actual offender at all.

"C-11", 21, show's that Mr. Bankhead, "Told" Timothy Spraght that he'd seen Yancy Brown when he'd left the night club, rather than "asking" Mr. Spraght which he'd seen, and allowing him to answer in his own word's.

"C-14", 18-19 show's that Mr. Bankhead herself, placed Mr. Phillips on the "right" of Mr. Brown in order to coinside with the fact that he was shot on his right side, before Mr. Spraght elected to follow suit by "agreeing" with this "manufactured" account by Mr. Bankhead, which qualifie's as "Voicing Opinion's", in it "not" being supported by the "evidence".

"C-14", 23, show's that Mr. Bankhead "Told" Mr. Spraght, which side he was supposed to see Yancy Brown's offender on, rather than "asking" him what side the offender was on.

"C-16", 14-16, 21, show's that Mr. Bankhead "Told" Mr. Spraght what he'd seen Mr. Phillips do, rather than "asking" him which he'd seen and allowing him to respond with his own answer's.

Marcello Lipinski
Darrell L. Farr

_Part Eight_

(Ineffective Assistance of Counsel)

The Counsel for the "Defense", Mr. Farr, and Ms. Lipinski, both failed to conduct an "Investigation", on the behalf of John Phillips, and obtain "Photograph's", of the parking lot's of both, the "Mancine's Blue Room" night Club, and also the "Big 10" night Club, the "Telephone pole", alleged by the State to be in the parking lot of "Mancine's", the two way traffic street, that separated the parking lot's of the night Club's, and also the "Light Fixture's", on the pole's inside of these parking lot's. All of which would have been "necessary" for the Defense Counsel to adequately defend Mr. Phillips, while "rebutting" the State's allegation's of a "positive I.D." being able to be made by it's witnesses, of an assailant.

An "Investigation", along with "Photograph's" of the area, would have revealed to the Jury by the "evidence", whether or not a "Telephone", actually existed on a pole in Mancines night Club's parking lot, the "Lighting Condition's" of the parking lot's, in the incident occurring after midnight, the "Traffic Condition's" of the "two way" street, that separated the parking lot's of these two night Club's, as well as the "Distance", between the two night Club's.

Which were all "Critical" factor's that needed to be introduced by "evidence", so that the Jury would have been able to take it into Consideration when determining whether or not a "positive I.D." of a subject under the possible "Vision Impairment" Circumstances, could have been made. Also, whether or not there actually was a "Telephone", on a pole inside of the parking lot of the Mancines night Club. It would have also revealed to the Jury, whether or not anyone would have been able under the "Circumstance's" to, actually "see" someone holding a "Black" gun, to Yancy Brown's right side, from the parking lot of another night Club, and after midnight, "For Black" gun statement, see "B-41", 1-3)

Instead, the Council for the defense, allowed the state, and it's witnesses (though discredited) to paint a picture of a positive I.D. being made, into the mind's of the Jury, without "objection", nor any "Material Evidence", to effectively "rebut" the state's allegation's. This in turn, subjected Mr. Phillips to a violation of his 6th amendment rights to a "Fair trial", and also "Effective assistance of Counsel". Had his Constitutional Right's not been violated, and had the Council for the defense conducted an "Investigation" on behalf of Mr. Phillips, they would have discovered "2 witnesses" that were known about, but never interviewed, that would have along with the "photograph's" of the areas in question, "Changed" the decision of the Jury, and therefore, the outcome of his trial. (People v. Berry, 202 Ill. App. 3d 212, 559 N.E. 2d 919)(1st Dist. 1990) and (People v. Davis, 203 Ill. App. 3d 129, 510 N.E. 2d 1072)(1st Dist. 1990) See (People v. Rogers, 172 Ill. App. 3d 471, 526 N.E. 2d 655)(2d Dist. 1988) See (People v. Rhodes, 85 Ill. 2d 241, 422 N.E. 2d 605)(1981) and People v. Butcher, 240 Ill. App. 3d 507, 608 N.E. 2d 496)(1st Dist 1992)


Not "once", did Council for the defense ever attempt to "impeach" the state's witnesses, and Charge them all with "Perjury" which is a "Class 3 felony", Calling for a Sentence of no less than 2yrs. and no more than 5yrs. imprisonment, though an "investigation" into the "Grand Jury" testimony of Sgt. James Cooper, who was the Case's "Chief Investigating Officer", would have offered the Council for the defense, "material evidence" (Transcripts) to the fact that, "after" Sgt. Cooper and his team of "Investigator's" Concluded their investigation into the alleged "eye witness" account's of Timothy Specht, Teel Griffin, and Yancy Brown, Sgt. James Cooper, in his official Capacity of "Chief Investigating Officer" of the Case, testified "under oath" to the Grand Jury, the Fact that it was someone "other than" John Phillips that Shot Yancy Brown,

3

and that, that individual was "Still At Large". Therefore, Completely "discrediting" under oath to the "Grand Jury", any and all testimony that alleged John Phillips to be the person that "Shot" Yancy Brown. In Sgt. Cooper being the Case's "Chief Investigative Officer," he therefore had "Sole" authority over who was to be Considered a Credible and Believable witness to the "account's" of the incident in question. In Sgt. Cooper testifying to the Grand Jury under oath "after" interviewing the alleged eye witnesses, and "investigating" their individual account's of the incident in question, that it was Someone other than John Phillips that Shot Yancy Brown, he was "also" Swearing under oath that, the "account's" of the incident in question as told by these "alleged" eye witnesses, "were not found to be neither "Credible", nor "Believable". Right then, the "Gun Charge's" should have been "dismissed", as well as the "discredited" witnesses that were interviewed by Sgt. Cooper, and his team of investigator's, prior to him testifying to the Grand Jury under oath. It was the "legal obligation" of the "State's Attorney's Office", to make sure that this was done. Otherwise, Sgt. Cooper, and the previously "discredited" witnesses, would all give "Conflicting" testimonia's at trial, though they would all be witnesses for the "State". This automatic "Conflict of Interests", would "prove" during the Course of the trial the "fact" that, "Perjury Testimony", was being used to Convict John Phillips, of a Crime that he did not Committ. Making the "State's Attorney's" that were trying the Case, the "True Guilty Partie's", for being "Officer's" of the Court that allowed witnesses that were to be "dismissed" to testify at John Phillips' trial, and Committ a "Class 3 Felony" (Perjury) in order to Secure a Conviction, Since there was no "Phisical Evidence" to Connect Mr. Phillips to any wrong doing's. A Pre-trial Motion to "Quash and Supress" would have elaviated this. Instead, due to the "ineffective assistance of Counsel"

in violation of his "Constitutional Rights", "All" of the State's witnesses have been "proven" by this lawsuit, to have Committed "Perjury" on "numerous occasion's" throughout their testimonie's, throughout Mr. Phillips' trial, without ever being "impeached" by the defenses, or being subjected to the penalties for "Perjury" in a Court of law, which is in fact a Class 3 "Felony". (See Trial Transcripts)

Even the victim himself, Yancy Brown, either Committed "Perjury" under oath, or even he himself had "exonerated" Mr. Phillips of any wrong doing's, in answering "No", to everything that, Sean McCone, who was the State's "key" witness against Mr. Phillips, testified to before he himself "recanted" his testimony.

Due to the victim Yancy Brown's "Perjury" testimony alone, a simple "Motion to Dismiss" would have prevented John Phillips from being subjected to further "False Imprisonment", if only his ineffective Counsel would have filed it. "Perjury Testimony", is "inadmissible" by "anyone" in a Court of law.

In answering "No", to the question; "Did you tell Sgt. Cooper any of the above"?, the victim Yancy Brown either Committed "more" perjury under oath, or he had "revealed" the fact that, Sgt. Sumner Cooper, who is Currently Serving a lengthy prison term on "Corruption's Charges", actually did set John Phillips up to take the fall all alone. Either way, it exonerate's John Phillips of all Charge's. Additionally, though Mr. Phillips was held for "96 hrs." before he was ever charged with a Crime in violation of his 4th amendment rights to "Illegal "Search and Seizure", there was "never" any "finger print's" discovered to Connect Mr. Phillips to a "Gun", No "bullet's", "Magazine's", "Spent Cartridge's", "Ballistics Check's" on a Weapon, "No Weapon", and also no

"powder burn", or "Gun Powder" test's administered to Mr. Phillips, to Connect him to a gun, and neither the "firing" of one. Therefore, the Council for the defense was to file a "Motion to Dismiss" the Gun charges during the "pre-trial" face of the Case. As well as the testimony of the State's "key" witness against Mr. Phillips, Sean McCraw who stated that "all" of the information that was submitted against Mr. Phillips was due to the "police brutality" that was administered by Sgt. Cooper, who is now serving a lengthy prison term for "Corruption Charges". Due to the "ineffective assistance" of Defense Council, a "Motion to Dismiss" these matter's was non-existent. (People v. Brisson, 80 Ill. App. 3d 388, 399 N.E. 2d 1010) (2d Dist. 1980) (Ill. Rev. Stat. 1983, Ch. 38, par. 32-2; Ill. Rev. Stat. 1983, Ch. 85½ par. 6-303) Ill. Rev. Stat. 1983, ch. 38, par. 32-2 (a); In re Obenbuch (1944), 386 Ill. 323, 332, 54 N.E. 2d 470; People v. Torres (1977), 55 Ill. App. 3d 688, 692, 13 Ill. Dec. 553, 371 N.E. 2d 270) People v. White (1974) 59 Ill. 2d 416, 421, 322 N.E. 2d. 1. People v. Glenn, 294 Ill. 333, 336, 128 N.E. 532; I.P.I. Criminal 22.02 par. Second. Fox v. People, 95 Ill. 91; People v. Bond, 291 Ill. 74, 125 N.E. 740.

Due to these numerous Constitutional Right's violation's "before" his "Malicious Prosecution", which led to "13 plus" year's of "Wrongful Incarceration" and "False Imprisonment" Starwood's as well, John Phillips, was subjected to the following "Unlawful Act's";

1. Being subjected to multiple "riot's" during his "19 month" stay at the Cook County Jail, where he was placed into "Life Threatening" position's on "numerous occasion's" against people with, "knives", "Boiling Baby Oil", "Icepick's", "Pool Ball's" stuffed into sock's, "Soap" stuffed into sock's, and "Food Poisoning", which was not treated well by Medical Staff

2. Been Subjected to brutal and violent "Beating's" by Cook County Deputy Sheriff's, by "Hand's", "Oak stick's", being Stomped" unconscious, having head "Slammed" into wall's and floor's, being Sprayed with "mase", and had Finger's "Dislocated" blocking "hand Shot's" from "Oak stick's".

3. Lost his older Sister and was not able to be with her during her "last day's", Son was "Shot" at age "11", because of his "unlawful" absence from his Child's life, his mother's health is ~~deteriorating~~ deteriorating, which has Caused him Severe and nearly Suicidal Mental Anguish to the point where he has lost all of his hair, he is "paranoid" of officer's, and remains "Closed off" where he used to be outgoing, and Suffering through Sleepless night's, wondering whether he will make it home to See his mother alive because of how her health is Continuously fading.

4. In being Convicted "wrongfully", and Sent to prison, he was "Stabbed" by another inmate, Scarring him for life, received stitches in "thumb" because of a bunk being "unsafe", his past relationship with the mother of his Child "ended" because he was not able to be there for her, he spent "6 month's" in Segregation which left him "distraught" mentally, he had Item's taken from him though they were Sold to him on the prison's Commissary, and was housed with "Rapist's", and other "Sexual Predator's", who placed him at risk on "numerous" occasion's of possibly ~~both~~ Catching another Charge for defending himself against these Sexual deviants. All of which, total's 134 year's of "phisical" and "mental" damage, that is beyond "repair" in Mr. Phillips being "Wrongfully Convicted" of a Charge that

the "Trial Transcript's" themselve's "prove", he did not Committ. These utterly "Inhumane" act's against John Phillips, directly violated his, 4th amendment right's against, "Illegal Search and Seizure's", his 5th amendment right's to "Due Process" of the law, his 6th amendment right's to a "Fair Trial", as well as an "Effective Assistance of Counsel", his 8th amendment right's against, "Cruel and Unusual" punishment, and his 14th amendment right's to, "Due Process" as well as "Equal Protection" of the law.

In support of the "fact" that, John Phillips' Cause from his, "Unlawful Arrest", and his "Malicious Prosecution", to his, "Wrongful Conviction", and "False Imprisonment", were all stemmed from his being subjected to the result's of, "Perjury Testimony", he Contends the following:

That, the "United States Supreme Court", has long recognized that, the deprivation of an individual's "Liberty", based upon "False Testimony", of which has been "proven" to this Honorable Court through the "Trial Transcript's" alone, is Contrary to the, "Fundamental Principal's of Fairness", in civilized society because, "Perjury" is the mortal enemy of justice. In furtherance of these Salutory principal's, if the "State's Attorney's" that try's a Cause, as well as if a "Trial Judge", knowingly allow's "Perjury Testimony" to be used as a means to Convict an individual, such as John Phillips, in a "Court of Law", as was in his Case, it is "incontrovertable" that the "Trial" would have "Lacked", the "Fundamental Fairness", implicit in all "Constitutional Guarantee's" of, "Due Process" of the Law.

And, in support of Mr. Phillips' "Constitutional Right's" in regards to the "State's Attorney's" on the Case, and during the Course of the Trial, as well as during the "Closing Argument's", prejudicing the Jury against Mr. Phillips by "Voicing Opinion's" that was absolutely in no way whatsoever supported by

allowed him to "discontinue" questioning the witness, without "clearing up" the matter of "Perjury" that he knew "personally", had taken place. The "Wrongful Incarceration", due to witnesses who were to be "dismissed" from the case after Sgt. Cooper's testimony to the Grand Jury, as the case's "Chief Investigating Officer", committing a "Class 3 Felony" (Perjury), as a means to convict Mr. Phillips, who was an innocent man (still is) and the "Constitutional Right's" violation's, "before" and due to a grossly Ineffective Assistance of Council, "both" — Trial Council, and Appellate, (4th, 5th, 6th, 8th, and 14th amendments) John Phillips is now seeking in "Punitive Damages"; for the "13 plus year's" of, Mental Anguish, and Physical Abuse, at the hand's of, Deputy Sheroll's, Correctional Officer's, and Inmate's alike, the sum of, 50 million dollars. He seeks in "Compensatory Damages"; for the "lifelong" affect that this horrifyingly Traumatic experience will have on him, the sum of, 50 million dollars. He seek's in "Direct" damages; for being subjected to an outright "Conspiracy of Injustice", by a "majority" of member's of the Justice System, who all, before being trusted to do their perspective dutie's as Officer's that "Enforce and Interpret" the law's, took a "Sworn Oath" to uphold the very law's that they had blatantly violated against John Phillips, the sum of 50 million dollars. All of which is to be determined by this Honorable Court he pray's, as to "who", should, and "will" pay what. And finally, John Phillips seek's his immediate "freedom" from his "unlawful" imprisonment. As, if it were not for the "Conspiracy of Injustice" that was executed against him, he would not have been imprisoned at all. Thank You.

Respectfully Submitted,

/s/ John Phillips

#B-39383 Centralia C.C.

P.O. Box #711, Centralia, IL. 62801

STATE OF ILLINOIS
COUNTY OF CLINTON
SIGNED AND SWORN TO BEFORE ME ON
17/10/08 BY JOHN PHILLIPS
Larry B. Taylor
SIGNATURE OF NOTARY PUBLIC

OFFICIAL SEAL
LARRY B. TAYLOR
Notary Public, State of Illinois
My Commission Expires Feb 25, 2012